WILL LEMKUL (NV Bar No. 6715)
    lemkul@morrissullivanlaw.com
CHRISTOPHER TURTZO (NV Bar No. 10253)
    turtzo@morrissullivanlaw.com
**MORRIS, SULLIVAN & LEMKUL, LLP**
3960 Howard Hughes Parkway, Suite 400
Las Vegas, NV 89169
Telephone: (702) 405-8100
Facsimile: (702) 405-8101

GARRETT R. BROSHUIS (will comply with LR IA 11-2 within 10 days)
    gbroshuis@koreintillery.com
CAROL O'KEEFE (will comply with LR IA 11-2 within 10 days)
    cokeefe@koreintillery.com
DEVIN DIPPOLD (will comply with LR IA 11-2 within 10 days)
    ddippold@koreintillery.com
**KOREIN TILLERY, LLC**
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Telephone:  (314) 241-4844
Facsimile: (314) 241-3525

PAMELA YAACOUB (will comply with LR IA 11-2 within 10 days)
    pyaacoub@koreintillery.com
**KOREIN TILLERY, LLC**
205 North Michigan Avenue, Suite 1950
Chicago, IL 60601
Telephone: (312) 641-9750
Facsimile: (314) 241-3525

*Attorneys for Plaintiffs Alana Costantino*
*and Kyle Nicholson, on behalf of themselves*
*and all those similarly situated*

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEVADA

| | |
|---|---|
| Alana Costantino and Kyle Nicholson, on behalf of themselves and all those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>Zuffa LLC, TKO Group Holdings, Inc., TKO Operating Company, LLC, and Endeavor Group Holdings, Inc.,<br><br>Defendants. | Case Number: _____<br><br>**CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

*Everybody thinks it's me being anti-competition. There is no competition. … There is no other guy.*

-Dana White, UFC CEO

## INTRODUCTION

Plaintiffs Alana Costantino and Kyle Nicholson bring this action individually and on behalf of Class Members, as defined below, against Zuffa LLC, TKO Group Holdings, TKO Operating Company, LLC, and Endeavor Group Holdings (collectively, "Defendants" or "the UFC") for damages, injunctive relief, restitution, and other relief. They do so pursuant to federal antitrust laws; state antitrust, unfair competition, and consumer protection laws; and state common law. Defendants, as the UFC, have utilized a monopsony on the market of Top-Ranked Fighters to monopolize the market for pay-per-view-level offerings of mixed martial arts events. Through this Scheme, Defendants have forced Plaintiffs and Class Members to pay inflated prices in order to view pay-per-view-level offerings of mixed martial arts events, and more recently, to subscribe to the streaming service Paramount+.

## I.    NATURE OF ACTION AND SUMMARY

1.    Until recently, it likely cost more to watch the Ultimate Fighting Championship on television than any other sport in the world.

2.    Unlike most sports, which viewers could watch as part of regularly scheduled programming, the UFC had chosen to broadcast its high-level events on a pay-per-view basis. To watch these events, consumers had to subscribe to ESPN+, a subscription network available (and purchased) nationwide, and then pay a substantial additional price for the pay-per-view event—nearly $80 per event in recent years. Between the costs of the individual pay-per-view events and the subscription price, UFC President Dana White admitted that the cost to be a UFC fan was $1,200 a year.

3.    Even now, having moved away from that model, the UFC drives up costs for consumers. After paying $7.7 billion to secure the rights to stream UFC events, Paramount+ (also available and purchased nationwide) raised the subscription price less than ten days before the first

UFC event. Being a UFC fan may no longer cost $1,200, but it still comes with inflated prices.

4.    This high cost can be traced to the UFC's complete control over the market for mixed martial arts ("MMA") pay-per-view quality events. In the early days of MMA, when multiple promotions vied for market share and Top-Ranked Fighters were not all forced to one promotion, MMA Promotions would cross-promote Cards, allowing fighters to participate in Bouts with fighters from rival MMA Promotions that would benefit both MMA Promotions financially.

5.    Starting in or around 2006, the UFC took actions to end that system. The UFC locked the best MMA fighters in the world into exclusive contracts, ensuring that no competitor could access the top-ranked, and thus top-drawing, athletes. When athletes sought a way around the UFC's contracts, the UFC retaliated with poor matchups in Bouts. When athletes sought to sign with competitors, the UFC threatened to blacklist them from ever working with the UFC. Having acquired a monopsony on the Top-Ranked Fighters, the UFC moved to monopolize the market for MMA events. The UFC stopped cross-promoting with other MMA Promotions, counterprogrammed against other MMA Promotions' events, and fought to prevent other MMA Promotions from securing television deals. Without Top-Ranked Fighters, other MMA Promotions could not build a fan base and thus were shuttered, purchased by the UFC, or accepted a role as a "feeder league" where lesser-known fighters build a name and reputation. In turn, the UFC was free to monopolize the market, relegating the remaining MMA Promotions into minor league players. Thanks to its monopsony on Top-Ranked Fighters and its actions to drive out competitors, the UFC monopolized the market for PPV-Level MMA Cards. And through that monopoly, the UFC now ensures every Top-Ranked Fighter will work for them, perpetuating the UFC's monopsony in the input market of fighters, and in turn, its monopoly in the output market of PPV-Level MMA Cards. The self-perpetuating Scheme has been designed with perfect synergy, denying all others market access at both the input and output levels.

6.    And, as any economic theorist would predict, that Scheme has led to higher prices for consumers. With no viable alternative to the UFC, fans have little choice but to pay the UFC's prices for PPV-Level MMA Cards if they want to watch MMA. Without competition, fans had to pay $1,200

a year to watch MMA through the PPV model. Without competition, consumers are still forced to pay an inflated price for the one Premium Online Streaming Service that now carries the UFC, as that Premium Online Streaming Service raised prices less than a month into its streaming rights deal with the UFC. Without competition, the UFC has no incentive to present the best possible Bouts on an MMA Card; it will be massively profitable no matter the quality of the Card.

7.     Antitrust law was designed to prevent this result. In fact, preventing a monopoly like the UFC from exploiting and gouging consumers has long been a core concern of antitrust law. This case seeks to allow consumers to be able to watch PPV-Level MMA Cards, and to subscribe to a streaming service, without paying the artificially inflated prices that result from the UFC's monopoly. It also seeks damages and other relief stemming from the inflated prices caused by the UFC's monopoly. The UFC has spent roughly two decades monopsonizing, monopolizing, and maintaining the market as a profit center for the UFC and the UFC alone. Ending the UFC's control will provide more competition for Top-Ranked Fighters and for MMA Promotions looking to present PPV-Level MMA Cards. In turn, that competition will provide MMA fans with more viewing options and force MMA Promotions, including the UFC, to compete on quality and price.

## II.    DEFINITIONS

8.     "Bout" is an individual athletic match between two fighters in combat sports. MMA Bouts must be registered with and sanctioned by state athletic commissions, nearly all of which are members of the Association of Boxing Commissions. ABC member commissions are encouraged to pass and apply the Unified Rules of Mixed Martial Arts to govern and standardize professional MMA Bouts.

9.     "Card" is a collection of Bouts put together in a single event. Promoters typically offer tickets to Cards to spectators and can further broadcast Cards over television networks, via PPV, or through a Premium Online Streaming Service. Cards often consist of the Undercard, in which up-and-coming or local MMA fighters with less notoriety compete in Bouts that may or may not be televised, and the Main Card, in which Top-Ranked Fighters compete in Bouts that are usually highly advertised to incentivize viewers to watch the Card.

10.    "Class Period" means the limitations period that applies under the laws at issue, as determined by the Court.

11.    "FightMatrix" is an independent, third-party ranking database for MMA fighters and is commonly used to determine who can be considered a Top-Ranked Fighter. FightMatrix's rankings can be found on FightMatrix.com.

12.    "Mixed Martial Arts" or "MMA" is a combat sport in which fighters use a combination of techniques from numerous martial arts (including but not limited to wrestling, judo, Muay Thai, taekwondo, karate, and boxing) in one-on-one Bouts.

13.    "MMA Promoter" or "MMA Promotion" is a company or individual that finances, organizes, or otherwise puts on an MMA Card for an audience (either live, via broadcast, or both).

14.    "Pay-Per-View" or "PPV" is a broadcast event in which viewers must pay a set fee in order to watch the event.

15.    "PPV-Level MMA Card" is an MMA Card that contains Bouts between Top-Ranked Fighters and, thus, can draw a large enough audience to market as either a PPV or as a feature for a Premium Online Streaming Service.

16.    "Premium Online Streaming Service" is an online media platform that delivers media such as movies, TV shows, and sporting events to paying subscribers over the internet, such as Paramount+.

17.    "Relevant States" are Arizona, Arkansas, California, Colorado, Connecticut, Delaware, District of Columbia, Florida, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

18.    "Top-Ranked Fighter" is an MMA fighter who is ranked in the top fifteen fighters for their weight class on FightMatrix or another reputable ranking database.

III.    PARTIES AND OTHER RELEVANT ENTITIES

### A. The Ultimate Fighting Championship

19.    **The Ultimate Fighting Championship (a/k/a the UFC)** is the trademarked name of the dominant MMA Promotion that currently has a monopoly on the market for PPV-Level MMA Cards and a monopsony on the market for Top-Ranked Fighters. Dana White is the CEO (formerly President) of the Ultimate Fighting Championship and often the public face of the MMA Promotion. The Ultimate Fighting Championship is headquartered at 6650 S Torrey Pines, Las Vegas, NV, 89118. Defendants have owned and controlled, and continue to own and control, the UFC throughout the Class Period.

### B. Defendants

20.    **Zuffa, LLC ("Zuffa")** is a Nevada limited liability company founded by Frank Fertitta III and Lorenzo Fertitta around December 2000 or January 2001 and headquartered in Las Vegas, Nevada. Zuffa was founded to be the parent company for the Ultimate Fighting Championship, and Zuffa wholly owned the Ultimate Fighting Championship trademark. Under that trademark, Zuffa promoted MMA Bouts and Cards in the United States and elsewhere; promoted live MMA events for in-person audiences as well as televised broadcasts, PPV broadcasts, and live streaming broadcasts; and licensed, marketed, sold, and distributed UFC licensed merchandise and promotional materials, including but not limited to: tickets to MMA Cards, live and taped television programming, PPV broadcasts of MMA Cards, and live streaming broadcasts of MMA Cards.

21.    **TKO Group Holdings, Inc. ("TKO")** was incorporated in Delaware in March 2023 and has its principal offices in New York, New York. TKO was formed to facilitate the business combination between the UFC and World Wrestling Entertainment, LLC under TKO Operating Company. Defendant Endeavor Group Holdings, Inc. and its subsidiaries retained a 51% controlling non-economic voting interest in TKO and a 51% economic interest in the operating subsidiary, TKO OpCo, which owns all of the UFC's assets. In 2025, Endeavor subsidiaries owned approximately 53.9% of the voting interests of TKO and 52.5% of the economic interests of TKO OpCo, and Endeavor was expected to own 61% of the voting interests in TKO upon the close of an agreement

1  for TKO to acquire assets from Endeavor Operating Company and IMG Worldwide. Endeavor thus

2  has control over TKO and TKO Operating Company.

3      22.  **TKO Operating Company, LLC (f/k/a Zuffa Parent, LLC) ("TKO OpCo")**, a

4  Delaware limited liability company headquartered in Las Vegas, Nevada, owned and operated the UFC

5  throughout the Class Period. Under the UFC trademark, TKO OpCo promoted MMA Bouts and

6  Cards in the United States and elsewhere; promoted live MMA events for in-person audiences as well

7  as televised broadcasts, PPV broadcasts, and live streaming broadcasts; and licensed, marketed, sold,

8  and distributed UFC licensed merchandise and promotional materials, including but not limited to:

9  tickets to MMA Cards, live and taped television programming, PPV broadcasts of MMA Cards, and

10  live streaming broadcasts of MMA Cards. TKO OpCo continued to operate after its acquisition by

11  Endeavor in 2021. In 2023, TKO OpCo (then Zuffa Parent) was merged with World Wrestling

12  Entertainment, LLC, after which it has continued to own and operate the UFC as TKO OpCo.

13      23.  **Endeavor Group Holdings, Inc. (f/k/a WME-ING, n/k/a WME Group)**

14  **("Endeavor")**, a Delaware company with its principal executive offices in Beverly Hills, California,

15  owned and operated Zuffa Parent and the UFC from approximately July 2016 to April 2023; and it

16  has retained control of the UFC since April 2023 through its controlling stake in TKO and TKO

17  OpCo. Endeavor also originally represented the UFC in its media rights deals prior to investing in and

18  acquiring the UFC. Endeavor (with affiliates of private-equity firm Silver Lake and affiliates of

19  Kohlberg Kravis Roberts & Co. L.P.) purchased a controlling 50.1% share of Zuffa Parent in 2016.

20  In February 2021, Endeavor entered into a transaction agreement with the Silver Lake affiliates and

21  KKR affiliates to fully acquire Zuffa Parent. On April 3, 2023, Endeavor entered into an agreement

22  under which World Wrestling Entertainment, Inc. would roll all its existing equity into Zuffa Parent;

23  further, TKO Group Holdings (an Endeavor subsidiary) would acquire a 51% controlling interest in

24  Zuffa Parent, which would become TKO OpCo. Ari Emanuel, Patrick Whitesell, and the Silver Lake

25  equity-holders controlled around 91.5% of the combined voting power of Endeavor stock. On March

26  24, 2025, Endeavor announced that it had gone private through a deal with Silver Lake, under which

27  Endeavor changed its name to WME Group.

28

COMPLAINT

24.    Endeavor produced, and continues to produce, live UFC events, which it broadcasts in over 160 countries and territories to approximately 1 billion TV households. Endeavor or its employees held, and continues to hold, promoters' and matchmakers' licenses to organize and hold UFC live events throughout the United States, including in California, Nevada, New Jersey, and New York. In 2019, Endeavor entered into a seven-year UFC media-rights deal with ESPN and ESPN+, under which ESPN was "the exclusive domestic home to all UFC events" and held "UFC's linear and pay-per-view rights in the US." As of 2021, Zuffa Parent paid Endeavor $25 million as part of a services agreement related to the UFC. As of 2023, TKO OpCo paid Endeavor $35 million for these services (to increase annually by 1% starting in 2025). Endeavor retains a controlling interest in TKO Group Holdings and, therefore, in the UFC.

25.    Throughout the Class Period, Defendants frequently, if not always, had overlapping officers and executives. Endeavor and TKO are separate entities, yet they have shared senior officers and directors throughout the years, often with identical titles in the respective companies:

      a.    CEO: Ari Emanuel

      b.    President & COO: Mark Shapiro

      c.    Chief Administrative Officer and Senior Counsel to Board of Directors and Senior Management: Seth Krauss

      d.    Three Directors (Emanuel, Shapiro, Egon Durban)

26.    Further, Andrew Schliemer, the current CFO of TKO was formerly the Deputy CFO of Endeavor from February 2021 to September 2023.

27.    At all times, Defendants and their officers, executives, and directors acted as part of, and in furtherance of, the anticompetitive Scheme described in this Complaint. The actions described herein were authorized, approved, and frequently directed by Defendants' owners, shareholders, officers, directors, executives, agents, and employees. Chief officials for Defendants (including but not limited to Endeavor CEO Ari Emanuel, former Zuffa owners Lorenzo Fertitta and Frank Fertitta, and UFC CEO Dana White) acted within the course and scope of their roles and employment in furthering the anticompetitive Scheme at issue.

### C. Plaintiffs

28.    **Alana Costantino** resides in New Jersey. Plaintiff purchased UFC PPV events in the last four years in New Jersey, which were at an artificially inflated price due to Defendants' conduct described in this Complaint. Plaintiff also is a subscriber to Paramount+. Plaintiff was thus injured by Defendants' conduct.

29.    **Kyle Nicholson** resides in Nebraska. Plaintiff purchased UFC PPV events in the last year in Nebraska, which were at an artificially inflated price due to Defendants' conduct described in this Complaint. Plaintiff also is a subscriber to Paramount+. Plaintiff was thus injured by Defendants' conduct.

## IV.    JURISDICTION AND VENUE

30.    This Court has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. §1332(d)(2), because each Class consists of 100 or more members; the aggregate amount in controversy exceeds $5,000,000 exclusive of interest and costs; and at least one member of each Class, including Plaintiffs Costantino and Nicholson, is a citizen of a State different from Defendants.

31.    In addition, this Court has federal question jurisdiction under 28 U.S.C. §§ 1331 and 1337(a) because Plaintiffs, on behalf of themselves and the Class, bring claims under Section 2 of the Sherman Act, 15 U.S.C. § 2, and section 16 of the Clayton Act, 15 U.S.C. § 26. The Court thus also has supplemental jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1367.

32.    This Court has personal jurisdiction over all Defendants. Zuffa and TKO OpCo are headquartered in Las Vegas, Nevada. Both Zuffa and TKO OpCo are controlled by Endeavor through TKO. All four Defendants transact substantial business within this District, transacted with members of the Class throughout the United States and in this District, had and have substantial contacts with the United States and this District, and committed substantial acts in furtherance of their unlawful Scheme in the United States and in this District. That is especially true given that the UFC is headquartered in this District at 6650 S Torrey Pines, Las Vegas, NV, 89118.

33.    Venue is also proper in this District under 28 U.S.C. § 1391(b) and under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 22, for the same reasons: all Defendants do substantial

business in this District through their control of the UFC, and two of the Defendants reside in this District.

## V.     CLASS ACTION ALLEGATIONS

34.     Plaintiffs bring this action on behalf of themselves and as a class action under Federal Rules of Civil Procedure 23(a) and (b) seeking damages, declaratory, and injunctive relief pursuant to antitrust, unfair competition, consumer protection, and common laws on behalf of three Classes: the PPV Class, the Streaming Class, and the Nationwide Injunctive Relief Class.

The PPV Class is defined as follows:

All persons and entities within the Relevant States who purchased a UFC PPV during the limitations period, as determined by the Court, through January 1, 2026.

The Streaming Class is defined as follows:

All persons and entities within the Relevant States who paid for a subscription to Paramount+ at any time from January 1, 2026 through resolution of this action.

The Nationwide Injunctive Relief Class is defined as follows:

All persons and entities who paid for a subscription to Paramount+ at any time from January 1, 2026 through resolution of this action.

The Classes are collectively referred to as the "Class." Members of any Class or all the Classes are collectively referred to as "Class Members."

35.     Excluded from the Class are: (1) any Judge or Magistrate Judge presiding over this action and any members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which any Defendant or its parent has a controlling interest and their current or former employees, officers, and directors; (3) persons who properly execute and file a timely request for exclusion from the Classes; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

36.     **Ascertainability:** Membership in the Class is defined based on objective criteria. For the PPV Class, membership depends on whether or not a person or entity purchased a UFC PPV to

view during the Class Period. For the Streaming Class and the Nationwide Injunctive Relief Class, membership depends on whether or not a person or entity was a paid subscriber to Paramount+ after January 1, 2026. Each Class's membership can be identified through records that will be obtained during discovery.

37. **Numerosity:** The members of each Class are so numerous and dispersed geographically that joinder of all Class Members is impractical. The number of Class Members is, at minimum, in the thousands, and Class Members reside in the Relevant States and within this District. Upon information and belief, UFC PPVs were available and purchased nationwide through ESPN+, and currently UFC events are available (and are viewed) nationwide with a Paramount+ subscription.

38. **Commonality:** There are numerous questions of law and fact common to the Class, including but not limited to the following:

a. whether the Relevant Geographic Market is the United States, North America, or the world;

b. whether the market for Top-Ranked Fighters (the Relevant Input Market) is an appropriate relevant market for analyzing the claims in this case;

c. whether Defendants possessed, and continue to possess, monopsony power over the Relevant Input Market;

d. whether Defendants, through the actions and conduct described in this Complaint, willfully acquired, maintained, and enhanced that monopsony power over the Relevant Input Market;

e. whether Defendants, through the actions and conduct described in this Complaint, prevented competing MMA Promotions from acquiring Top-Ranked Fighters in the Relevant Input Market;

f. whether competing MMA Promotions could present a PPV-Level MMA Card without access to Top-Ranked Fighters;

g. whether the market for PPV-Level MMA Cards (the Relevant Output Market) is an appropriate relevant market for analyzing the claims in this case;

h. whether Defendants possessed, and continue to possess, monopoly power over the Relevant Output Market;

i. whether Defendants, through the actions and conduct described in this Complaint, willfully acquired, maintained, and enhanced their monopoly power over the Relevant Output Market;

j. whether Defendants, using their monopoly power in the Relevant Output Market, artificially inflated the price for PPV offerings of PPV-Level MMA Cards by ensuring no competing MMA Promotion could present a PPV-Level MMA Card and negotiating inflated media rights deals on that basis;

k. whether Defendants, using their monopoly power in the Relevant Output Market, artificially inflated the price for Premium Online Streaming Services carrying PPV-Level MMA Cards by ensuring no competing MMA Promotion could present a PPV-Level MMA Card and negotiating inflated media rights deals on that basis;

l. whether Defendants schemed to use their monopoly power over the Relevant Output Market and monopsony power over the Relevant Input Market;

m. whether Defendants' Scheme to use their monopoly power over the Relevant Output Market and monopsony power over the Relevant Input Market had anticompetitive effects on the Relevant Markets;

n. whether Defendants' Scheme alleged herein caused injury to Plaintiffs and Class Members;

o. whether Plaintiffs and Class Members are entitled to damages due to Defendants' Scheme; and

p. whether Plaintiffs and Class Members are entitled to restitution;

q. whether any other injunctive or declaratory relief is appropriate.

39. These questions predominate over any question that may affect an individual Class Member.

40. **Typicality:** Plaintiffs' claims are typical of the claims of other members of the Putative Classes. Plaintiffs subscribed to ESPN+ and purchased UFC PPVs in addition to that subscription

within the limitations period. Plaintiffs also paid for a subscription to Paramount+ on or after January 1, 2026. These are the same PPV purchases and subscriptions that, due to Defendants' actions, caused Class Members to pay artificially inflated prices.

41.    **Adequacy:** Plaintiffs will represent the Class fairly and adequately, protecting the Class's interests. Plaintiffs also have hired counsel with extensive experience in complex, multi-million-dollar class litigation, including indirect purchaser antitrust litigation, and with the resources to prosecute this case vigorously. Neither Plaintiffs nor their counsel have any interests adverse to those of the Class.

42.    **Superiority:** Class proceedings are the superior method to ensure fair and efficient adjudication of the claims at issue in this case. Class Members all paid inflated rates for UFC PPVs and/or an inflated price for Paramount+ after January 1, 2026. The claims at issue will be managed more efficiently, comprehensively, and uniformly before a single Court rather than through countless, potentially inconsistent individual actions throughout the country.

43.    Plaintiffs and Class Members have suffered, and, for the Streaming Class and the Nationwide Injunctive Relief Class, will continue to suffer, antitrust injury as a result of the Defendants' Scheme as alleged, which will continue to result in artificially inflated prices for at least the Streaming Class and the Nationwide Injunctive Relief Class.

## VI.    MMA OVERVIEW

44.    MMA as a combat sport started to gain traction during the 1990s and has since become one of the most popular spectator sports in the United States, North America, and globally. MMA fighters use a combination of techniques from numerous martial arts (including but not limited to wrestling, judo, Muay Thai, taekwondo, karate, and boxing) in one-on-one Bouts. MMA fighters are ranked in divisions separated by weight classes. In order to increase their ranking—and increase their pay rate—MMA fighters work with MMA Promotions that offer them a Bout against a similarly ranked MMA fighter in their weight class.

45.    MMA Promotions group several of these MMA Bouts into an event, commonly called an MMA Card. Generally, an MMA Card that features Top-Ranked Fighters will draw more ticket

sales, more PPV purchases, and more viewers on television channels or a Premium Online Streaming Service. The vast majority of MMA Cards offered for PPV purchase in the United States are promoted by the UFC.

46.     Unlike in the other major sports offered in the United States, where multiple teams in a league competitively bid for athletes' services, the UFC has secured almost every Top-Ranked Fighter through exclusive, long-term contracts. Under these contracts, the UFC controls which MMA fighters to put in Bouts, which MMA fighters receive title opportunities, which MMA fighters are promoted at weigh-ins or through video packages, and therefore which fighters are known to MMA audiences and can climb the rankings and draw higher PPV buy rates. Thus, this total control of the Top-Ranked Fighter market allows the UFC to prevent MMA fighters outside the UFC from climbing the rankings, which in turn prevents other MMA promotions from building a PPV-Level MMA Card using Top-Ranked Fighters.

## VII.    ANTICOMPETITIVE SCHEME & RESULTING ANTITRUST INJURIES

### A.    The UFC Controls the Top-Ranked Fighters, who are Necessary Inputs for the Market

*In [the UFC] contract, I'm not free. In that contract, I'm not an independent contractor. In that contract, I have no rights, I have no power. I hand over all the power to you guys, and I've seen in the past how you can utilize that power.*

-Francis Ngannou, former UFC Heavyweight Champion

47.     Numerous MMA promotions once vied for the public's attention and competed to draw an audience. Today, the UFC, through its anticompetitive conduct, has secured complete control of the market, and it uses continued anticompetitive conduct to maintain that control. The UFC has used, and continues to use, two main methods to put a chokehold on its competition. First, the UFC has ensured total control over the market for Top-Ranked Fighters. Using contractual clauses to lock Top-Ranked Fighters in to exclusive deals, the UFC made sure these Top-Ranked Fighters could not pursue Bouts in other promotions, or even as part of a cross-promotional Card. And if a Top-Ranked

Fighter voiced concerns with their status, the UFC employed retaliatory measures (unfavorable Bouts, lack of Bouts and thus lack of pay) to force the fighters in line.

48.  This monopsony on Top-Ranked Fighters set up the UFC to freeze competitors out of the Top-Ranked-Fighter market. This in turn prevented the UFC's competitors from promoting PPV-Level MMA Cards, without which these competitors had no way to build a fan base or earn sufficient revenue to compete with the UFC. This left other MMA Promotions only three options: fold, get bought out by the UFC, or act as a "feeder league" by working with up-and-coming fighters until the UFC is ready to sign them and promote them as Top-Ranked Fighters. Today, most would-be competitors to the UFC willingly accept their status as a minor league—and thus, as MMA Promotions incapable of competing with the UFC—rather than fold.

49.  To draw audiences to their PPV offerings, the UFC knew it needed to control the best fighters available. Any MMA Card relies on fighters, but Top-Ranked Fighters increase viewership and, importantly, PPV buys and streaming demand. Historically, for example, having Top-Ranked Fighters headline a Card lead to significantly more PPV buys. As one fighter put it, "Without us, all you have is a cage, cameras and lights." But a Top-Ranked Fighter must also show that he or she can connect with the crowd and draw viewership. Without a star, the UFC (or any MMA Promotion) will have lower viewership, lower PPV buys, and lower streaming demand. Dana White has admitted that one of his concerns in the early days of the UFC was that "Chuck Liddell was really our only big, legitimate star," which is also why White has bragged about "creat[ing] a lot of stars here on the UFC." To that end, the UFC looks to secure any Top-Ranked Fighter that it can market as such a star. White explained this when discussing his first meeting with Conor McGregor: "I didn't know if he could fight, but when I had dinner with him, his f***ing personality was so off the charts, I'm like, 'everybody's going to love this f***ing guy.' And if he can even fight a little bit, he can be big." White has said that, when a fighter is captivating as a personality, it is "a home run" so long as he or she "can fight and finish people, that's what I need." Using its monopsony, the UFC ensures that only it can hit these home runs.

50.     Thus, any MMA Promoter seeking to provide PPV-Level offerings requires Top-Ranked Fighters in order to ensure audiences purchase or stream those offerings. And in order to ensure Top-Ranked Fighters appear on a PPV-Level offering, an MMA Promoter needs those fighters under contract. The UFC contracts with fighters at set compensation rates tied to Bouts. The UFC uses exclusive contracts, and under the contract, fighters earn a set "show" amount to participate in a Bout and additional payment in the same amount if the fighter wins the Bout. These contracts usually last for either a minimum period of time or for a specific number of Bouts; the UFC determines when Bouts occur and which fighters will face each other in a Bout.

51.     The UFC ensures its monopsony on Top-Ranked Fighters by giving fighters little choice but to agree to its exclusive contracts. Rather than allow fighters to compete in other MMA Promotions, the UFC locks them in with standard-form agreements under which the fighters cannot accept Bouts elsewhere, often for years. Other MMA Promotions in the past followed suit with similar exclusivity provisions, which in turn allowed the UFC to argue that all MMA Promotions shared the UFC's views on exclusivity.

52.     For example, having repeatedly failed to arrange a Bout between Randy Couture and then-number-one ranked heavyweight Fedor Emelianenko, Dana White blamed Emelianenko's contract without even suggesting cross-promotion as an option: "Emelianenko's under another contract right now to another promotion and if he becomes available or something works out with that other promotion -- obviously everybody knows how crazy we are about protecting our contracts. Well, we would never do that to somebody else." Emelianenko agreed it was a contract issue. He claimed that the restrictive UFC contracts kept him from signing with the UFC: "The UFC contract was just draconian and oppressive. I'm not ready to sign such an enslaving contract." Meanwhile, while Emelianenko was undefeated, M-1 Global (who had signed Emelianenko) made clear that it was willing to cross-promote, stating publicly that "[i]f the UFC gets Randy back and they call and want Fedor to fight, we'll send him to the UFC." The UFC thus publicly reinforces the idea that no MMA Promotion would allow its fighters to participate in a cross-promoted Bout without acknowledging that the UFC set that standard as the dominant market force.

53.     The UFC's standard-form agreement contains several clauses that lock fighters into the UFC—and out of all other MMA Promotions—for lengthy periods of time, including but not limited to the following:

- Exclusion Clause: fighters may only fight for the UFC and are prohibited from taking Bouts elsewhere;

- Right-to-Match Clause: the UFC has up to a year after a contract has expired to match another promotion's offer and often prohibits the other promotion from countering;

- Champion's Clause: if a fighter becomes a title-holding champion, then the UFC may automatically extend the fighter's contract for one year or three Bouts;

- Retirement Clause: if the fighter retires, the UFC may suspend the fighter's contract so that the fighter may not come out of retirement to fight in other MMA Promotions;

- Tolling Clause: the UFC may extend the contract term for the period of time that the fighter is unable or unwilling to compete in a Bout due to injury or refusal to fight a certain opponent;

- Exclusive Negotiation Clause: the fighter must negotiate exclusively with the UFC for contract renewal for a period of 30 to 90 days.

54.     The UFC will rarely, if ever, change these terms when negotiating a fighter's contract. When Francis Ngannou, former UFC Heavyweight Champion, sought to negotiate a new contract, the deal fell apart because the UFC would not waive the Exclusive Negotiation Clause or the Right-to-Match Clause. Dana White claimed that the UFC released Ngannou (which Ngannou disputes) and stripped him of the Heavyweight Championship because Ngannou sought more money to face lesser competition.

55.     While these provisions limit fighters' ability to move from MMA Promotion to MMA Promotion, the UFC goes further, using its market dominance to deter fighters from reaching free agency or looking outside the UFC for opportunities. For instance, the UFC negotiates with and requires a new deal from a fighter before the fighter's last Bout under the current contract. That puts pressure on the fighter and increases the likelihood that the fighter re-signs with UFC. Joe Silva, a

UFC matchmaker who was involved in most fighter contract negotiations, has testified that "I always renegotiate before the last fight." Similarly, Michael Merch, Assistant General Counsel and Vice President of Business, Legal and Government Affairs at Zuffa, has said that "if a fighter is successful under a 4 fight deal, we typically negotiate a new agreement after the 3rd fight so he <u>never will see the end of his contract</u> and, assuming the fighter is successful, or at least competitive, that is the process that will continue thereafter."

56.     In theory, a UFC fighter could refuse to re-sign before the final Bout despite this pressure. But the UFC has other tools available. The UFC can, and did, delay Bouts under a fighter's contract, especially for the final Bout, in order to force the fighter to renegotiate before the contract's expiration. Fighters are paid per Bout, and therefore any delay also meant the fighter could not earn income from MMA. Jon Fitch, a former UFC fighter, stated that the UFC "[held his] next fight hostage" until he agreed to a new contract, and further stated that "they do that to everybody. We're going to hold your bout agreement until you sign your extension. We won't allow you to become a free agent." The "negotiations" between the UFC and the fighters often are less negotiations and more take-it-or-leave-it offers, as former fighter Josh Thomson recounted:

> I couldn't tell you what it was like to do business with the UFC, because there never was a business side of it as far as, there is no negotiation. There were times we've heard there's talks and negotiations, but you really don't need a manager because, "This is the deal you're going to get." There's been talks like, "Sure, you can negotiate for an extra two or three grand, but don't expect to get any backroom bonuses [undocumented bonuses paid at the UFC's discretion]." So then you question, is it really even worth negotiating that extra two or three grand?

57.     The UFC can, and did, also retaliate by providing the fighter with an unfavorable Bout. Fighters increase their reputation, and thus their earning potential, by fighting well-known fighters on the main Card. But Brandon Vera, a former UFC fighter, stated it was "common knowledge" in the MMA business that, if you did not renegotiate, "you were going to get frozen out or put on a dark show so that nobody would ever see your last fight." Such fights could hurt the fighter's ranking and thus their negotiating power as a free agent. One fighter explained that Dana White "could stick you

on the undercard in your next fight against some unfavorable opponent. If you're on the undercard, you would make far less. If anything in sponsorship because you weren't on TV."

58.     Even worse, the UFC can deliberately pit a fighter against someone who is a mismatch or more skilled than the fighter as a negotiating tactic. Kyle Kingsbury faced this scenario: Mr. Silva wanted him to fight a then-unknown fighter who was "extremely talented," making the match "a lose-lose. If I beat him, I'm supposed to beat him. If I don't beat him, I just got my ass kicked by a guy that nobody knows." While Kingsbury was "really concerned for [his] health" given a recent orbital injury, he also knew the UFC was the only MMA Promotion available to him. "There's nowhere else to go at this point. Strikeforce didn't exist anymore. Pride didn't exist anymore. And I had no way of saying no."

59.     Mr. Silva has admitted to employing these very tactics. Mr. Silva "lowballed" UFC fighter Nick Diaz in contract negotiations, knowing that "If they turn it down I put him in a prelim against a really tough guy for his last fight." As Mr. Silva told UFC fighters, ""if you don't like the first fight I offer you, you're sure as shit not going to like the second one." And Mr. Silva allegedly could be even more brutal in his tactics. According to Gray Maynard, a former UFC fighter, when another fighter "fell out of favor" with the company for comments critical of UFC, "Joe [Silva] told me he wanted me to go out and break his arm."

60.     Mr. Silva was not alone in threatening consequences to fighters who displease the UFC. When then-UFC Welterweight Champion BJ Penn signed with K-1 for a significant pay increase in 2004, he alleges, Dana White called him to say he was "f***ing done," that he would "never fight in the UFC again," that White considered Penn "scorched earth," and that White would remove Penn's fight from a soon-to-release DVD "so no one would even know who [he] was." The UFC thus has threatened to cut off any fighter who would leave for a better payday even if the fighter has no contractual obligation to stay.

61.     Even if fighters wanted to wait out their contracts despite the UFC's abusive tactics, they lacked the luxury of time. Professional athletes in any sport have a limited window in which they are at their prime physical condition and thus best positioned to earn lucrative contracts. Randy

Couture, a former Top-Ranked Fighter, explained how age concerns made him renegotiate with the UFC rather than continue to hold out: "I'm certainly under time constraints too. I'm 45. I can't sit around in court rooms for very long. I want to fight." For an MMA fighter, the average career length is between 31 and 41 months (covering about five to six Bouts), and a UFC fighter is on average under an exclusive contract for around 36.7 months. Experts in a similar case found that the UFC controlled between 95% to 99% of the Top-Ranked Fighters from December 2010 through June 2017, and similar numbers persist today. Top-Ranked Fighters who want to maximize their earnings have little choice but to stay under the UFC's control and accept the Bouts provided.

62.    Thanks to these tactics and others, the UFC overwhelmingly controls the market for Top-Ranked Fighters in the United States, in North America, and even globally. And the UFC itself boasts that it controls the Top-Ranked Fighters. As Mark Shapiro, president of Endeavor and TKO, has stated, "Not only do we have over 600 fighters, we have the premiere[sic] fighters." Mr. Silva similarly titled an email "We Own MMA" because the UFC had most of the Top-Ranked Fighters across weight classes.

63.    On the rare occasion a Top-Ranked Fighter does not sign with the UFC, the UFC treats that fighter as *persona non grata* while dismissing their talent as inconsequential. Prior to fighting Fabricio Werdum, Fedor Emelianenko had reached a sponsorship deal with Tapout and was to wear a shirt the company designed. Dana White called Tapout prior to the Bout and threatened to revoke Tapout as a UFC sponsor if it went through with the deal, causing Tapout to withdraw the offer. When Emelianenko's undefeated streak came to a close with a loss in that fight, White tweeted out ":D" in response. Years later, when Emelianenko retired as perhaps the best fighter never to compete in the UFC, White dismissed Emelianenko's accomplishments: "[H]e never got to test himself over here. I was never one of the guys that thought he was one of the greatest of all-time."

64.    The UFC's monopsony helps Dana White make such boasts: either compete in the UFC, or be denigrated by the UFC's CEO. The UFC's control of Top-Ranked Fighters means that fighters outside the UFC cannot increase their ranking. In September 2024, when asked if his No. 7 ranking on FightMatrix was fair, then-Bellator middleweight champion Johnny Eblen said "Yes, I

think it's pretty accurate because it's based on who you fight. I just don't have the opportunity to fight certain people."

65.    Meanwhile, the UFC can provide quality Bouts to Top-Ranked Fighters that can increase their ranking any time it pleases. In fact, it controls the market for Top-Ranked Fighters so thoroughly that it deliberately contracts with more fighters than needed for its roster, often keeping fighters idle with no scheduled Bouts while locking them away from other MMA Promotions. In turn, that means MMA Promotions outside the UFC do not have access to the fighters necessary to put together a PPV-Level MMA Card. This "shelving" practice only makes sense as a means to maintain the UFC's monopsony; it prevents other MMA Promotions from fielding profitable PPV-Level MMA Cards that would increase revenue and allow them to bid competitively for fighters' services. These MMA Promotions have no means to procure enough fighters to cross-promote a successful Card with each other, let alone to promote a PPV-Level MMA Card on their own.

## B.  The UFC Has Destroyed and/or Acquired Any Competition

*There was a time when it was neck-and-neck. That time is over. There were times when we were in dogfights, but everybody needs to just concede and realize we're the [expletive] NFL. Period. End of story.*

-Dana White

*I'm the Grim Reaper, motherf***ers.*

-Dana White, holding a tombstone reading "RIP" with the logos of International Fight League, Elite Xtreme Combat, and Affliction Entertainment, November 2008

66.    Of course, the UFC's practices in hiring and retaining Top-Ranked Fighters begs the question, why aren't Top-Ranked Fighters moving to MMA Promotions with fewer restrictions? Put simply, there are no MMA Promotions that can provide Top-Ranked Fighters with comparable Bouts or similar possibilities for advancing their career. Using its monopsony on Top-Ranked Fighters, the UFC bought or pushed out its main competitors that could have produced PPV-Level MMA Cards. With that monopoly captured, the UFC could easily maintain its monopsony on Top-Ranked Fighters,

which again froze rival MMA Promotions out of the marketplace for PPV-Level MMA Cards. The UFC's Scheme self-reinforces, ensuring that competing MMA Promotions have no way to compete with the UFC.

67.    The tactics that other MMA Promotions have used to try to compete had no chance to work in light of the UFC's Scheme. For example, one way for MMA Promotions to provide access to Top-Ranked Fighters not under contract is by cross-promoting events with other MMA Promotions. Strikeforce, for instance, cross-promoted events with M-1 Global and DREAM. Strikeforce was also willing to cross-promote a champion-vs.-champion Bout with Bellator MMA. Bellator, likewise, cross-promoted events with Japan's Rizin Fighting Federation and the United Kingdom's BAMMA. A November 9, 2017 letter to the United States House of Representatives on behalf of Bellator noted that "Bellator frequently co-promotes events with smaller domestic local promoters and international fight promoters to enhance our events and allow them opportunities to showcase their league talent."

68.    While boxing does not occupy the same Relevant Markets as MMA, it provides a useful illustration. At one point, those that controlled boxing similarly used coercive contracts to monopolize the market for promoting and broadcasting championship-level boxing Cards. Those practices were successfully challenged through litigation (*International Boxing Club v. United States*, 358 U.S. 242 (1959)) and through legislation (the Muhammad Ali Boxing Reform Act of 2000, 15 U.S.C. §§ 6301, *et seq.*). Today, boxing has multiple promotions competing for the best available boxers (including title contenders) who can draw audiences to PPVs, with at least five to ten promotions able to put forth major championship Bouts, at least twenty promotions who have offered televised events, and more than five who have promoted PPV events. And, while still rare, these promotions do enter into cross-promotional fights more often than the UFC.

69.    Dana White, who is trying to break into boxing with Zuffa Boxing, sees this as a flawed system:

> I love that all these boxing guys love the Ali Act the way it is now. I wanna see how many of them actually stay there and do that version of the Ali Act instead of the add-on that we're gonna do. ... They [boxers] have options. All these promoters are saying

the Ali Act is perfect and this is the way it should be. I want to see them all stay in it. I want every one of them to stay in the Ali Act as it is now. … I f***ing guarantee you, they won't.

70.    As White sees it, "Boxing got so f***ed up [due to large paydays for boxers] that nobody could actually make a living out of it."

71.    In its early days, the UFC also cross-promoted Cards with PRIDE Fighting Championships, a Japanese MMA Promotion. In a 2001 interview, from four days after Zuffa finalized its purchase of the UFC, Dana White stated "The first thing I did when we bought the UFC was call Yukino Kanda from PRIDE. I told her there was always a war between the UFC and PRIDE. … **I told her the war is over.**" He stressed that he wanted to arrange a fight with Kazushi Sakuraba of PRIDE: "And my main goal … Even if I have to co-promote with PRIDE, and we don't have a problem with co-promoting, they do it in boxing... is Sakuraba." In 2003, the UFC allowed one of its fighters, Chuck Liddell, to fight in a PRIDE tournament. White suggested there could be further cross-promotion stemming from that event: "The door's open. When I was over there at the press conference, I welcomed any Pride fighter that thinks he can beat a UFC fighter to come on over."

72.    But those days are gone. The UFC spent years eliminating its most serious competition, either through purchase or through other means. For instance, the World Fighting Alliance, a Las Vegas-based MMA Promotion, had put on four events between 2001 and 2006 and could attract Top-Ranked Fighters like Quinton Jackson and Matt Lindland. World Extreme Cagefighting, another MMA Promotion, had put on twenty-four events in the same timeframe. In December 2006, the UFC announced its purchase of both WFA and WEC. Reporting at the time of the purchase suggests that WEC was purchased in part to "attempt to secure a high-profile national television deal for the WEC in a strategic maneuver to impede the chances of other MMA promotions … to secure a national TV deal in the United States." Since "[t]here are only so many TV deals available for an MMA company in the United States," any such deal would have prevented other MMA Promotions from expanding into television. In 2007, Dana White and the Fertittas announced the purchase of PRIDE Fighting Championships, with plans to expand PRIDE internationally. But on October 4, 2007, they shut down PRIDE instead.

73.    The UFC has many reasons to buy out its competitors or drive them out of business, but a chief reason is to secure the Top-Ranked Fighters through exclusive contracts, and in turn control both the input and output markets. Dana White, acknowledging in September 2008 that Fedor Emelianenko (then a top-ranked heavyweight fighter) could not work for the UFC due to a contract with Affliction Entertainment, clarified how crucial exclusive contracts are: "Fedor's under contract with somebody else right now. And everybody knows how hard we are at protecting our contracts. … We would never interfere with somebody else's contract." But White foreshadowed a way around these contracts: if the other MMA Promotion fails, then there is no contract left. "[Affliction will] be gone in a couple of months anyway, and then Fedor will have to come here. **You're not under contract if the company's not in business anymore**."

74.    White's prediction partially came true. Affliction, an MMA clothing company that had licensing deals with top UFC fighters, sought to establish Affliction Entertainment as a competing MMA Promotion. Affliction Entertainment ran two MMA Cards, including the January 24, 2009 "Day of Reckoning" event promoted by Donald Trump and held alongside Oscar de la Hoya's Golden Boy Promotions. Affliction's Tom Atencio stated that the Promotion's goal was to hold four MMA Cards per year, and an additional ten MMA Cards co-promoted with M1 Global. But the UFC banned fighters from wearing Affliction's clothing due to Affliction entering the MMA Promotion business. The UFC also counter-programmed Day of Reckoning with a free replay of UFC 91. This counter-programming, which is not profitable in isolation, allows the UFC to limit the growth of its competitors. After less than a year, Affliction ceased acting as an MMA Promotion and once again was allowed to sponsor UFC fighters as a clothing company.

75.    Affliction is hardly the only MMA Promotion to suffer this fate. Golden Boy Promotions ran one MMA Card on its own in 2018. Oscar de la Hoya explicitly stated that Golden Boy's goal was to "compete with Dana White," and he invited MMA fighters to be a part of Golden Boy: "If any fighter who is an MMA fighter wants to explore a different avenue, come knock on our door, give us a call." But ultimately, de la Hoya admitted pressure from Dana White kept Golden Boy MMA from succeeding. "We had the arena jam-packed; pay-per-views didn't do too well for certain

1  reasons, certain cable operators weren't working with us, but I think *it's just because I received too much*
2  *heat from Dana White.*"

3  76.    The International Fight League, an MMA Promotion founded in 2005, focused on
4  "teams" of MMA fighters competing in individual Bouts to earn points for their team. The IFL offered
5  its fighters a salary and health benefits (unlike the UFC or other MMA Promotions). But according to
6  the IFL, the UFC fought to prevent the IFL from signing a television deal with Fox Sports by
7  threatening to sue. According to Pat Miletich, a former IFL coach, Dana White called him and stated
8  "he was going to f***ing crush these [the IFL] guys." Miletich further said that White stated that "he
9  had spoken with the Fertittas (who own Zuffa), and they had given their 'permission' to go after the
10  IFL," and further threatened that "when the dust settles, anyone associated with the IFL would not
11  be associated with the UFC." While the IFL ultimately secured a television show on MyNetworkTV,
12  it was too late. In 2008, after 22 events, the IFL shuttered, deeply in debt.

13  77.    HDNet Fights, a television network owned by Mark Cuban that broadcast MMA and
14  combat sports, bought substantially all of IFL's assets. Cuban intended to have HDNet Fights operate
15  a competing MMA Promotion, and he believed that his access to his own television network (as well
16  as venue, production company, and DVD production) would provide advantages to HDNet Fights.
17  HDNet Fights held two MMA Cards, and was reaching out to people like the boxer Floyd Mayweather
18  as potential fighters. When then-UFC heavyweight champion Randy Couture quit the UFC in 2007,
19  HDNet Fights attempted to promote a Bout between Couture and Fedor Emelianenko. HDNet
20  Fights was unable to arrange the Bout given litigation between the UFC and Couture regarding
21  whether Couture was subject to a non-compete clause that would bar him from fighting elsewhere.
22  HDNet Fights never held a third MMA Card.

23  78.    Strikeforce was one of the few MMA Promotions that presented serious competition
24  to the UFC, with Cards presented on Showtime and CBS and archival Bouts and other footage on
25  NBC. Strikeforce offered women the chance to compete in MMA before the UFC, and it co-promoted
26  events with global MMA Promotions like M-1 Global from Russia and DREAM from Japan. Under
27  these co-promotional agreements, fighters from Strikeforce fought against fighters from M-1 Global

28

and from DREAM, with the profits shared between the MMA Promotions. In response, the UFC planned counter-programming that aired simultaneously with Strikeforce Cards.

79. Despite this, Strikeforce continued to draw some Top-Ranked Fighters. So Zuffa took the next step to eliminate the competition: it purchased Strikeforce in 2011. And it soon eliminated Strikeforce's heavyweight division, among other changes. Strikeforce continued as a standalone MMA Promotion until its final show in January 2013, after which it was dissolved and its fighter contracts largely absorbed by the UFC.

80. Bellator MMA, an MMA Promotion that debuted in 2009, was, for a time, the UFC's main competitor. In 2011, Viacom acquired Bellator and began airing the promotion on Spike TV (later Paramount Network). Bellator also offered PPV events and aired at various times on CBS Sports Network, MTV2, and Showtime. For a period of time, Bellator offered fighters an advantage that the UFC lacked: while the UFC had signed an exclusive sponsorship deal with Reebok, Bellator fighters could still negotiate for their own sponsorship deals. As one fighter, Benson Henderson, explained:

> If you have other options now where we can make good money and make sponsorship money—so not only are you going to make as much as you made in the other organization, but on top of that, you'll make a good chunk of change in sponsorships once again—why would you not do that?

81. Publicly, Dana White did not consider Bellator competition. In 2014, White stated "I honestly, I literally never think of Bellator, I don't give a shit what Bellator's doing or what's going on with them. It's not like Bellator is some organization you have to look out for." In 2020, asked about Bellator's Light Heavyweight division, White again dismissed Bellator, stating that "Everybody they have . . . we let go of." Yet Zuffa stated that Bellator was a "significant competitor to the UFC" and noted that it "has continued to grow since 2017." Thus, the UFC took steps to cut off that growth, using its monopsony power to weaken Bellator.

82. In a letter to the United States House of Representatives, Vice President of Business and Legal Affairs at Viacom Media Networks, Tracey Lesetar-Smith, noted that there was no "silver bullet that will rupture the UFC's heavy market share" but stated that "the continued unimpaired movement of skilled athletes to organizations like Bellator and Bellator's continued ability to foster,

build, and develop remarkable talent will be critical in our continuing ability to reshape the landscape of MMA as we know it." As noted, *supra* Section VII.A, however, the UFC ensured fighters could not move between organizations unimpaired. In 2014, Lorenzo Fertitta texted Dana White regarding fighter Gilbert Melendez leaving the UFC for Bellator. Mr. Fertitta texted "We gotta keep taking these f***ers oxygen till they tap out. We have sacrificed too much to let anyone get traction now[.]" Mr. Fertitta later confirmed that "f***ers" referred to Bellator, and "oxygen" referred to fighters like Melendez that were being recruited by Bellator.

83. The Professional Fighters League acquired Bellator in 2023, with plans to continue the company. Dana White dismissed the PFL's purchase, asking "Why on God's green f***ing earth would anyone buy Bellator?" He framed it in other comments as "One shitty organization that sells no tickets and nobody watches buys another shitty organization that sells no tickets and nobody watches." In early 2024, Bellator signed a deal with Warner Bros. Discovery under which it would air on Max and on truTV. But in January 2025, the PFL stopped promoting events under the Bellator MMA name, effectively ending the MMA Promotion.

84. Today, and throughout the Class Period, most of the non-UFC MMA Promotions are little more than feeder leagues for the UFC. And this is by design. Speaking at the Global Speaker Series at the Stanford Graduate School of Business on April 8, 2013, Dana White explained his view of these other leagues and why the UFC does not seek to take them over: "Nobody ever wants to look at themselves as a feeder league to the UFC. Deal with it. You're all feeder leagues to the UFC, okay. I want them to exist and make money because those guys create the next talent that will end up in our organization someday." TKO COO and President Mark Shapiro similarly referred to PFL and Bellator as "pipeline and feeder properties."

85. In fact, many MMA Promotions today accept that feeder-league status. When forming the Resurrection Fighting Alliance, Ed Soares stated the "vision" for the Promotion was "to build a developmental league for guys who want to move up into the UFC," and so any fighter with an offer from the UFC was allowed to leave to fight in the UFC. Resurrection Fighting Alliance later merged with Legacy Fighting Championship to form Legacy Fighting Alliance, and Soares stated this new

MMA Promotion would "give fighters a chance to gain the experience of competing in a top-tier organization, develop a fanbase on national and international TV, and potentially reach the next level of their career" similar to how college football develops athletes for the NFL or AAA baseball allows players to reach Major League Baseball.

86.     Similarly, Titan Fighting Championship fighters also had a Zuffa-out clause in their contracts allowing them to leave for the UFC if they received an offer. Jeff Aronson, CEO of Titan FC, explained that Titan FC was intended to "give [fighters] a forum to get back in [the UFC] and that he was "not looking to compete with Zuffa." As Aronson explained, "**No one is going to take on Zuffa and win at this point. It's just not going to happen, and I have no aspirations to do that.**" Titan FC eventually reached a deal to stream its Cards on UFC FIGHT PASS.

87.     Invicta Fighting Championships, founded in 2012, is the world's largest all-women MMA Promotion. In 2013, the UFC acquired eleven strawweight fighters from Invicta FC in order to create its own division. Shannon Knapp, president of Invicta, framed this as "graduation, "advancement," and an "opportunity," as the UFC could offer these fighters more money than Invicta could and Invicta would be hindering their careers if it did not let them leave.

88.     The Professional Fighters League, founded in 2018, formed out of an acquisition and restructuring of the World Series of Fighting. The PFL designed itself around a points-based regular season, leading to a playoff period and million-dollar prizes for champions in six weight classes. However, the PFL has intentionally sought to promote itself in markets that are not the focus of the UFC, such as certain international markets instead of the U.S. market, ensuring that it does not compete directly with the UFC in the Relevant Market. While the PFL is expanding into markets less served by the UFC, the financial gap between the two is massive. The PFL earned $100 million in revenue in 2024, and as of May 2025 it is valued at $1 billion. But PFL founder Donn Davis estimates the UFC to be valued at "probably $20 billion today," and TKO reported $1.406 billion in revenue for the UFC in 2024. When considering the merger between WWE and the UFC, Guggenheim analysts considered the PFL "the minor leagues." And the UFC certainly has not suggested it sees the PFL as a serious competitor. Mark Shapiro, president of Endeavor and TKO, stated that the PFL's

acquisition of Bellator was "good for MMA," but added, "make no doubt about it, they are the 'B' squad."

89.    Because of the UFC's monopoly and monopsony, none of these rival MMA Promotions have offered a PPV-Level MMA Card for at least a decade. Indeed, while several of these MMA Promotions have marketed PPV broadcasts of Cards, none of them have charged prices similar to the UFC.

90.    Dana White keeps a faux tombstone commemorating rival MMA Promotions like the IFL, Elite Xtreme Combat, and Affliction Entertainment that have gone out of business. As Jay Larkin, a former Showtime executive and producer for the IFL's television show, said in 2008, "MMA is a one-promotion industry and that promotion is the UFC. … The UFC *is* MMA."

## VIII.    THE SCHEME'S EFFECTS ON PRICING AND QUALITY

91.    Across its history, the UFC has had multiple television and PPV deals to broadcast its MMA Cards live. These live broadcasts are key to the UFC's business model. As Dana White succinctly explained, "Nobody's gonna watch a taped or delayed sporting event."

92.    In August 2005, the UFC signed a broadcast deal with Spike TV, under which Spike would broadcast the UFC's "The Ultimate Fighter" reality series. By 2011, when the deal ended, the UFC was making around $35 million annually from this contract. In 2012, the UFC signed a deal with Fox, bringing the MMA promotion to network television. The deal ran until 2018, with the UFC receiving over $100 million a year on average through the partnership. While UFC programming was broadcast on Spike TV or on Fox, the UFC continued to offer PPVs, with the prices steadily rising over the years, increasing from $29.95 in early 2005 to $59.99 by 2015.

93.    These price increases far outpaced inflation. According to the U.S. Bureau of Labor Statistics Consumer Price Index Inflation Calculator, $29.99 in February 2005 had the same buying power as $36.98 in December 2015. By 2015, a UFC PPV cost $23.01 more than expected based on inflation rates.

94.    Buoyed by the UFC's monopoly power, the price hikes continued. From 2019 to 2025, the UFC partnered with ESPN to distribute UFC MMA Cards via PPV broadcasts, netting the UFC

around $2 billion over the life of the deal. ESPN ran 294 live UFC events under this contract, as well as the UFC's "The Ultimate Fighter" reality series and Dana White's Contender Series, a separate MMA Promotion run by Dana White to showcase MMA fighters not signed to the UFC with the hopes of finding future talent for the UFC. These UFC PPVs were available and purchased in all 50 states and the District of Columbia. Once again, PPV rates steadily increased over the course of the deal, starting at $59.99 in 2019, increasing to $64.99 in 2020, increasing again to $69.99 in 2021, then a third increase to $74.99 in 2022, and finally increasing to $79.99 through the life of the deal.

95. Had the UFC's PPV price increased at the rate of inflation, as calculated by the Bureau of Labor Statistics CPI Inflation Calculator and based on the 2005 $29.95 price, a December 2025 UFC PPV would have cost $50.60. Instead, a UFC PPV cost nearly $30 more than expected based on inflation rates.

96. The UFC's pricing does not just outpace inflation, it also bears no resemblance to the pricing seen in other combat sports, which now operate in a more competitive environment, and which often saw price drops in the last decade as streaming technology became widespread. Professional wrestling, for instance, has presented two radically different ways to watch PPV-Level Cards, both of which cost less than the UFC's PPV model with ESPN+.

97. A leading professional wrestling promotion called WWE, also owned by Endeavor, long ago stopped the PPV model, renaming its former PPV events "Premium Live Events," or PLEs. These PLEs can be viewed as part of a Premium Online Streaming Service and are included with the programming price. As of September 20, 2025, viewers can watch these PLEs either through the ESPN Premium Online Streaming Service for $29.99 per month or in a Premium Online Streaming Service bundle that includes ESPN, Disney+, and Hulu for $35.99 per month.

98. PLEs for NXT, a professional wrestling promotion owned by WWE, can be viewed on the Peacock Premium Online Streaming Service through March 2026 for $10.99 per month or $109.99 per year.

99. All Elite Wrestling, the WWE's main competitor, offers PPVs on HBO Max for $39.99 or on other providers for $49.99. Either way, the price is lower than what UFC fans have paid for the last several years.

100. Similarly, boxing has several promoters competing for consumers. As streaming has become more and more ubiquitous, certain promotions turned to a cheaper streaming model in the last decade. DAZN, for instance, offers a $44.99 monthly plan that includes PPVs, as well as a $20.99 monthly plan that includes all non-PPV Cards with PPVs offered at additional cost. Those promoters who maintained PPVs saw the average price decrease in recent years—all while UFC PPVs increased in price.

101. Thus, as economic theory would predict, when there are competitors in a market, such as in professional wrestling, the competition leads to more choices for the end user, better quality productions, and better pricing. When it comes to MMA, the UFC's monopolistic practices have led to an absence of choice and to inflated pricing.

102. As Mark Shapiro admitted in a TKO earnings call in 2024, while ESPN set the downstream PPV prices, *they did so because of "what they're paying us for those rights."* ESPN itself likely saw issues with their UFC deal. Lacking serious MMA competitors, the UFC grew stagnant, and many fans expressed frustration about the lack of quality of some Cards. But given the UFC's monopoly, PPV prices remained inflated no matter who was on the Cards. The monopoly rent was still being extracted even during lower quality Bouts. Per reporting around that time, ESPN may have been "frustrated" with the UFC due to a drop in quality. Dana White also publicly stated that he was skeptical PPV would continue to work as a distribution model: "There will be a handful of channels that exist globally, and the whole world will be able to watch the same thing at the same time on the same channel. … So with these streaming services, I believe that the possibility of PPV could go away some day."

103. On August 11, 2025, the UFC and Paramount announced a $7.7 billion deal under which Paramount would broadcast all domestic UFC events for seven years, starting with UFC 324 on January 24, 2026. Under this deal, thirteen numbered UFC events and 30 Fight Nights will be

distributed per year on Paramount+, a Premium Online Streaming Service, and select numbered events will be simulcast on the CBS broadcast network. Thus, the UFC will no longer offer its events as PPVs but instead will offer them at no additional cost to Paramount+ subscribers beyond their Paramount+ subscription.

104.    Upon information and belief, Paramount+ has subscribers in all 50 states and the District of Columbia. Dana White frames the Paramount+ deal as savings for the customer: "The ESPN+ model ... was $1200 bucks a year to be a UFC fan, it's $100 bucks a year to be a UFC fan now." But on January 15, 2026, less than ten days before the first UFC MMA Card on Paramount+, the price for Paramount+ plans increased: an annual subscription with advertisements went up a whopping 50% immediately (from $60 to $90), while an annual plan without ads increased approximately 17% (from $120 to $140). In a shareholder letter, Paramount CEO David Ellison linked the price increases to the acquisition of the costly UFC rights. Ellison described the UFC media rights as "a once-in-a-decade opportunity," but to support the cost of adding such media rights, Paramount+ would need "to implement price increases." And once UFC fans are locked into the new model, the prices will likely continue to increase as long as the UFC's monopoly persists.

105.    The UFC also offers UFC FIGHT PASS, an on-demand streaming service offering access to archived UFC bouts, as well as video libraries of over 30 other combat sports promotions, including other MMA promotions. Live PPV-Level MMA Cards are not available on UFC FIGHT PASS.

106.    Endeavor's purchase of the UFC provided multiple benefits to the UFC's media structure, all of which furthered the anticompetitive Scheme at issue. In its 2023 Annual Report, Endeavor stated that its "capabilities and expertise have been integral to helping UFC and WWE announce new international events with significant site fees, ink sizable partnership agreements, and secure media rights fee increases domestically and internationally." The report further stressed that the WWE's then-new media rights deals "are critical proof points for the compelling rationale of bringing WWE together with UFC under TKO and harnessing the power of the Endeavor flywheel."

This "flywheel" is a term Endeavor uses for its ability to use properties like the UFC to create value for itself and those properties. As Endeavor explained in its 2023 Form 10-K:

> [T]he integration of our broad range of capabilities, along with our owned and managed premium sports and entertainment properties, drives network effects across the Endeavor flywheel, which is the way we connect and utilize multiple divisions of Endeavor to maximize the power of our platform, creating value for our business, clients and employees.

107.    Since taking over, Endeavor has used this flywheel to drive profitability for the UFC. In an April 2023 investor presentation, Endeavor presented TKO as an "[o]pportunity to own two global sports and entertainment leaders in a single company," stressing that its "flywheel creates multiple additional avenues for future growth," and stating that Endeavor had "shown a track record of value creation across UFC and other strategic acquisitions." The presentation listed the UFC as an owned property that showed "Connected Segments Drive Powerful Growth Across the Endeavor Flywheel" and TKO as an opportunity "to Drive Meaningful Synergies Across the Company by Leveraging the Endeavor Flywheel." Endeavor also listed the UFC's upcoming media rights renewal (ultimately not a renewal, but a move to Paramount+) as an opportunity for investment.

108.    Endeavor naturally worked to ensure that its media deals remained profitable. As Endeavor noted in its 2023 Form 10-K (and TKO in its 2025 Form 10-K), its programming like UFC Cards "is distributed by television and cable networks, satellite providers, PPV, digital streaming, and other media" and therefore "any failure to maintain or renew arrangements with distributors and platforms, the failure of distributors or platforms to continue to provide services to us, or the failure to enter into new distribution opportunities on terms favorable to us could adversely affect our business."

109.    The UFC's revenue has increased in line with its increased PPV and media deals. In 2016, the UFC reported revenues of $690 million. By 2021, revenues had increased to $930 million. Last year, TKO reported total UFC revenue of $1.3 billion in 2023 and $1.4 billion in 2024. TKO further reported higher-than-normal EBITDA margins of 58% for 2023 and 57% for 2024. That revenue (and those margins) largely derives from PPV sales and media rights deals. In 2016, reporting

found that the UFC's PPV revenue typically accounted for around 35% of the UFC's annual revenue. And per its 2025 10-K, TKO reported UFC media rights and content revenue of $870.6 million in 2023 and $879.4 million in 2024. Given the aforementioned total revenues, media rights and content were responsible for 67% of the UFC's total revenue in 2023 and 63% of the UFC's total revenue in 2024. The UFC's market power has generated massive returns from consumers purchasing UFC PPVs and accessing UFC Cards through Premium Online Streaming Services.

110.    None of this market power translates to quality for MMA fans; it merely restricts the Top-Ranked Fighters, and by extension the PPV-Level MMA Cards, to one company. By contrast, many of the top-ranked boxers are ranked in the top 15 by all four major boxing promotions, sometimes holding titles in multiple promotions. Similarly, Pro Wrestling Illustrated's list of the top ten male professional wrestlers of 2025 includes wrestlers from four promotions, and its list of the top ten female professional wrestlers of 2025 also includes wrestlers from multiple promotions. As one MMA fan claimed, the UFC is "coasting" because "they've got the fans. They don't care about appeasing the fans who are already there." Meanwhile, "boxing is better for boxing fans" because, with competition between promotions, "the best fight the best and you get the big fights." But despite seeing the disparity, MMA fans are not going to switch to a different sport. They "are going to watch [the UFC] regardless"; they "are … addicted to this. … And they know they've got" the fans, who have no other choice in MMA.

## IX.    DEFENDANTS' MONOPSONY AND MONOPOLY

*When you control and own the league like we do with the WWE [and] UFC, we're the owner, commissioner, and the coach all in one. We're only limited by our creativity.*

-Mark Shapiro, President, TKO Group & Endeavor

111.    MMA Cards can be distributed to customers throughout the United States as part of a PPV event (whereby a customer pays for the standalone right to watch the MMA Card), as part of a television network (whereby a customer pays for a cable or satellite subscription that accesses channels that broadcast the MMA Card), or via a Premium Online Streaming Service (whereby a

customer pays for an online video streaming service that broadcasts the MMA Card). PPV-Level MMA Cards must be built upon several Bouts, in which most or all of the fighters involved must be Top-Ranked Fighters. Top-Ranked Fighters have been recognized in respected fighter rankings such as FightMatrix and have sufficient name recognition and notoriety to attract an audience to watch their matches.

112.    While many combat sports offer PPV-level cards or events, none occupy the same market as MMA. MMA is one of the few combats sports that allows both striking techniques like punches and kicks (unlike Greco Roman wrestling) as well as grappling techniques like throws and joint locks (unlike boxing). Fans of MMA do not find other combat sports to be adequate substitutions for MMA because these other combat sports are fought under different sets of rules and typically involve an entirely separate set of fighters with skills tailored to one specific combat sport. MMA, as a blend of techniques from many combat sports, requires fighters with a different, nontransferable skill set and presents Bouts and Cards that do not resemble other combat sports to audiences that specifically seek MMA Bouts and Cards.

113.    As such, in order to present a PPV-Level MMA Card, an MMA Promoter must be able to present enough Bouts between Top-Ranked Fighters to ensure that audiences purchase the means to watch the MMA Card. Without Top-Ranked Fighters, an MMA Promotion cannot present a PPV-Level MMA Card. The Relevant Output Market is the promotion and distribution of PPV-Level MMA Cards involving Top-Ranked Fighters through PPV or a Premium Online Streaming Service. The UFC and other MMA Promotions promote MMA Cards globally, but where the MMA Card itself is held is less relevant to the Relevant Output Market than where the MMA Card is broadcast. MMA Cards and MMA Bouts can be held anywhere in the world and still be presented to audiences in the United States via PPV or as part of a Premium Online Streaming Service. The Relevant Geographic Market for the Relevant Output Market is the United States.

114.    The UFC has had, and continues to have, monopoly power over the Relevant Output Market due to the anticompetitive conduct alleged in this Complaint. The UFC has foreclosed any competitors from presenting PPV-Level MMA Cards or broadcasting PPV-Level MMA Cards to

audiences in the Relevant Geographic Market. This foreclosure enables the UFC to control, maintain, and increase the price to view PPV-Level MMA Cards through PPV or as part of a Premium Online Streaming Service.

115.     The UFC has exercised, and continues to exercise, its monopoly power to prevent competition from entering the Relevant Output Market by preventing other MMA Promotions from accessing Top-Ranked Fighters, by pressuring would-be rivals into becoming "minor leagues" for the UFC, by brokering deals under which other MMA Promotions stream MMA Cards through the UFC FIGHT PASS service, and by controlling prices and excluding competition. Through these measures, the UFC has secured its place as the dominant, and likely exclusive, provider of PPV-Level MMA Cards in the Relevant Output Market.

116.     By controlling the Relevant Output Market, the UFC also controls when and how fighters are publicized to consumers. Top-Ranked Fighters often must build a brand or otherwise win over an audience who in turn will pay to watch those Top-Ranked Fighters compete. The UFC, as the dominant and likely exclusive provider of PPV-Level MMA Cards, is the only MMA Promotion where a fighter's Bouts can be seen by enough people to increase the fighter's star power and thus increase their chance to be seen as a Top-Ranked Fighter. Further, the UFC controls the marketing around its PPV-Level MMA Cards (such as interviews, weigh-ins, and video packages) that affords fighters more opportunity to show audiences why they should be Top-Ranked Fighters. Thus, the UFC's control in the Relevant Output Market includes control over the avenues available for a fighter to become a Top-Ranked Fighter.

117.     Using the aforementioned monopoly, as well as its monopsony power over the market for Top-Ranked Fighters discussed *infra*, the UFC can and has restricted access and limited expansion of actual or potential rivals in the Relevant Output Market. The UFC has acquired would-be competitors, locked the Top-Ranked Fighters into exclusive contracts, and coerced any fighters or would-be MMA Promoters seeking to disrupt the UFC's power. In turn, no would-be competing MMA Promotion can secure enough Top-Ranked Fighters to run a PPV-Level MMA Card.

118.     That level of power pays dividends to the UFC. In a similar case, experts estimated that the UFC's market share has been as high as approximately 90% since at least 2008, while the three closest competitors combined never earned more than 9% of the total revenues in the market. Upon information and belief, the UFC controls a similar, and likely greater, share of the revenue from PPV-Level MMA Cards broadcast through PPV or as part of a Premium Online Streaming Service. That market share and level of dominance in the input and output markets more than suffices to establish the UFC's monopsony and monopoly market power under federal and state laws.

119.     There are natural barriers preventing easy entry into the Relevant Output Market. Running an MMA Promotion requires substantial capital to promote MMA Cards, management and cooperation with various regulators, media deals and broadcast rights, and other hurdles. But numerous companies and individuals with the finances and other resources to overcome these natural barriers have failed to do so. Billionaires like Mark Cuban and Donald Trump have backed MMA Promotions that failed to break into the market. Viacom (which merged with CBS to form Paramount Global) previously owned Bellator MMA, a promotion that never managed to find its footing despite corporate backing. Even the Professional Fighters League, which is currently backed by Saudi Arabia's Public Investment Fund, cannot approach the UFC's dominance in the Relevant Output Market.

120.     Natural barriers did not keep these potential MMA Promoters from succeeding. Artificial barriers set up by the UFC to protect its monopoly and monopsony power did. Chiefly, the UFC has secured most of the Top-Ranked Fighters through exclusive contracts, and the UFC refuses to cross-promote MMA Bouts with other MMA Promoters. Without Top-Ranked Fighters, other MMA Promotions cannot generate sufficient ticket sales for venues needed to put on a PPV-Level MMA Card. Nor can these other MMA Promotions entice customers to purchase an MMA Card through PPV or as part of a Premium Online Streaming Service without sufficient Top-Ranked Fighters on the Card.

121.     Instead, these other MMA Promotions often become "feeder" leagues where less experienced MMA fighters, or former Top-Ranked Fighters who no longer draw as many viewers, compete. These feeder leagues often structure themselves as a place for MMA fighters to develop in

the hopes of reaching the UFC, often allowing MMA fighters to opt out of their contracts if the UFC makes an offer to the fighter. These clauses show that the MMA fighters in feeder leagues are not part of the Relevant Input Market, and the MMA promotions themselves have no way to compete in the Relevant Output Market. As one such promotion, Alliance MMA, explained:

> It is our intention to serve as a developmental organization for the UFC and other premier national MMA promotions in the same fashion as college athletic programs serve as 'feeders' to professional sports leagues. … Should the UFC … view us as a competitive threat they could use their significantly greater resources to frustrate our business and growth strategy and materially and adversely affect our business.

122.    With no access to the Top-Ranked Fighters needed to compete in the market for PPV-Level MMA Cards, nor the means to create Top-Ranked Fighters internally or through promoting fighters, these other MMA Promotions can either act as a feeder league, close, or be swallowed up by the UFC. None of them, therefore, can provide any PPV-Level MMA Cards, let alone competitive PPV-Level MMA Cards, for MMA enthusiasts to purchase through PPV or as part of a Premium Online Streaming Service. The UFC, as both buyer on the Relevant Input Side and seller on the Relevant Output Side, has total control of what PPV offerings are available and what fighters will be on the PPV Card. That control allowed the UFC to secure a deal in which ESPN needed roughly 300,000 PPV purchases at an inflated price for each PPV event to break even on the nearly $2 billion it paid. And that control allowed the UFC to secure $7.7 billion from Paramount to move away from the PPV pricing model.

123.    As explained *supra*, Top-Ranked Fighters are not interchangeable with athletes in other combat sports like boxing or taekwondo, given that fighters in those sports are not trained in the wide variety of techniques needed to compete in an MMA Bout. Nor are MMA fighters sufficiently specialized in the skills needed to succeed in other combat sports. MMA Promotions thus require Top-Ranked Fighters (not top-ranked boxers or top-ranked sumo wrestlers) to attract purchasers for PPV-Level MMA Cards. Given that all or virtually all Top-Ranked Fighters are under the UFC's control, other MMA Promoters have no means to produce a PPV-Level MMA Card. And as noted *supra*, the UFC's control of the Relevant Output Market also gives the UFC control of the media and

promotional means to convince the public that a fighter is a Top-Ranked Fighter. The Relevant Input Market is the market for Top-Ranked Fighters as decided by the FightMatrix ranking database, which is used to determine the top MMA fighters per weight class.

124.    To the extent a Top-Ranked Fighter is not originally from the United States, the market requires that fighter to come to the United States, where the UFC is based. It is expensive and difficult for fighters to leave their home country to compete in MMA Bouts. But Top-Ranked Fighters from abroad must do so to compete in the United States, where the vast majority of UFC MMA Cards are held. Most non-U.S.-based MMA Promotions choose to focus on fighters in their country or region and hold only a handful of events per year. Given these MMA Promotions rarely, if ever, have access to Top-Ranked Fighters, neither fighters nor audiences would consider non-U.S.-based promotions competitive in the Relevant Input Market. The Relevant Geographic Market for the Relevant Input Market is the United States.

125.    The UFC has locked the vast majority of Top-Ranked Fighters into contracts and refuses to cross-promote MMA Bouts with other MMA Promotions. If a Top-Ranked Fighter wishes to fight against comparable talent (to improve their ranking, seek relevant titles, and compete for more money), they must come to the United States—and specifically to the UFC—to compete. And the UFC uses its market power to promote its fighters as Top-Ranked Fighters, which affects public perception of these fighters and increases their value. In turn, audiences purchasing and viewing PPV-Level MMA Cards expect and require Top-Ranked Fighters on the Card. Non-UFC MMA Promoters (whether in the United States or abroad) cannot access the Top-Ranked Fighters needed to compete in the Relevant Output Market. The UFC has thus artificially suppressed the supply of Top-Ranked Fighters, leaving other MMA Promotions without access to critical inputs and no way to create a PPV-Level MMA Cards. This in turn leaves viewers with no source but the UFC for PPV-Level MMA Cards. The UFC's Top-Ranked Fighter monopsony and PPV-Level MMA Card monopoly thus feed each other, creating a profitable and nigh unbreakable Scheme.

126.    Endeavor and TKO have not changed the UFC's practices. In fact, maintaining this monopoly and monopsony has been not only profitable for Endeavor, but also a marketing benefit.

Endeavor saw buying out the UFC as "a better investment" than being the majority owner, making the UFC the "crown jewel" in its portfolio. In an investor presentation touting the soon-to-be-named TKO, Endeavor compared the UFC to other sports leagues. One major benefit the UFC had that the other leagues did not was a "Lack of Teams/Team Owners." Rather than move away from the UFC's long-term monopoly and monopsony, Endeavor has doubled down, seeing the lack of competition as little more than an investment opportunity. Endeavor can apply its "flywheel" to handle streaming rights negotiations, grow sponsorship, deal with government relations, and handle licensing without worrying about the UFC competing with other MMA Promotions. Endeavor perpetuates the anticompetitive conduct by continuing the Schemes put in place by the UFC before Endeavor's acquisition, and it utilizes its control of TKO OpCo and its controlling interest in TKO to perpetuate these Schemes.

## X.    INTERSTATE COMMERCE

127.    The UFC engages in extensive interstate commerce and activities affecting interstate commerce. The UFC promotes MMA Cards that occur in almost every state in the country. The UFC produces television and Premium Online Subscription Service content in broadcasting each MMA Card and also through press conferences, weigh-ins, interviews, and other presentations. The UFC broadcasts their MMA Cards through PPV, television, and Premium Online Subscription Services. These broadcasts, including PPVs purchased through ESPN+ and UFC Cards watched on Paramount+, are available in all 50 states. These productions earn the UFC billions of dollars in revenue yearly.

## XI.    FEDERAL ANTITRUST LAW

### COUNT ONE: Section 2 of the Sherman Act
### (15 U.S.C. § 2)

### (On Behalf of Plaintiffs and the Nationwide Injunctive Relief Class for Injunctive and Equitable Relief)

128.    Plaintiffs repeat, reallege, and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

129.    Premium Online Streaming Services (currently Paramount+) carrying the UFC's PPV-Level MMA Cards were available for purchase, were purchased, and continue to be purchased by consumers throughout the United States, including Class Members, throughout the Class Period.

130.    Section 2 of the Sherman Act makes it unlawful for any person to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations . . . ." 15 U.S.C. § 2. And Section 16 of the Clayton Act authorizes "[a]ny person, firm, corporation, or association . . . to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws . . . ." 15 U.S.C. § 26.

131.    At all relevant times, Defendants possessed, and continue to possess, significant market power (i.e., monopoly power)—or possessed and continue to possess a dangerous probability of achieving market power—over the Relevant Output Market or narrower markets therein, in that the UFC is the dominant, if not exclusive, provider of PPV-Level MMA Cards nationwide.

132.    At all relevant times, Defendants monopolized or attempted to monopolize the Relevant Output Market in the United States for the purpose of excluding competition and controlling, fixing, and maintaining prices for PPV-Level MMA Cards, which in turn have led to inflated prices for Premium Online Streaming Services carrying the UFC's PPV-Level MMA Cards, and they continue to do so, in violation of federal antitrust law.

133.    At all relevant times, Defendants acted, and continue to act, knowingly, willfully, and unlawfully to establish, maintain, use, and enhance—or attempt to establish, maintain, use, and enhance—their monopoly power in the Relevant Output Market, including through restrictive, exclusionary, and anticompetitive conduct.

134.    As more fully stated above, Defendants' restrictive, exclusionary, and anticompetitive conduct for the purpose of establishing, maintaining, using, and enhancing their monopoly power in the Relevant Output Market includes, but is not limited to, the following:

a.    Locking MMA fighters into exclusive contracts, ensuring that competitors could not access top-ranked and top-drawing athletes

b.  Threatening and retaliating against athletes who sought to negotiate their contracts or work with competitors

c.  Eliminating cross-promotion with competing MMA Promotions

d.  Counterprogramming competing MMA Promotions' events

e.  Preventing competing MMA Promotions from securing television deals

f.  Purchasing and shuttering competing MMA Promotions (or forcing them to be "feeder" leagues)

135.  Defendants' anticompetitive conduct was and continues to be willful, flagrant, and malicious and done with the intent to harm competition and consumers throughout the United States.

136.  Defendants' anticompetitive conduct substantially affected consumers and interstate commerce, and continues to do so.

137.  As a direct and proximate result of Defendants' monopolization or attempted monopolization of the Relevant Output Market:

a.  price competition for PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards has been (and is being) restrained, suppressed, and eliminated throughout the United States;

b.  the price for PPV-Level MMA Cards and the price of Premium Online Streaming Services carrying PPV-Level MMA Cards has been (and is being) raised, fixed, maintained, or stabilized at supra-competitive levels throughout the United States; and

c.  consumers throughout the United States have been (and are being) denied the benefits of free and unrestrained competition.

138.  Defendants' ongoing anticompetitive conduct presents a dangerous probability that they will succeed, to the extent they have not already, in their attempt to monopolize the Relevant Output Market.

139.  There are no legitimate business or pro-competitive justifications for Defendants' conduct and any such purported justifications are mere pretexts. Even if such a justification existed,

any purported pro-competitive benefits can be achieved through alternative means less restrictive of competition.

140.    As a direct and proximate result of Defendants' unlawful conduct, consumers nationwide, including Plaintiffs and Class Members, have been and continue to be injured in their business and property in that they paid more for a Premium Online Streaming Services (currently Paramount+) carrying PPV-Level MMA Cards than they otherwise would have in the absence of such conduct.

141.    Plaintiffs and Class Members seek all available relief, including a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) declaring that Defendants' conduct violates Section 2 of the Sherman Act.

142.    Plaintiffs also seek equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the monopolistic and anticompetitive market effects caused by Defendants' unlawful conduct and other relief to assure that similar anticompetitive conduct does not recur.

143.    Plaintiffs and Class Members have no adequate remedy at law in the United States for their overpayment for Premium Online Streaming Services carrying PPV-Level MMA Cards purchased indirectly in the states that do not provide damages remedies to indirect purchasers. Plaintiffs and Class Members will face irreparable harm unless Defendants are enjoined from continuing to maintain, use, and enhance their monopoly in the Relevant Output Market and from continuing to engage in anticompetitive conduct in furtherance of that monopolistic Scheme. Otherwise, Plaintiffs and Class Members will continue to pay more for Premium Online Streaming Services carrying PPV-Level MMA Cards than they otherwise would have in the absence of Defendants' conduct.

## XII.    COUNT TWO: STATE ANTITRUST STATUTES

### (On behalf of Plaintiffs, the PPV Class, and the Streaming Class)

### Arizona Uniform State Antitrust Act
### (Ariz. Rev. Stat. §§ 44-1401, *et seq.*)

144.    Plaintiffs repeat, reallege, and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

145.    PPV offerings of PPV-Level MMA Cards and/or Premium Online Streaming Services carrying PPV-Level MMA Cards were available for purchase, and were purchased, by consumers in Arizona, including Class Members, throughout the Class Period.

146.    In addition, Defendants have operated, and continue to operate, in Arizona as part of their business in the Relevant Output Market, including by directly marketing and selling their products in the state; opening and operating gyms for UFC MMA fighters in Arizona; and holding live PPV-Level MMA Cards in Arizona.

147.    The Arizona Uniform State Antitrust Act provides that "[t]he establishment, maintenance or use of a monopoly or an attempt to establish a monopoly of trade or commerce, any part of which is within this state, by any person for the purpose of excluding competition or controlling, fixing or maintaining prices is unlawful." Ariz. Rev. Stat. § 44-1403.

148.    At all relevant times, Defendants possessed, and continue to possess, significant market power (i.e., monopoly power)—or possessed and continue to possess a dangerous probability of achieving market power—over the Relevant Output Market or narrower markets therein, in that the UFC is the dominant, if not exclusive, provider of PPV-Level MMA Cards nationwide, including in Arizona.

149.    At all relevant times, Defendants monopolized or attempted to monopolize the Relevant Output Market in the United States, including in Arizona, for the purpose of excluding competition and controlling, fixing, and maintaining prices for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards, and they continue to do so, in violation of Arizona antitrust law.

150.    At all relevant times, Defendants acted, and continue to act, knowingly, willfully, and unlawfully to establish, maintain, use, and enhance—or attempt to establish, maintain, use, and enhance—their monopoly power in the Relevant Output Market, including through restrictive, exclusionary, and anticompetitive conduct.

151.   As more fully stated above, Defendants' restrictive, exclusionary, and anticompetitive conduct for the purpose of establishing, maintaining, using, and enhancing their monopoly power in the Relevant Output Market includes, but is not limited to, the following:

     a.   Locking MMA fighters into exclusive contracts, ensuring that competitors could not access top-ranked and top-drawing athletes

     b.   Threatening and retaliating against athletes who sought to negotiate their contracts or work with competitors

     c.   Eliminating cross-promotion with competing MMA Promotions

     d.   Counterprogramming competing MMA Promotions' events

     e.   Preventing competing MMA Promotions from securing television deals

     f.   Purchasing and shuttering competing MMA Promotions (or forcing them to be "feeder" leagues)

152.   Defendants' anticompetitive conduct was, and continues to be, willful, flagrant, and malicious and done with the intent to harm competition and consumers throughout the United States, including in Arizona.

153.   Defendants' anticompetitive conduct substantially affected consumers and economic activity in Arizona, and continues to do so.

154.   As a direct and proximate result of Defendants' monopolization or attempted monopolization of the Relevant Output Market:

     a.   price competition for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards has been restrained, suppressed, and eliminated throughout the United States, including in Arizona;

     b.   the price of PPV for PPV-Level MMA Cards and the price of Premium Online Streaming Services carrying PPV-Level MMA Cards has been raised, fixed, maintained, or stabilized at supra-competitive levels throughout the United States, including in Arizona; and

c. consumers in Arizona have been denied the benefits of free and unrestrained competition.

155. Defendants' ongoing anticompetitive conduct presents a dangerous probability that they will succeed, to the extent they have not already, in their attempt to monopolize the Relevant Output Market.

156. There are no legitimate business or pro-competitive justifications for Defendants' conduct and any such purported justifications are mere pretexts. Even if such a justification existed, any purported pro-competitive benefits can be achieved through alternative means less restrictive of competition.

157. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and/or other members of the PPV Class and/or the Streaming Class in Arizona have been, and continue to be, injured in their business and property in that they paid more for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards than they otherwise would have in the absence of such conduct.

158. Plaintiffs and Class Members seek all available relief under Arizona law.

159. Plaintiffs will serve a copy of this Complaint on the Attorney General of the State of Arizona, and file proof of service with this Court, in compliance with Ariz. Rev. Stat. § 44-1415.

**Colorado State Antitrust Act of 2023**
**(Colo. Rev Stat §§ 6-4-101, *et seq.*)**

160. Plaintiffs repeat, reallege, and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

161. PPV offerings of PPV-Level MMA Cards and/or Premium Online Streaming Services carrying PPV-Level MMA Cards were available for purchase, and were purchased, by consumers in Colorado, including Class Members, throughout the Class Period.

162. In addition, Defendants have operated, and continue to operate, in Colorado as part of their business in the Relevant Output Market, including by directly marketing and selling their products in the state, and through their UFC Gym location in Lone Tree, Colorado.

163.    The Colorado State Antitrust Act provides that "[i] is illegal for any person to monopolize, attempt to monopolize, or combine or conspire with any other person to monopolize any part of trade or commerce." Colo. Rev Stat § 6-4-105.

164.    At all relevant times, Defendants possessed, and continue to possess, significant market power (i.e., monopoly power)—or possessed and continue to possess a dangerous probability of achieving market power—over the Relevant Output Market or narrower markets therein, in that the UFC is the dominant, if not exclusive, provider of PPV-Level MMA Cards nationwide, including in Colorado.

165.    At all relevant times, Defendants monopolized or attempted to monopolize the Relevant Output Market in the United States, including in Colorado, for the purpose of excluding competition and controlling, fixing, and maintaining prices for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards, and they continue to do so, in violation of the Colorado State Antitrust Act.

166.    At all relevant times, Defendants acted, and continue to act, knowingly, willfully, and unlawfully to establish, maintain, use, and enhance—or attempt to establish, maintain, use, and enhance—their monopoly power in the Relevant Output Market, including through restrictive, exclusionary, and anticompetitive conduct.

167.    As more fully stated above, Defendants' restrictive, exclusionary, and anticompetitive conduct for the purpose of establishing, maintaining, using, and enhancing their monopoly power in the Relevant Output Market includes, but is not limited to, the following:

  a.  Locking MMA fighters into exclusive contracts, ensuring that competitors could not access top-ranked and top-drawing athletes

  b.  Threatening and retaliating against athletes who sought to negotiate their contracts or work with competitors

  c.  Eliminating cross-promotion with competing MMA Promotions

  d.  Counterprogramming competing MMA Promotions' events

  e.  Preventing competing MMA Promotions from securing television deals

f.  Purchasing and shuttering competing MMA Promotions

168.  Defendants' anticompetitive conduct was, and continues to be, willful, flagrant, and malicious and done with the intent to harm competition and consumers throughout the United States, including in Colorado.

169.  Defendants' anticompetitive conduct substantially affected consumers and economic activity in Colorado, and continues to do so.

170.  As a direct and proximate result of Defendants' monopolization or attempted monopolization of the Relevant Output Market:

a.  price competition for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards has been restrained, suppressed, and eliminated throughout the United States, including in Colorado;

b.  the price of PPV for PPV-Level MMA Cards and the price of Premium Online Streaming Services carrying PPV-Level MMA Cards has been raised, fixed, maintained, or stabilized at supra-competitive levels throughout the United States, including in Colorado; and

c.  consumers in Colorado have been denied the benefits of free and unrestrained competition.

171.  Defendants' ongoing anticompetitive conduct presents a dangerous probability that they will succeed, to the extent they have not already, in their attempt to monopolize the Relevant Output Market.

172.  There are no legitimate business or pro-competitive justifications for Defendants' conduct and any such purported justifications are mere pretexts. Even if such a justification existed, any purported pro-competitive benefits can be achieved through alternative means less restrictive of competition.

173.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and/or other members of the PPV Class and/or the Streaming Class in Colorado have been, and continue to be, injured in their business and property in that they paid more for PPV offerings of PPV-Level

MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards than they otherwise would have in the absence of such conduct.

174.    Plaintiffs and Class Members seek all available relief under Colorado law.

175.    Plaintiffs will mail a copy of this Complaint to the Attorney General of the State of Colorado, in compliance with Colo. Rev. Stat. Ann. § 6-4-116.

**Connecticut Antitrust Act**
**(Conn. Gen. Stat. §§ 35-24, *et seq.*)**

176.    Plaintiffs repeat, reallege, and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

177.    PPV offerings of PPV-Level MMA Cards and/or Premium Online Streaming Services carrying PPV-Level MMA Cards were available for purchase, and were purchased, by consumers in Connecticut, including Class Members, throughout the Class Period.

178.    In addition, Defendants have operated, and continue to operate, in Connecticut as part of their business in the Relevant Output Market, including by directly marketing and selling their products in the state.

179.    The Connecticut Antitrust Act provides that "[e]very contract, combination, or conspiracy to monopolize, or attempt to monopolize, or monopolization of any part of trade or commerce is unlawful…." Conn. Gen. Stat. § 35-27.

180.    At all relevant times, Defendants possessed, and continue to possess, significant market power (i.e., monopoly power)—or possessed and continue to possess a dangerous probability of achieving market power—over the Relevant Output Market or narrower markets therein, in that the UFC is the dominant, if not exclusive, provider of PPV-Level MMA Cards nationwide, including in Connecticut.

181.    At all relevant times, Defendants monopolized or attempted to monopolize the Relevant Output Market in the United States, including in Connecticut, for the purpose of excluding competition and controlling, fixing, and maintaining prices for PPV offerings of PPV-Level MMA

Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards, and they continue to do so, in violation of Connecticut antitrust law.

182.    At all relevant times, Defendants acted, and continue to act, knowingly, willfully, and unlawfully to establish, maintain, use, and enhance—or attempt to establish, maintain, use, and enhance—their monopoly power in the Relevant Output Market, including through restrictive, exclusionary, and anticompetitive conduct.

183.    As more fully stated above, Defendants' restrictive, exclusionary, and anticompetitive conduct for the purpose of establishing, maintaining, using, and enhancing their monopoly power in the Relevant Output Market includes, but is not limited to, the following:

     a.  Locking MMA fighters into exclusive contracts, ensuring that competitors could not access top-ranked and top-drawing athletes

     b.  Threatening and retaliating against athletes who sought to negotiate their contracts or work with competitors

     c.  Eliminating cross-promotion with competing MMA Promotions

     d.  Counterprogramming competing MMA Promotions' events

     e.  Preventing competing MMA Promotions from securing television deals

     f.  Purchasing and shuttering competing MMA Promotions (or forcing them to be "feeder" leagues)

184.    Defendants' anticompetitive conduct was willful, flagrant, and malicious and was done with the intent to harm competition and consumers throughout the United States, including in Connecticut.

185.    Defendants' anticompetitive conduct substantially affected consumers and economic activity in Connecticut, and continues to do so.

186.    As a direct and proximate result of Defendants' monopolization or attempted monopolization of the Relevant Output Market:

a.  price competition for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards has been restrained, suppressed, and eliminated throughout the United States, including in Connecticut;

b.  the price of PPV for PPV-Level MMA Cards and the price of Premium Online Streaming Services carrying PPV-Level MMA Cards has been raised, fixed, maintained, or stabilized at supra-competitive levels throughout the United States, including in Connecticut; and

c.  consumers in Connecticut have been denied the benefits of free and unrestrained competition.

187.    Defendants' ongoing anticompetitive conduct presents a dangerous probability that they will succeed, to the extent they have not already, in their attempt to monopolize the Relevant Output Market.

188.    There are no legitimate business or pro-competitive justifications for Defendants' conduct and any such purported justifications are mere pretexts. Even if such a justification existed, any purported pro-competitive benefits can be achieved through alternative means less restrictive of competition.

189.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and/or other members of the PPV Class and/or the Streaming Class in Connecticut have been, and continue to be, injured in their business and property in that they paid more for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards than they otherwise would have in the absence of such conduct.

190.    Plaintiffs and Class Members seek all available relief under Connecticut law.

191.    Plaintiffs will mail a copy of this Complaint to the Attorney General of the State of Connecticut, in compliance with Conn. Gen. Stat. Ann. § 35-37.

**Delaware Antitrust Act**
**(6 Del. Code §§ 2101, *et seq.*)**

192.     Plaintiffs repeat, reallege, and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

193.     PPV offerings of PPV-Level MMA Cards and/or Premium Online Streaming Services carrying PPV-Level MMA Cards were available for purchase, and were purchased, by consumers in Delaware, including Class Members, throughout the Class Period.

194.     The Delaware Antitrust Act provides that "[i]t is unlawful for a person to monopolize, attempt to monopolize, or combine or conspire with any other persons to monopolize trade or commerce of this State." 6 Del. Code § 2103.

195.     At all relevant times, Defendants possessed, and continue to possess, significant market power (i.e., monopoly power)—or possessed and continue to possess a dangerous probability of achieving market power—over the Relevant Output Market or narrower markets therein, in that the UFC is the dominant, if not exclusive, provider of PPV-Level MMA Cards nationwide, including in Delaware.

196.     At all relevant times, Defendants monopolized or attempted to monopolize the Relevant Output Market in the United States, including in Delaware, for the purpose of excluding competition and controlling, fixing, and maintaining prices for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards, and they continue to do so, in violation of Delaware antitrust law.

197.     At all relevant times, Defendants acted knowingly, willfully, and unlawfully to establish, maintain, use, and enhance—or attempt to establish, maintain, use, and enhance—their monopoly power in the Relevant Output Market, including through restrictive, exclusionary, and anticompetitive conduct.

198.     As more fully stated above, Defendants' restrictive, exclusionary, and anticompetitive conduct for the purpose of establishing, maintaining, using, and enhancing their monopoly power in the Relevant Output Market includes, but is not limited to, the following:

    a.   Locking MMA fighters into exclusive contracts, ensuring that competitors could not access top-ranked and top-drawing athletes

b.  Threatening and retaliating against athletes who sought to negotiate their contracts or work with competitors

c.  Eliminating cross-promotion with competing MMA Promotions

d.  Counterprogramming competing MMA Promotions' events

e.  Preventing competing MMA Promotions from securing television deals

f.  Purchasing and shuttering competing MMA Promotions (or forcing them to be "feeder" leagues)

199.    Defendants' anticompetitive conduct was, and continues to be, willful, flagrant, and malicious and done with the intent to harm competition and consumers throughout the United States, including in Delaware.

200.    Defendants' anticompetitive conduct substantially affected consumers and economic activity in Delaware, and continues to do so.

201.    As a direct and proximate result of Defendants' monopolization or attempted monopolization of the Relevant Output Market:

a.  price competition for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards has been restrained, suppressed, and eliminated throughout the United States, including in Delaware;

b.  the price of PPV for PPV-Level MMA Cards and the price of Premium Online Streaming Services carrying PPV-Level MMA Cards has been raised, fixed, maintained, or stabilized at supra-competitive levels throughout the United States, including in Delaware; and

c.  consumers in Delaware have been denied the benefits of free and unrestrained competition.

202.    Defendants' ongoing anticompetitive conduct presents a dangerous probability that they will succeed, to the extent they have not already, in their attempt to monopolize the Relevant Output Market.

203.    There are no legitimate business or pro-competitive justifications for Defendants' conduct and any such purported justifications are mere pretexts. Even if such a justification existed, any purported pro-competitive benefits can be achieved through alternative means less restrictive of competition.

204.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and/or other members of the PPV Class and/or the Streaming Class in Delaware have been, and continue to be, injured in their business and property in that they paid more for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards than they otherwise would have in the absence of such conduct.

205.    Plaintiffs and Class Members seek all available relief under Delaware law.

**The District of Columbia Antitrust Act**
**(D.C. Code §§ 28-4501, *et seq.*)**

206.    Plaintiffs repeat, reallege, and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

207.    PPV offerings of PPV-Level MMA Cards and/or Premium Online Streaming Services carrying PPV-Level MMA Cards were available for purchase, and were purchased, by consumers in the District of Columbia (D.C.), including Class Members, throughout the Class Period.

208.    In addition, Defendants have operated, and continue to operate, in D.C. as part of their business in the Relevant Output Market, including by directly marketing and selling their products in D.C. and by holding live PPV-Level MMA Cards in D.C.

209.    The District of Columbia Antitrust Act provides that "[i]t shall be unlawful for any person to monopolize, attempt to monopolize, or combine or conspire with any other person or persons to monopolize any part of trade or commerce, all or any part of which is within the District of Columbia." D.C. Code § 28-4503.

210.    At all relevant times, Defendants possessed, and continue to possess, significant market power (i.e., monopoly power)—or possessed and continue to possess a dangerous probability of achieving market power—over the Relevant Output Market or narrower markets therein, in that

the UFC is the dominant, if not exclusive, provider of PPV-Level MMA Cards nationwide, including in D.C.

211.    At all relevant times, Defendants monopolized or attempted to monopolize the Relevant Output Market in the United States, including in D.C., for the purpose of excluding competition and controlling, fixing, and maintaining prices for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards, and they continue to do so, in violation of D.C. antitrust law.

212.    At all relevant times, Defendants acted, and continue to act, knowingly, willfully, and unlawfully to establish, maintain, use, and enhance—or attempt to establish, maintain, use, and enhance—their monopoly power in the Relevant Output Market, including through restrictive, exclusionary, and anticompetitive conduct.

213.    As more fully stated above, Defendants' restrictive, exclusionary, and anticompetitive conduct for the purpose of establishing, maintaining, using, and enhancing their monopoly power in the Relevant Output Market includes, but is not limited to, the following:

    a.    Locking MMA fighters into exclusive contracts, ensuring that competitors could not access top-ranked and top-drawing athletes

    b.    Threatening and retaliating against athletes who sought to negotiate their contracts or work with competitors

    c.    Eliminating cross-promotion with competing MMA Promotions

    d.    Counterprogramming competing MMA Promotions' events

    e.    Preventing competing MMA Promotions from securing television deals

    f.    Purchasing and shuttering competing MMA Promotions (or forcing them to be "feeder" leagues)

214.    Defendants' anticompetitive conduct was, and continues to be, willful, flagrant, and malicious and done with the intent to harm competition and consumers throughout the United States, including in D.C.

215.     Defendants' anticompetitive conduct substantially affected consumers and economic activity in D.C, and continues to do so.

216.     As a direct and proximate result of Defendants' monopolization or attempted monopolization of the Relevant Output Market:

    a.     price competition for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards has been restrained, suppressed, and eliminated throughout the United States, including in D.C.;

    b.     the price of PPV for PPV-Level MMA Cards and the price of Premium Online Streaming Services carrying PPV-Level MMA Cards has been raised, fixed, maintained, or stabilized at supra-competitive levels throughout the United States, including in D.C.; and

    c.     consumers in D.C. have been denied the benefits of free and unrestrained competition.

217.     Defendants' ongoing anticompetitive conduct presents a dangerous probability that they will succeed, to the extent they have not already, in their attempt to monopolize the Relevant Output Market.

218.     There are no legitimate business or pro-competitive justifications for Defendants' conduct and any such purported justifications are mere pretexts. Even if such a justification existed, any purported pro-competitive benefits can be achieved through alternative means less restrictive of competition.

219.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and/or other members of the PPV Class and/or the Streaming Class in D.C. have been, and continue to be, injured in their business and property in that they paid more for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards than they otherwise would have in the absence of such conduct.

220.     Plaintiffs and Class Members seek all available relief under D.C. law.

**Iowa Competition Law**
**(Iowa Code §§ 553.1, *et seq.*)**

221.    Plaintiffs repeat, reallege, and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

222.    PPV offerings of PPV-Level MMA Cards and/or Premium Online Streaming Services carrying PPV-Level MMA Cards were available for purchase, and were purchased, by consumers in Iowa, including Class Members, throughout the Class Period.

223.    In addition, Defendants have operated, and continue to operate, in Iowa as part of their business in the Relevant Output Market, including by directly marketing and selling their products in the state and by holding live PPV-Level MMA Cards in Iowa.

224.    The Iowa Competition Law provides that "[a] person shall not attempt to establish or establish, maintain, or use a monopoly of trade or commerce in a relevant market for the purpose of excluding competition or of controlling, fixing, or maintaining prices." Iowa Code § 553.5.

225.    At all relevant times, Defendants possessed, and continue to possess, significant market power (i.e., monopoly power)—or possessed and continue to possess a dangerous probability of achieving market power—over the Relevant Output Market or narrower markets therein, in that the UFC is the dominant, if not exclusive, provider of PPV-Level MMA Cards nationwide, including in Iowa.

226.    At all relevant times, Defendants monopolized or attempted to monopolize the Relevant Output Market in the United States, including in Iowa, for the purpose of excluding competition and controlling, fixing, and maintaining prices for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards, and they continue to do so, in violation of Iowa antitrust law.

227.    At all relevant times, Defendants acted, and continue to act, knowingly, willfully, and unlawfully to establish, maintain, use, and enhance—or attempt to establish, maintain, use, and enhance—their monopoly power in the Relevant Output Market, including through restrictive, exclusionary, and anticompetitive conduct.

228.    As more fully stated above, Defendants' restrictive, exclusionary, and anticompetitive conduct for the purpose of establishing, maintaining, using, and enhancing their monopoly power in the Relevant Output Market includes, but is not limited to, the following:

a.    Locking MMA fighters into exclusive contracts, ensuring that competitors could not access top-ranked and top-drawing athletes

b.    Threatening and retaliating against athletes who sought to negotiate their contracts or work with competitors

c.    Eliminating cross-promotion with competing MMA Promotions

d.    Counterprogramming competing MMA Promotions' events

e.    Preventing competing MMA Promotions from securing television deals

f.    Purchasing and shuttering competing MMA Promotions (or forcing them to be "feeder" leagues)

229.    Defendants' anticompetitive conduct was, and continues to be, willful, flagrant, and malicious and done with the intent to harm competition and consumers throughout the United States, including in Iowa.

230.    Defendants' anticompetitive conduct substantially affected consumers and economic activity in Iowa, and continues to do so.

231.    As a direct and proximate result of Defendants' monopolization or attempted monopolization of the Relevant Output Market:

a.    price competition for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards has been restrained, suppressed, and eliminated throughout the United States, including in Iowa;

b.    the price of PPV for PPV-Level MMA Cards and the price of Premium Online Streaming Services carrying PPV-Level MMA Cards has been raised, fixed, maintained, or stabilized at supra-competitive levels throughout the United States, including in Iowa; and

c.    consumers in Iowa have been denied the benefits of free and unrestrained competition.

232.    Defendants' ongoing anticompetitive conduct presents a dangerous probability that they will succeed, to the extent they have not already, in their attempt to monopolize the Relevant Output Market.

233.    There are no legitimate business or pro-competitive justifications for Defendants' conduct and any such purported justifications are mere pretexts. Even if such a justification existed, any purported pro-competitive benefits can be achieved through alternative means less restrictive of competition.

234.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and/or other members of the PPV Class and/or the Streaming Class in Iowa have been, and continue to be, injured in their business and property in that they paid more for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards than they otherwise would have in the absence of such conduct.

235.    Plaintiffs and Class Members seek all available relief under Iowa law.

**Maine Monopolies and Profiteering Law**
**(Me. Rev. Stat. Ann. 10, §§ 1101, *et seq.*)**

236.    Plaintiffs repeat, reallege, and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

237.    PPV offerings of PPV-Level MMA Cards and/or Premium Online Streaming Services carrying PPV-Level MMA Cards were available for purchase, and were purchased, by consumers in Maine, including Class Members, throughout the Class Period.

238.    In addition, Defendants have operated, and continue to operate, in Maine as part of their business in the Relevant Output Market, including by directly marketing and selling their products in Maine and by holding live PPV-Level MMA Cards in Maine.

239.    Under the Maine Monopolies and Profiteering Law, "[w]hoever shall monopolize or attempt to monopolize or combine or conspire with any other person or persons to monopolize any

part of the trade or commerce of this State shall be guilty of a Class C crime." Me. Rev. Stat. Ann. Tit. 10, § 1102. Further, "[a]ny person . . . injured directly or indirectly in its business or property by any other person or corporation by reason of anything forbidden or declared to be unlawful by section 1101, 1102 or 1102-A, may sue for the injury in a civil action." *Id.* § 1104.

240.    At all relevant times, Defendants possessed, and continue to possess, significant market power (i.e., monopoly power)—or possessed and continue to possess a dangerous probability of achieving market power—over the Relevant Output Market or narrower markets therein, in that the UFC is the dominant, if not exclusive, provider of PPV-Level MMA Cards nationwide, including in Maine.

241.    At all relevant times, Defendants monopolized or attempted to monopolize the Relevant Output Market in the United States, including in Maine, for the purpose of excluding competition and controlling, fixing, and maintaining prices for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards, and they continue to do so, in violation of Maine antitrust law.

242.    At all relevant times, Defendants acted, and continue to act, knowingly, willfully, and unlawfully to establish, maintain, use, and enhance—or attempt to establish, maintain, use, and enhance—their monopoly power in the Relevant Output Market, including through restrictive, exclusionary, and anticompetitive conduct.

243.    As more fully stated above, Defendants' restrictive, exclusionary, and anticompetitive conduct for the purpose of establishing, maintaining, using, and enhancing their monopoly power in the Relevant Output Market includes, but is not limited to, the following:

      a.  Locking MMA fighters into exclusive contracts, ensuring that competitors could not access top-ranked and top-drawing athletes

      b.  Threatening and retaliating against athletes who sought to negotiate their contracts or work with competitors

      c.  Eliminating cross-promotion with competing MMA Promotions

      d.  Counterprogramming competing MMA Promotions' events

e.   Preventing competing MMA Promotions from securing television deals

f.   Purchasing and shuttering competing MMA Promotions (or forcing them to be "feeder" leagues)

244.   Defendants' anticompetitive conduct was, and continues to be, willful, flagrant, and malicious and done with the intent to harm competition and consumers throughout the United States, including in Maine.

245.   Defendants' anticompetitive conduct substantially affected consumers and economic activity in Maine, and continues to do so.

246.   As a direct and proximate result of Defendants' monopolization or attempted monopolization of the Relevant Output Market:

a.   price competition for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards has been restrained, suppressed, and eliminated throughout the United States, including in Maine;

b.   the price of PPV for PPV-Level MMA Cards and the price of Premium Online Streaming Services carrying PPV-Level MMA Cards has been raised, fixed, maintained, or stabilized at supra-competitive levels throughout the United States, including in Maine; and

c.   consumers in Maine have been denied the benefits of free and unrestrained competition.

247.   Defendants' ongoing anticompetitive conduct presents a dangerous probability that they will succeed, to the extent they have not already, in their attempt to monopolize the Relevant Output Market.

248.   There are no legitimate business or pro-competitive justifications for Defendants' conduct and any such purported justifications are mere pretexts. Even if such a justification existed, any purported pro-competitive benefits can be achieved through alternative means less restrictive of competition.

249.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and/or other members of the PPV Class and/or the Streaming Class in Maine have been, and continue to be, injured in their business and property in that they paid more for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards than they otherwise would have in the absence of such conduct.

250.    Plaintiffs and Class Members seek all available relief under Maine law.

**Maryland Antitrust Act**
**(Md. Code Ann., Com. Law §§ 11-201, *et seq.*)**

251.    Plaintiffs repeat, reallege, and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

252.    PPV offerings of PPV-Level MMA Cards and/or Premium Online Streaming Services carrying PPV-Level MMA Cards were available for purchase, and were purchased, by consumers in Maryland, including Class Members, throughout the Class Period.

253.    In addition, Defendants have operated, and continue to operate, in Maryland as part of their business in the Relevant Output Market, including by directly marketing and selling their products in the state and by holding live PPV-Level MMA Cards in Maryland.

254.    Under the Maryland Antitrust Act, "[a] person may not . . . [m]onopolize, attempt to monopolize, or combine or conspire with one or more other persons to monopolize any part of the trade or commerce within the State, for the purpose of excluding competition or of controlling, fixing, or maintaining prices in trade or commerce." Md. Code Ann., Com. Law § 11-204(a)(2).

255.    At all relevant times, Defendants possessed, and continue to possess, significant market power (i.e., monopoly power)—or possessed and continue to possess a dangerous probability of achieving market power—over the Relevant Output Market or narrower markets therein, in that the UFC is the dominant, if not exclusive, provider of PPV-Level MMA Cards nationwide, including in Maryland.

256.    At all relevant times, Defendants monopolized or attempted to monopolize the Relevant Output Market in the United States, including in Maryland, for the purpose of excluding

competition and controlling, fixing, and maintaining prices for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards, and they continue to do so, in violation of Maryland antitrust law.

257.    At all relevant times, Defendants acted, and continue to act, knowingly, willfully, and unlawfully to establish, maintain, use, and enhance—or attempt to establish, maintain, use, and enhance—their monopoly power in the Relevant Output Market, including through restrictive, exclusionary, and anticompetitive conduct.

258.    As more fully stated above, Defendants' restrictive, exclusionary, and anticompetitive conduct for the purpose of establishing, maintaining, using, and enhancing their monopoly power in the Relevant Output Market includes, but is not limited to, the following:

    a.    Locking MMA fighters into exclusive contracts, ensuring that competitors could not access top-ranked and top-drawing athletes

    b.    Threatening and retaliating against athletes who sought to negotiate their contracts or work with competitors

    c.    Eliminating cross-promotion with competing MMA Promotions

    d.    Counterprogramming competing MMA Promotions' events

    e.    Preventing competing MMA Promotions from securing television deals

    f.    Purchasing and shuttering competing MMA Promotions (or forcing them to be "feeder" leagues)

259.    Defendants' conduct was, and continues to be, willful, flagrant, and malicious and done with the intent to harm competition and consumers throughout the United States, including in Maryland.

260.    Defendants' anticompetitive conduct substantially affected consumers and economic activity in Maryland, and continues to do so.

261.    As a direct and proximate result of Defendants' monopolization or attempted monopolization of the Relevant Output Market:

a.  price competition for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards has been restrained, suppressed, and eliminated throughout the United States, including in Maryland;

b.  the price of PPV for PPV-Level MMA Cards and the price of Premium Online Streaming Services carrying PPV-Level MMA Cards has been raised, fixed, maintained, or stabilized at supra-competitive levels throughout the United States, including in Maryland; and

c.  consumers in Maryland have been denied the benefits of free and unrestrained competition.

262.    Defendants' ongoing anticompetitive conduct presents a dangerous probability that they will succeed, to the extent they have not already, in their attempt to monopolize the Relevant Output Market.

263.    There are no legitimate business or pro-competitive justifications for Defendants' conduct and any such purported justifications are mere pretexts. Even if such a justification existed, any purported pro-competitive benefits can be achieved through alternative means less restrictive of competition.

264.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and/or other members of the PPV Class and/or the Streaming Class in Maryland have been, and continue to be, injured in their business and property in that they paid more for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards than they otherwise would have in the absence of such conduct.

265.    Plaintiffs and Class Members seek all available relief under Maryland law.

**Michigan Antitrust Reform Act**
**(Mich. Comp. Laws §§ 445.771, *et seq.*)**

266.    Plaintiffs repeat, reallege, and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

267. PPV offerings of PPV-Level MMA Cards and/or Premium Online Streaming Services carrying PPV-Level MMA Cards were available for purchase, and were purchased, by consumers in Michigan, including Class Members, throughout the Class Period.

268. In addition, Defendants have operated, and continue to operate, in Michigan as part of their business in the Relevant Output Market, including by directly marketing and selling their products in Michigan and by holding live PPV-Level MMA Cards in Michigan. UFC PPV-Level MMA Cards are popular among Michigan MMA fans; for example, the UFC 257 fight between Conor McGregor and Dustin Poirier was the third most-bet-on sporting event in Michigan's first weekend of legal online gambling in 2021.

269. Under the Michigan Antitrust Reform Act, "[t]he establishment, maintenance, or use of a monopoly, or any attempt to establish a monopoly, of trade or commerce in a relevant market by any person, for the purpose of excluding or limiting competition or controlling, fixing, or maintaining prices, is unlawful." Mich. Comp. Laws Ann. § 445.773.

270. At all relevant times, Defendants possessed, and continue to possess, significant market power (i.e., monopoly power)—or possessed and continue to possess a dangerous probability of achieving market power—over the Relevant Output Market or narrower markets therein, in that the UFC is the dominant, if not exclusive, provider of PPV-Level MMA Cards nationwide, including in Michigan.

271. At all relevant times, Defendants monopolized or attempted to monopolize the Relevant Output Market in the United States, including in Michigan, for the purpose of excluding or limiting competition and controlling, fixing, and maintaining prices for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards, and they continue to do so, in violation of Michigan antitrust law.

272. At all relevant times, Defendants acted, and continue to act, knowingly, willfully, and unlawfully to establish, maintain, use, and enhance—or attempt to establish, maintain, use, and enhance—their monopoly power in the Relevant Output Market, including through restrictive, exclusionary, and anticompetitive conduct.

273.    As more fully stated above, Defendants' restrictive, exclusionary, and anticompetitive conduct for the purpose of establishing, maintaining, using, and enhancing their monopoly power in the Relevant Output Market includes, but is not limited to, the following:

a.    Locking MMA fighters into exclusive contracts, ensuring that competitors could not access top-ranked and top-drawing athletes

b.    Threatening and retaliating against athletes who sought to negotiate their contracts or work with competitors

c.    Eliminating cross-promotion with competing MMA Promotions

d.    Counterprogramming competing MMA Promotions' events

e.    Preventing competing MMA Promotions from securing television deals

f.    Purchasing and shuttering competing MMA Promotions (or forcing them to be "feeder" leagues)

274.    Defendants' conduct was, and continues to be, willful, flagrant, and malicious and done with the intent to harm competition and consumers throughout the United States, including in Michigan.

275.    Defendants' anticompetitive conduct substantially affected consumers and economic activity in Michigan, and continues to do so.

276.    As a direct and proximate result of Defendants' monopolization or attempted monopolization of the Relevant Output Market:

a.    price competition for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards has been restrained, suppressed, and eliminated throughout the United States, including in Michigan;

b.    the price of PPV for PPV-Level MMA Cards and the price of Premium Online Streaming Services carrying PPV-Level MMA Cards has been raised, fixed, maintained, or stabilized at supra-competitive levels throughout the United States, including in Michigan; and

c.  consumers in Michigan have been denied the benefits of free and unrestrained competition.

277.  Defendants' ongoing anticompetitive conduct presents a dangerous probability that they will succeed, to the extent they have not already, in their attempt to monopolize the Relevant Output Market.

278.  There are no legitimate business or pro-competitive justifications for Defendants' conduct and any such purported justifications are mere pretexts. Even if such a justification existed, any purported pro-competitive benefits can be achieved through alternative means less restrictive of competition.

279.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and/or other members of the PPV Class and/or the Streaming Class in Michigan have been, and continue to be, injured in their business and property in that they paid more for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards than they otherwise would have in the absence of such conduct.

280.  Plaintiffs and Class Members seek all available relief under Michigan law.

**Minnesota Antitrust Law of 1971**
**(Minn. Stat. Ann. §§ 325D.49, *et seq.*)**

281.  Plaintiffs repeat, reallege, and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

282.  PPV offerings of PPV-Level MMA Cards and/or Premium Online Streaming Services carrying PPV-Level MMA Cards were available for purchase, and were purchased, by consumers in Minnesota, including Class Members, throughout the Class Period.

283.  In addition, Defendants have operated, and continue to operate, in Minnesota as part of their business in the Relevant Output Market, including by directly marketing and selling their products in Minnesota and by holding live PPV-Level MMA Cards in Minnesota.

284.  Under the Minnesota Antitrust Law of 1971, "[t]he establishment, maintenance, or use of, or any attempt to establish, maintain, or use monopoly power over any part of trade or commerce

by any person or persons for the purpose of affecting competition or controlling, fixing, or maintaining prices is unlawful." Minn. Stat. Ann. § 325D.52.

285.    At all relevant times, Defendants possessed, and continue to possess, significant market power (i.e., monopoly power)—or possessed and continue to possess a dangerous probability of achieving market power—over the Relevant Output Market or narrower markets therein, in that the UFC is the dominant, if not exclusive, provider of PPV-Level MMA Cards nationwide, including in Minnesota.

286.    At all relevant times, Defendants monopolized or attempted to monopolize the Relevant Output Market in the United States, including in Minnesota, for the purpose of excluding or limiting competition and controlling, fixing, and maintaining prices for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards, and they continue to do so, in violation of Minnesota antitrust law.

287.    At all relevant times, Defendants acted, and continue to act, knowingly, willfully, and unlawfully to establish, maintain, use, and enhance—or attempt to establish, maintain, use, and enhance—their monopoly power in the Relevant Output Market, including through restrictive, exclusionary, and anticompetitive conduct.

288.    As more fully stated above, Defendants' restrictive, exclusionary, and anticompetitive conduct for the purpose of establishing, maintaining, using, and enhancing their monopoly power in the Relevant Output Market includes, but is not limited to, the following:

    a.  Locking MMA fighters into exclusive contracts, ensuring that competitors could not access top-ranked and top-drawing athletes

    b.  Threatening and retaliating against athletes who sought to negotiate their contracts or work with competitors

    c.  Eliminating cross-promotion with competing MMA Promotions

    d.  Counterprogramming competing MMA Promotions' events

    e.  Preventing competing MMA Promotions from securing television deals

f.   Purchasing and shuttering competing MMA Promotions (or forcing them to be "feeder" leagues)

289.   Defendants' conduct was, and continues to be, willful, flagrant, and malicious and done with the intent to harm competition and consumers throughout the United States, including in Minnesota.

290.   Defendants' anticompetitive conduct substantially affected consumers and economic activity in Minnesota, and continues to do so.

291.   As a direct and proximate result of Defendants' monopolization or attempted monopolization of the Relevant Output Market:

a.   price competition for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards has been restrained, suppressed, and eliminated throughout the United States, including in Minnesota;

b.   the price of PPV for PPV-Level MMA Cards and the price of Premium Online Streaming Services carrying PPV-Level MMA Cards has been raised, fixed, maintained, or stabilized at supra-competitive levels throughout the United States, including in Minnesota; and

c.   consumers in Minnesota have been denied the benefits of free and unrestrained competition.

292.   Defendants' ongoing anticompetitive conduct presents a dangerous probability that they will succeed, to the extent they have not already, in their attempt to monopolize the Relevant Output Market.

293.   There are no legitimate business or pro-competitive justifications for Defendants' conduct and any such purported justifications are mere pretexts. Even if such a justification existed, any purported pro-competitive benefits can be achieved through alternative means less restrictive of competition.

294.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and/or other members of the PPV Class and/or the Streaming Class in Minnesota have been, and continue

to be, injured in their business and property in that they paid more for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards than they otherwise would have in the absence of such conduct.

295.     Plaintiffs and Class Members seek all available relief under Minnesota law.

### Title 75, Chapter 21 of the Mississippi Code
### (Miss. Code. Ann. §§ 75-21-1, *et seq.*)

296.     Plaintiffs repeat, reallege, and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

297.     PPV offerings of PPV-Level MMA Cards and/or Premium Online Streaming Services carrying PPV-Level MMA Cards were available for purchase, and were purchased, by consumers in Mississippi, including Class Members, throughout the Class Period.

298.     In addition, Defendants have operated, and continue to operate, in Mississippi as part of their business in the Relevant Output Market, including by directly marketing and selling their products in Mississippi and by holding live PPV-Level MMA Cards in Mississippi.

299.     The Mississippi Code prohibits "[a]ny corporation, domestic or foreign, or individual, partnership, or association of persons" from "monopoliz[ing] or attempt[ing] to monopolize the production, control or sale of any commodity, or the prosecution, management or control of any kind, class or description of business," regardless of their intent, if the aforementioned conduct is accomplished "to a degree inimical to public welfare." Miss. Code Ann. § 75-21-3.

300.     At all relevant times, Defendants possessed, and continue to possess, significant market power (i.e., monopoly power)—or possessed and continue to possess a dangerous probability of achieving market power—over the Relevant Output Market or narrower markets therein, in that the UFC is the dominant, if not exclusive, provider of PPV-Level MMA Cards nationwide, including in Mississippi.

301.     At all relevant times, Defendants monopolized or attempted to monopolize the Relevant Output Market in the United States, including in Mississippi, for the purpose of excluding competition and controlling, fixing, and maintaining prices for PPV offerings of PPV-Level MMA

Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards, and they continue to do so, in violation of Mississippi antitrust law.

302.    At all relevant times, Defendants acted, and continue to act, knowingly, willfully, and unlawfully to establish, maintain, use, and enhance—or attempt to establish, maintain, use, and enhance—their monopoly power in the Relevant Output Market, including through restrictive, exclusionary, and anticompetitive conduct.

303.    As more fully stated above, Defendants' restrictive, exclusionary, and anticompetitive conduct for the purpose of establishing, maintaining, using, and enhancing their monopoly power in the Relevant Output Market includes, but is not limited to, the following:

a. Locking MMA fighters into exclusive contracts, ensuring that competitors could not access top-ranked and top-drawing athletes

b. Threatening and retaliating against athletes who sought to negotiate their contracts or work with competitors

c. Eliminating cross-promotion with competing MMA Promotions

d. Counterprogramming competing MMA Promotions' events

e. Preventing competing MMA Promotions from securing television deals

f. Purchasing and shuttering competing MMA Promotions (or forcing them to be "feeder" leagues)

304.    Defendants' conduct was, and continues to be, willful, flagrant, and malicious and done with the intent to harm competition and consumers throughout the United States, including in Mississippi.

305.    Defendants' anticompetitive conduct substantially affected consumers and economic activity in Mississippi to a degree that was harmful to public welfare, and it continues to do so.

306.    As a direct and proximate result of Defendants' monopolization or attempted monopolization of the Relevant Output Market:

a.  price competition for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards has been restrained, suppressed, and eliminated throughout the United States, including in Mississippi;

b.  the price of PPV for PPV-Level MMA Cards and the price of Premium Online Streaming Services carrying PPV-Level MMA Cards has been raised, fixed, maintained, or stabilized at supra-competitive levels throughout the United States, including in Mississippi; and

c.  consumers in Mississippi have been denied the benefits of free and unrestrained competition.

307.    Defendants' ongoing anticompetitive conduct presents a dangerous probability that they will succeed, to the extent they have not already, in their attempt to monopolize the Relevant Output Market.

308.    There are no legitimate business or pro-competitive justifications for Defendants' conduct and any such purported justifications are mere pretexts. Even if such a justification existed, any purported pro-competitive benefits can be achieved through alternative means less restrictive of competition.

309.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and/or other members of the PPV Class and/or the Streaming Class in Mississippi have been, and continue to be, injured in their business and property in that they paid more for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards than they otherwise would have in the absence of such conduct.

310.    Plaintiffs and Class Members seek all available relief under Mississippi law.

**Nebraska Junkin Act**
**(Neb. Rev. Stat. Ann. §§ 59-801, _et seq._)**

311.    Plaintiffs repeat, reallege, and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

312.    PPV offerings of PPV-Level MMA Cards and/or Premium Online Streaming Services carrying PPV-Level MMA Cards were available for purchase, and were purchased, by consumers in Nebraska, including Class Members, throughout the Class Period.

313.    In addition, Defendants have operated, and continue to operate, in Nebraska as part of their business in the Relevant Output Market, including by directly marketing and selling their products in Nebraska and by planning and holding live PPV-Level MMA Cards in Nebraska.

314.    The Nebraska Junkin Act provides that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce, within this state, shall be deemed guilty of a Class IV felony." Neb. Rev. Stat. Ann. § 59-802. Further, "[a]ny person who is injured in his or her business or property by any other person or persons by a violation of sections 59-801 to 59-831, whether such injured person dealt directly or indirectly with the defendant, may bring a civil action . . . ." *Id.* § 59-821.

315.    At all relevant times, Defendants possessed, and continue to possess, significant market power (i.e., monopoly power)—or possessed and continue to possess a dangerous probability of achieving market power—over the Relevant Output Market or narrower markets therein, in that the UFC is the dominant, if not exclusive, provider of PPV-Level MMA Cards nationwide, including in Nebraska.

316.    At all relevant times, Defendants monopolized or attempted to monopolize the Relevant Output Market in the United States, including in Nebraska, for the purpose of excluding competition and controlling, fixing, and maintaining prices for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards, and they continue to do so, in violation of Nebraska antitrust law.

317.    At all relevant times, Defendants acted, and continue to act, knowingly, willfully, and unlawfully to establish, maintain, use, and enhance—or attempt to establish, maintain, use, and enhance—their monopoly power in the Relevant Output Market, including through restrictive, exclusionary, and anticompetitive conduct.

318.    As more fully stated above, Defendants' restrictive, exclusionary, and anticompetitive conduct for the purpose of establishing, maintaining, using, and enhancing their monopoly power in the Relevant Output Market includes, but is not limited to, the following:

    a.    Locking MMA fighters into exclusive contracts, ensuring that competitors could not access top-ranked and top-drawing athletes

    b.    Threatening and retaliating against athletes who sought to negotiate their contracts or work with competitors

    c.    Eliminating cross-promotion with competing MMA Promotions

    d.    Counterprogramming competing MMA Promotions' events

    e.    Preventing competing MMA Promotions from securing television deals

    f.    Purchasing and shuttering competing MMA Promotions (or forcing them to be "feeder" leagues)

319.    Defendants' conduct was, and continues to be, willful, flagrant, and malicious and done with the intent to harm competition and consumers throughout the United States, including in Nebraska.

320.    Defendants' anticompetitive conduct substantially affected consumers and economic activity in Nebraska, and continues to do so.

321.    As a direct and proximate result of Defendants' monopolization or attempted monopolization of the Relevant Output Market:

    a.    price competition for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards has been restrained, suppressed, and eliminated throughout the United States, including in Nebraska;

    b.    the price of PPV for PPV-Level MMA Cards and the price of Premium Online Streaming Services carrying PPV-Level MMA Cards has been raised, fixed, maintained, or stabilized at supra-competitive levels throughout the United States, including in Nebraska; and

c. consumers in Nebraska have been denied the benefits of free and unrestrained competition.

322. Defendants' ongoing anticompetitive conduct presents a dangerous probability that they will succeed, to the extent they have not already, in their attempt to monopolize the Relevant Output Market.

323. There are no legitimate business or pro-competitive justifications for Defendants' conduct and any such purported justifications are mere pretexts. Even if such a justification existed, any purported pro-competitive benefits can be achieved through alternative means less restrictive of competition.

324. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and/or other members of the PPV Class and/or the Streaming Class in Nebraska have been, and continue to be, injured in their business and property in that they paid more for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards than they otherwise would have in the absence of such conduct.

325. Plaintiffs and Class Members seek all available relief under Nebraska law.

### Nevada Unfair Trade Practice Act
### (Nev. Rev. Stat. Ann. §§ 598A.010, *et seq.*)

326. Plaintiffs repeat, reallege, and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

327. PPV offerings of PPV-Level MMA Cards and/or Premium Online Streaming Services carrying PPV-Level MMA Cards were available for purchase, and were purchased, by consumers in Nevada, including Class Members, throughout the Class Period.

328. In addition, Defendants have operated, and continue to operate, in Nevada as part of their business in the Relevant Output Market, including by directly marketing and selling their products in the state. In addition, Zuffa, TKO OpCo, and the UFC are all headquartered in Nevada; the UFC has UFC Gyms in Las Vegas and Reno; and the UFC has held numerous live PPV-Level MMA Cards in Nevada (at least 38 since 2024).

329.    The Nevada Unfair Trade Practice Act prohibits "[m]onopolization of trade or commerce in this State, including, without limitation, attempting to monopolize or otherwise combining or conspiring to monopolize trade or commerce in this State." Nev. Rev. Stat. Ann. § 598A.060(1)(e).

330.    At all relevant times, Defendants possessed, and continue to possess, significant market power (i.e., monopoly power)—or possessed and continue to possess a dangerous probability of achieving market power—over the Relevant Output Market or narrower markets therein, in that the UFC is the dominant, if not exclusive, provider of PPV-Level MMA Cards nationwide, including in Nevada.

331.    At all relevant times, Defendants monopolized or attempted to monopolize the Relevant Output Market in the United States, including in Nevada, for the purpose of excluding competition and controlling, fixing, and maintaining prices for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards, and they continue to do so, in violation of Nevada antitrust law.

332.    At all relevant times, Defendants acted, and continue to act, knowingly, willfully, and unlawfully to establish, maintain, use, and enhance—or attempt to establish, maintain, use, and enhance—their monopoly power in the Relevant Output Market, including through restrictive, exclusionary, and anticompetitive conduct.

333.    As more fully stated above, Defendants' restrictive, exclusionary, and anticompetitive conduct for the purpose of establishing, maintaining, using, and enhancing their monopoly power in the Relevant Output Market includes, but is not limited to, the following:

    a.  Locking MMA fighters into exclusive contracts, ensuring that competitors could not access top-ranked and top-drawing athletes

    b.  Threatening and retaliating against athletes who sought to negotiate their contracts or work with competitors

    c.  Eliminating cross-promotion with competing MMA Promotions

    d.  Counterprogramming competing MMA Promotions' events

    e.   Preventing competing MMA Promotions from securing television deals

    f.   Purchasing and shuttering competing MMA Promotions (or forcing them to be "feeder" leagues)

334.    Defendants' conduct was, and continues to be, willful, flagrant, and malicious and done with the intent to harm competition and consumers throughout the United States, including in Nevada.

335.    Defendants' anticompetitive conduct substantially affected consumers and economic activity in Nevada, and continues to do so.

336.    As a direct and proximate result of Defendants' monopolization or attempted monopolization of the Relevant Output Market:

    a.   price competition for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards has been restrained, suppressed, and eliminated throughout the United States, including in Nevada;

    b.   the price of PPV for PPV-Level MMA Cards and the price of Premium Online Streaming Services carrying PPV-Level MMA Cards has been raised, fixed, maintained, or stabilized at supra-competitive levels throughout the United States, including in Nevada; and

    c.   consumers in Nevada have been denied the benefits of free and unrestrained competition.

337.    Defendants' ongoing anticompetitive conduct presents a dangerous probability that they will succeed, to the extent they have not already, in their attempt to monopolize the Relevant Output Market.

338.    There are no legitimate business or pro-competitive justifications for Defendants' conduct and any such purported justifications are mere pretexts. Even if such a justification existed, any purported pro-competitive benefits can be achieved through alternative means less restrictive of competition.

339.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and/or other members of the PPV Class and/or the Streaming Class in Nevada have been, and continue to be, injured in their business and property in that they paid more for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards than they otherwise would have in the absence of such conduct.

340.    Plaintiffs and Class Members seek all available relief under Nevada law.

341.    Plaintiffs will mail a copy of this Complaint to the Attorney General of the State of Nevada simultaneously with filing this Complaint, in compliance with Nev. Rev. Stat. Ann. § 598A.210.3.

### Chapter 356 of the New Hampshire Revised Statutes
### (N.H. Rev. Stat. Ann. §§ 356:1, *et seq.*)

342.    Plaintiffs repeat, reallege, and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

343.    PPV offerings of PPV-Level MMA Cards and/or Premium Online Streaming Services carrying PPV-Level MMA Cards were available for purchase, and were purchased, by consumers in New Hampshire, including Class Members, throughout the Class Period.

344.    In addition, Defendants have operated, and continue to operate, in New Hampshire as part of their business in the Relevant Output Market, including by directly marketing and selling their products in the state.

345.    New Hampshire law provides that "[t]he establishment, maintenance or use of monopoly power, or any attempt to establish, maintain or use monopoly power over trade or commerce for the purpose of affecting competition or controlling, fixing or maintaining prices is unlawful." N.H. Rev. Stat. Ann. § 356:3.

346.    At all relevant times, Defendants possessed, and continue to possess, significant market power (i.e., monopoly power)—or possessed and continue to possess a dangerous probability of achieving market power—over the Relevant Output Market or narrower markets therein, in that

the UFC is the dominant, if not exclusive, provider of PPV-Level MMA Cards nationwide, including in New Hampshire.

347.    At all relevant times, Defendants monopolized or attempted to monopolize the Relevant Output Market in the United States, including in New Hampshire, for the purpose of affecting or excluding competition and controlling, fixing, and maintaining prices for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards, and they continue to do so, in violation of New Hampshire antitrust law.

348.    At all relevant times, Defendants acted, and continue to act, knowingly, willfully, and unlawfully to establish, maintain, use, and enhance—or attempt to establish, maintain, use, and enhance—their monopoly power in the Relevant Output Market, including through restrictive, exclusionary, and anticompetitive conduct.

349.    As more fully stated above, Defendants' restrictive, exclusionary, and anticompetitive conduct for the purpose of establishing, maintaining, using, and enhancing their monopoly power in the Relevant Output Market includes, but is not limited to, the following:

a.  Locking MMA fighters into exclusive contracts, ensuring that competitors could not access top-ranked and top-drawing athletes

b.  Threatening and retaliating against athletes who sought to negotiate their contracts or work with competitors

c.  Eliminating cross-promotion with competing MMA Promotions

d.  Counterprogramming competing MMA Promotions' events

e.  Preventing competing MMA Promotions from securing television deals

f.  Purchasing and shuttering competing MMA Promotions (or forcing them to be "feeder" leagues)

350.    Defendants' anticompetitive conduct was, and continues to be, willful, flagrant, and malicious and done with the intent to harm competition and consumers throughout the United States, including in New Hampshire.

351.    Defendants' anticompetitive conduct substantially affected consumers and economic activity in New Hampshire, and continues to do so.

352.    As a direct and proximate result of Defendants' monopolization or attempted monopolization of the Relevant Output Market:

    a.    price competition for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards has been restrained, suppressed, and eliminated throughout the United States, including in New Hampshire;

    b.    the price of PPV for PPV-Level MMA Cards and the price of Premium Online Streaming Services carrying PPV-Level MMA Cards has been raised, fixed, maintained, or stabilized at supra-competitive levels throughout the United States, including in New Hampshire; and

    c.    consumers in New Hampshire have been denied the benefits of free and unrestrained competition.

353.    Defendants' ongoing anticompetitive conduct presents a dangerous probability that they will succeed, to the extent they have not already, in their attempt to monopolize the Relevant Output Market.

354.    There are no legitimate business or pro-competitive justifications for Defendants' conduct and any such purported justifications are mere pretexts. Even if such a justification existed, any purported pro-competitive benefits can be achieved through alternative means less restrictive of competition.

355.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and/or other members of the PPV Class and/or the Streaming Class in New Hampshire have been, and continue to be, injured in their business and property in that they paid more for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards than they otherwise would have in the absence of such conduct.

356.    Plaintiffs and Class Members seek all available relief under New Hampshire law.

**New Jersey Antitrust Act**

**(NJ Rev. Stat. §§ 56:9-1, *et seq.*)**

357.    Plaintiffs repeat, reallege, and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

358.    PPV offerings of PPV-Level MMA Cards and/or Premium Online Streaming Services carrying PPV-Level MMA Cards were available for purchase, and were purchased, by consumers in New Jersey, including Class Members, throughout the Class Period.

359.    In addition, Defendants have operated, and continue to operate, in New Jersey as part of their business in the Relevant Output Market, including by directly marketing and selling their products in the state; through several UFC Gym locations in New Jersey; and by holding live PPV-Level MMA Cards in New Jersey (at least 4 since 2023).

360.    The New Jersey Antitrust Act provides that "[i]t shall be unlawful for any person to monopolize, or attempt to monopolize, or to combine or conspire with any person or persons, to monopolize trade or commerce in any relevant market within this State." N.J. Stat. Ann. § 56:9-4(a).

361.    At all relevant times, Defendants possessed, and continue to possess, significant market power (i.e., monopoly power)—or possessed and continue to possess a dangerous probability of achieving market power—over the Relevant Output Market or narrower markets therein, in that the UFC is the dominant, if not exclusive, provider of PPV-Level MMA Cards nationwide, including in New Jersey.

362.    At all relevant times, Defendants monopolized or attempted to monopolize the Relevant Output Market in the United States, including in New Jersey, for the purpose of affecting or excluding competition and controlling, fixing, and maintaining prices for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards, and they continue to do so, in violation of New Jersey antitrust law.

363.    At all relevant times, Defendants acted, and continue to act, knowingly, willfully, and unlawfully to establish, maintain, use, and enhance—or attempt to establish, maintain, use, and enhance—their monopoly power in the Relevant Output Market, including through restrictive, exclusionary, and anticompetitive conduct.

364.    As more fully stated above, Defendants' restrictive, exclusionary, and anticompetitive conduct for the purpose of establishing, maintaining, using, and enhancing their monopoly power in the Relevant Output Market includes, but is not limited to, the following:

    a.  Locking MMA fighters into exclusive contracts, ensuring that competitors could not access top-ranked and top-drawing athletes

    b.  Threatening and retaliating against athletes who sought to negotiate their contracts or work with competitors

    c.  Eliminating cross-promotion with competing MMA Promotions

    d.  Counterprogramming competing MMA Promotions' events

    e.  Preventing competing MMA Promotions from securing television deals

    f.  Purchasing and shuttering competing MMA Promotions (or forcing them to be "feeder" leagues)

365.    Defendants' anticompetitive conduct was, and continues to be, willful, flagrant, and malicious and done with the intent to harm competition and consumers throughout the United States, including in New Jersey.

366.    Defendants' anticompetitive conduct substantially affected consumers and economic activity in New Jersey, and continues to do so.

367.    As a direct and proximate result of Defendants' monopolization or attempted monopolization of the Relevant Output Market:

    a.  price competition for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards has been restrained, suppressed, and eliminated throughout the United States, including in New Jersey;

    b.  the price of PPV for PPV-Level MMA Cards and the price of Premium Online Streaming Services carrying PPV-Level MMA Cards has been raised, fixed, maintained, or stabilized at supra-competitive levels throughout the United States, including in New Jersey; and

c.    consumers in New Jersey have been denied the benefits of free and unrestrained competition.

368.    Defendants' ongoing anticompetitive conduct presents a dangerous probability that they will succeed, to the extent they have not already, in their attempt to monopolize the Relevant Output Market.

369.    There are no legitimate business or pro-competitive justifications for Defendants' conduct and any such purported justifications are mere pretexts. Even if such a justification existed, any purported pro-competitive benefits can be achieved through alternative means less restrictive of competition.

370.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and/or other members of the PPV Class and/or the Streaming Class in New Jersey have been, and continue to be, injured in their business and property in that they paid more for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards than they otherwise would have in the absence of such conduct.

371.    Plaintiffs and Class Members seek all available relief under New Jersey law.

**New Mexico Antitrust Act**
**(N.M. Stat. Ann. §§ 57-1-1, *et seq.*)**

372.    Plaintiffs repeat, reallege, and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

373.    PPV offerings of PPV-Level MMA Cards and/or Premium Online Streaming Services carrying PPV-Level MMA Cards were available for purchase, and were purchased, by consumers in New Mexico, including Class Members, throughout the Class Period.

374.    In addition, Defendants have operated, and continue to operate, in New Mexico as part of their business in the Relevant Output Market, including by directly marketing and selling their products in New Mexico and by holding live PPV-Level MMA Cards in New Mexico.

375.    The New Mexico Antitrust Act provides that "[i]t is hereby declared to be unlawful for any person to monopolize or attempt to monopolize, or combine or conspire with any other

person or persons to monopolize, trade or commerce, any part of which trade or commerce is within this state." N.M. Stat. Ann. § 57-1-2.

376.   At all relevant times, Defendants possessed, and continue to possess, significant market power (i.e., monopoly power)—or possessed and continue to possess a dangerous probability of achieving market power—over the Relevant Output Market or narrower markets therein, in that the UFC is the dominant, if not exclusive, provider of PPV-Level MMA Cards nationwide, including in New Mexico.

377.   At all relevant times, Defendants monopolized or attempted to monopolize the Relevant Output Market in the United States, including in New Mexico, for the purpose of excluding competition and controlling, fixing, and maintaining prices for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards, and they continue to do so, in violation of New Mexico antitrust law.

378.   At all relevant times, Defendants acted, and continue to act, knowingly, willfully, and unlawfully to establish, maintain, use, and enhance—or attempt to establish, maintain, use, and enhance—their monopoly power in the Relevant Output Market, including through restrictive, exclusionary, and anticompetitive conduct.

379.   As more fully stated above, Defendants' restrictive, exclusionary, and anticompetitive conduct for the purpose of establishing, maintaining, using, and enhancing their monopoly power in the Relevant Output Market includes, but is not limited to, the following:

a.   Locking MMA fighters into exclusive contracts, ensuring that competitors could not access top-ranked and top-drawing athletes

b.   Threatening and retaliating against athletes who sought to negotiate their contracts or work with competitors

c.   Eliminating cross-promotion with competing MMA Promotions

d.   Counterprogramming competing MMA Promotions' events

e.   Preventing competing MMA Promotions from securing television deals

     f.   Purchasing and shuttering competing MMA Promotions (or forcing them to be "feeder" leagues)

380.    Defendants' anticompetitive conduct was, and continues to be, willful, flagrant, and malicious and done with the intent to harm competition and consumers throughout the United States, including in New Mexico.

381.    Defendants' anticompetitive conduct substantially affected consumers and economic activity in New Mexico, and continues to do so.

382.    As a direct and proximate result of Defendants' monopolization or attempted monopolization of the Relevant Output Market:

    a.   price competition for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards has been restrained, suppressed, and eliminated throughout the United States, including in New Mexico;

    b.   the price of PPV for PPV-Level MMA Cards and the price of Premium Online Streaming Services carrying PPV-Level MMA Cards has been raised, fixed, maintained, or stabilized at supra-competitive levels throughout the United States, including in New Mexico; and

    c.   consumers in New Mexico have been denied the benefits of free and unrestrained competition.

383.    Defendants' ongoing anticompetitive conduct presents a dangerous probability that they will succeed, to the extent they have not already, in their attempt to monopolize the Relevant Output Market.

384.    There are no legitimate business or pro-competitive justifications for Defendants' conduct and any such purported justifications are mere pretexts. Even if such a justification existed, any purported pro-competitive benefits can be achieved through alternative means less restrictive of competition.

385.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and/or other members of the PPV Class and/or the Streaming Class in New Mexico have been, and continue

to be, injured in their business and property in that they paid more for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards than they otherwise would have in the absence of such conduct.

386.    Plaintiffs and Class Members seek all available relief under New Mexico law.

## Chapter 75 of the North Carolina General Statutes
## (N.C. Gen. Stat. §§ 75-1, *et seq.*)

387.    Plaintiffs repeat, reallege, and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

388.    PPV offerings of PPV-Level MMA Cards and/or Premium Online Streaming Services carrying PPV-Level MMA Cards were available for purchase, and were purchased, by consumers in North Carolina, including Class Members, throughout the Class Period.

389.    In addition, Defendants have operated, and continue to operate, in North Carolina as part of their business in the Relevant Output Market, including by directly marketing and selling their products in North Carolina and by holding live PPV-Level MMA Cards in North Carolina.

390.    Section 75-2.1 of the North Carolina General Statutes provides that "[i]t is unlawful for any person to monopolize, or attempt to monopolize, or combine or conspire with any other person or persons to monopolize, any part of trade or commerce in the State of North Carolina." N.C. Gen. Stat. Ann. § 75-2.1.

391.    At all relevant times, Defendants possessed, and continue to possess, significant market power (i.e., monopoly power)—or possessed and continue to possess a dangerous probability of achieving market power—over the Relevant Output Market or narrower markets therein, in that the UFC is the dominant, if not exclusive, provider of PPV-Level MMA Cards nationwide, including in North Carolina.

392.    At all relevant times, Defendants monopolized or attempted to monopolize the Relevant Output Market in the United States, including in North Carolina, for the purpose of excluding competition and controlling, fixing, and maintaining prices for PPV offerings of PPV-Level

MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards, and they continue to do so, in violation of North Carolina antitrust law.

393.    At all relevant times, Defendants acted, and continue to act, knowingly, willfully, and unlawfully to establish, maintain, use, and enhance—or attempt to establish, maintain, use, and enhance—their monopoly power in the Relevant Output Market, including through restrictive, exclusionary, and anticompetitive conduct.

394.    As more fully stated above, Defendants' restrictive, exclusionary, and anticompetitive conduct for the purpose of establishing, maintaining, using, and enhancing their monopoly power in the Relevant Output Market includes, but is not limited to, the following:

    a.    Locking MMA fighters into exclusive contracts, ensuring that competitors could not access top-ranked and top-drawing athletes

    b.    Threatening and retaliating against athletes who sought to negotiate their contracts or work with competitors

    c.    Eliminating cross-promotion with competing MMA Promotions

    d.    Counterprogramming competing MMA Promotions' events

    e.    Preventing competing MMA Promotions from securing television deals

    f.    Purchasing and shuttering competing MMA Promotions (or forcing them to be "feeder" leagues)

395.    Defendants' anticompetitive conduct was, and continues to be, willful, flagrant, and malicious and done with the intent to harm competition and consumers throughout the United States, including in North Carolina.

396.    Defendants' anticompetitive conduct substantially affected consumers and economic activity in North Carolina, and continues to do so.

397.    As a direct and proximate result of Defendants' monopolization or attempted monopolization of the Relevant Output Market:

a.  price competition for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards has been restrained, suppressed, and eliminated throughout the United States, including in North Carolina;

b.  the price of PPV for PPV-Level MMA Cards and the price of Premium Online Streaming Services carrying PPV-Level MMA Cards has been raised, fixed, maintained, or stabilized at supra-competitive levels throughout the United States, including in North Carolina; and

c.  consumers in North Carolina have been denied the benefits of free and unrestrained competition.

398.    Defendants' ongoing anticompetitive conduct presents a dangerous probability that they will succeed, to the extent they have not already, in their attempt to monopolize the Relevant Output Market.

399.    There are no legitimate business or pro-competitive justifications for Defendants' conduct and any such purported justifications are mere pretexts. Even if such a justification existed, any purported pro-competitive benefits can be achieved through alternative means less restrictive of competition.

400.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and/or other members of the PPV Class and/or the Streaming Class in North Carolina have been, and continue to be, injured in their business and property in that they paid more for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards than they otherwise would have in the absence of such conduct.

401.    Plaintiffs and Class Members seek all available relief under North Carolina law.

**North Dakota Uniform State Antitrust Act**
**(N.D. Cent. Code §§ 51-08.1-01, *et seq.*)**

402.    Plaintiffs repeat, reallege, and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

403.    PPV offerings of PPV-Level MMA Cards and/or Premium Online Streaming Services carrying PPV-Level MMA Cards were available for purchase, and were purchased, by consumers in North Dakota, including Class Members, throughout the Class Period.

404.    In addition, Defendants have operated, and continue to operate, in North Dakota as part of their business in the Relevant Output Market, including by directly marketing and selling their products in the state.

405.    The North Dakota Uniform State Antitrust Act provides that "[t]he establishment, maintenance, or use of a monopoly, or an attempt to establish a monopoly, of trade or commerce in a relevant market by any person, for the purpose of excluding competition or controlling, fixing, or maintaining prices, is unlawful." N.D. Cent. Code Ann. § 51-08.1-03.

406.    At all relevant times, Defendants possessed, and continue to possess, significant market power (i.e., monopoly power)—or possessed and continue to possess a dangerous probability of achieving market power—over the Relevant Output Market or narrower markets therein, in that the UFC is the dominant, if not exclusive, provider of PPV-Level MMA Cards nationwide, including in North Dakota.

407.    At all relevant times, Defendants monopolized or attempted to monopolize the Relevant Output Market in the United States, including in North Dakota, for the purpose of excluding competition and controlling, fixing, and maintaining prices for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards, and they continue to do so, in violation of North Dakota antitrust law.

408.    At all relevant times, Defendants acted, and continue to act, knowingly, willfully, and unlawfully to establish, maintain, use, and enhance—or attempt to establish, maintain, use, and enhance—their monopoly power in the Relevant Output Market, including through restrictive, exclusionary, and anticompetitive conduct.

409.    As more fully stated above, Defendants' restrictive, exclusionary, and anticompetitive conduct for the purpose of establishing, maintaining, using, and enhancing their monopoly power in the Relevant Output Market includes, but is not limited to, the following:

a. Locking MMA fighters into exclusive contracts, ensuring that competitors could not access top-ranked and top-drawing athletes

b. Threatening and retaliating against athletes who sought to negotiate their contracts or work with competitors

c. Eliminating cross-promotion with competing MMA Promotions

d. Counterprogramming competing MMA Promotions' events

e. Preventing competing MMA Promotions from securing television deals

f. Purchasing and shuttering competing MMA Promotions (or forcing them to be "feeder" leagues)

410. Defendants' anticompetitive conduct was, and continues to be, willful, flagrant, and malicious and done with the intent to harm competition and consumers throughout the United States, including in North Dakota.

411. Defendants' anticompetitive conduct substantially affected consumers and economic activity in North Dakota, and continues to do so.

412. As a direct and proximate result of Defendants' monopolization or attempted monopolization of the Relevant Output Market:

a. price competition for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards has been restrained, suppressed, and eliminated throughout the United States, including in North Dakota;

b. the price of PPV for PPV-Level MMA Cards and the price of Premium Online Streaming Services carrying PPV-Level MMA Cards has been raised, fixed, maintained, or stabilized at supra-competitive levels throughout the United States, including in North Dakota; and

c. consumers in North Dakota have been denied the benefits of free and unrestrained competition.

413. Defendants' ongoing anticompetitive conduct presents a dangerous probability that they will succeed, to the extent they have not already, in their attempt to monopolize the Relevant Output Market.

414. There are no legitimate business or pro-competitive justifications for Defendants' conduct and any such purported justifications are mere pretexts. Even if such a justification existed, any purported pro-competitive benefits can be achieved through alternative means less restrictive of competition.

415. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and/or other members of the PPV Class and/or the Streaming Class in North Dakota have been, and continue to be, injured in their business and property in that they paid more for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards than they otherwise would have in the absence of such conduct.

416. Plaintiffs and Class Members seek all available relief under North Dakota law.

### Title 50, Chapter 646 of the Oregon Revised Statutes
### (Or. Rev. Stat. §§ 646.705, *et seq.*)

417. Plaintiffs repeat, reallege, and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

418. PPV offerings of PPV-Level MMA Cards and/or Premium Online Streaming Services carrying PPV-Level MMA Cards were available for purchase, and were purchased, by consumers in Oregon, including Class Members, throughout the Class Period.

419. In addition, Defendants have operated, and continue to operate, in Oregon as part of their business in the Relevant Output Market, including by directly marketing and selling their products in Oregon and by planning and holding live PPV-Level MMA Cards in Oregon.

420. Oregon antitrust law provides that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of trade or commerce, shall be in violation of ORS 136.617, 646.705 to 646.805 and 646.990." Or. Rev. Stat. Ann. § 646.730.

421.    At all relevant times, Defendants possessed, and continue to possess, significant market power (i.e., monopoly power)—or possessed and continue to possess a dangerous probability of achieving market power—over the Relevant Output Market or narrower markets therein, in that the UFC is the dominant, if not exclusive, provider of PPV-Level MMA Cards nationwide, including in Oregon.

422.    At all relevant times, Defendants monopolized or attempted to monopolize the Relevant Output Market in the United States, including in Oregon, for the purpose of excluding competition and controlling, fixing, and maintaining prices for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards, and they continue to do so, in violation of Oregon antitrust law.

423.    At all relevant times, Defendants acted, and continue to act, knowingly, willfully, and unlawfully to establish, maintain, use, and enhance—or attempt to establish, maintain, use, and enhance—their monopoly power in the Relevant Output Market, including through restrictive, exclusionary, and anticompetitive conduct.

424.    As more fully stated above, Defendants' restrictive, exclusionary, and anticompetitive conduct for the purpose of establishing, maintaining, using, and enhancing their monopoly power in the Relevant Output Market includes, but is not limited to, the following:

a.  Locking MMA fighters into exclusive contracts, ensuring that competitors could not access top-ranked and top-drawing athletes

b.  Threatening and retaliating against athletes who sought to negotiate their contracts or work with competitors

c.  Eliminating cross-promotion with competing MMA Promotions

d.  Counterprogramming competing MMA Promotions' events

e.  Preventing competing MMA Promotions from securing television deals

f.  Purchasing and shuttering competing MMA Promotions (or forcing them to be "feeder" leagues)

425.    Defendants' anticompetitive conduct was, and continues to be, willful, flagrant, and malicious and done with the intent to harm competition and consumers throughout the United States, including in Oregon.

426.    Defendants' anticompetitive conduct substantially affected consumers and economic activity in Oregon, and continues to do so.

427.    As a direct and proximate result of Defendants' monopolization or attempted monopolization of the Relevant Output Market:

      a.    price competition for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards has been restrained, suppressed, and eliminated throughout the United States, including in Oregon;

      b.    the price of PPV for PPV-Level MMA Cards and the price of Premium Online Streaming Services carrying PPV-Level MMA Cards has been raised, fixed, maintained, or stabilized at supra-competitive levels throughout the United States, including in Oregon; and

      c.    consumers in Oregon have been denied the benefits of free and unrestrained competition.

428.    Defendants' ongoing anticompetitive conduct presents a dangerous probability that they will succeed, to the extent they have not already, in their attempt to monopolize the Relevant Output Market.

429.    There are no legitimate business or pro-competitive justifications for Defendants' conduct and any such purported justifications are mere pretexts. Even if such a justification existed, any purported pro-competitive benefits can be achieved through alternative means less restrictive of competition.

430.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and/or other members of the PPV Class and/or the Streaming Class in Oregon have been, and continue to be, injured in their business and property in that they paid more for PPV offerings of PPV-Level

MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards than they otherwise would have in the absence of such conduct.

431.    Plaintiffs and Class Members seek all available relief under Oregon law.

432.    Plaintiffs will mail a copy of this Complaint to the Attorney General of the State of Oregon, in compliance with Or. Rev. Stat. Ann. § 646.780.

**Rhode Island Antitrust Act**
**(R.I. Gen. Laws Ann. §§ 6-36-1, *et seq.*)**

433.    Plaintiffs repeat, reallege, and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

434.    PPV offerings of PPV-Level MMA Cards and/or Premium Online Streaming Services carrying PPV-Level MMA Cards were available for purchase, and were purchased, by consumers in Rhode Island, including Class Members, throughout the Class Period.

435.    In addition, Defendants have operated, and continue to operate, in Rhode Island as part of their business in the Relevant Output Market, including by directly marketing and selling their products in Rhode Island.

436.    The Rhode Island Antitrust Act provides that "[t]he establishment, maintenance, or use of a monopoly, or an attempt to establish a monopoly, of trade or commerce by any person, for the purpose of excluding competition or controlling, fixing, or maintaining prices, is unlawful." R.I. Gen. Laws Ann. § 6-36-5.

437.    At all relevant times, Defendants possessed, and continue to possess, significant market power (i.e., monopoly power)—or possessed and continue to possess a dangerous probability of achieving market power—over the Relevant Output Market or narrower markets therein, in that the UFC is the dominant, if not exclusive, provider of PPV-Level MMA Cards nationwide, including in Rhode Island.

438.    At all relevant times, Defendants monopolized or attempted to monopolize the Relevant Output Market in the United States, including in Rhode Island, for the purpose of excluding competition and controlling, fixing, and maintaining prices for PPV offerings of PPV-Level MMA

Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards, and they continue to do so, in violation of the Rhode Island Antitrust Act.

439.    At all relevant times, Defendants acted, and continue to act, knowingly, willfully, and unlawfully to establish, maintain, use, and enhance—or attempt to establish, maintain, use, and enhance—their monopoly power in the Relevant Output Market, including through restrictive, exclusionary, and anticompetitive conduct.

440.    As more fully stated above, Defendants' restrictive, exclusionary, and anticompetitive conduct for the purpose of establishing, maintaining, using, and enhancing their monopoly power in the Relevant Output Market includes, but is not limited to, the following:

    a.  Locking MMA fighters into exclusive contracts, ensuring that competitors could not access top-ranked and top-drawing athletes

    b.  Threatening and retaliating against athletes who sought to negotiate their contracts or work with competitors

    c.  Eliminating cross-promotion with competing MMA Promotions

    d.  Counterprogramming competing MMA Promotions' events

    e.  Preventing competing MMA Promotions from securing television deals

    f.  Purchasing and shuttering competing MMA Promotions (or forcing them to be "feeder" leagues)

441.    Defendants' anticompetitive conduct was, and continues to be, willful, flagrant, and malicious and done with the intent to harm competition and consumers throughout the United States, including in Rhode Island.

442.    Defendants' anticompetitive conduct substantially affected consumers and economic activity in Rhode Island, and continues to do so.

443.    As a direct and proximate result of Defendants' monopolization or attempted monopolization of the Relevant Output Market:

    a.    price competition for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards has been restrained, suppressed, and eliminated throughout the United States, including in Rhode Island;

    b.    the price of PPV for PPV-Level MMA Cards and the price of Premium Online Streaming Services carrying PPV-Level MMA Cards has been raised, fixed, maintained, or stabilized at supra-competitive levels throughout the United States, including in Rhode Island; and

    c.    consumers in Rhode Island have been denied the benefits of free and unrestrained competition.

444.    Defendants' ongoing anticompetitive conduct presents a dangerous probability that they will succeed, to the extent they have not already, in their attempt to monopolize the Relevant Output Market.

445.    There are no legitimate business or pro-competitive justifications for Defendants' conduct and any such purported justifications are mere pretexts. Even if such a justification existed, any purported pro-competitive benefits can be achieved through alternative means less restrictive of competition.

446.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and/or other members of the PPV Class and/or the Streaming Class in Rhode Island have been, and continue to be, injured in their business and property in that they paid more for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards than they otherwise would have in the absence of such conduct.

447.    Plaintiffs and Class Members seek all available relief under Rhode Island law.

448.    Plaintiffs will serve a copy of this Complaint on the Attorney General of the State of Rhode Island, and file proof of service with this Court, in compliance with R.I. Gen. Laws Ann. § 6-36-21.

**Title 37, Chapter 1 of the South Dakota Codified Laws**
**(S.D. Codified Laws §§ 37-1-3.1, *et seq.*)**

449. Plaintiffs repeat, reallege, and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

450. PPV offerings of PPV-Level MMA Cards and/or Premium Online Streaming Services carrying PPV-Level MMA Cards were available for purchase, and were purchased, by consumers in South Dakota, including Class Members, throughout the Class Period.

451. In addition, Defendants have operated, and continue to operate, in South Dakota as part of their business in the Relevant Output Market, including by directly marketing and selling their products in South Dakota.

452. Section 37-1-3.2 of the South Dakota Codified Laws provides that "[t]e monopolization by any person, or an attempt to monopolize, or combine, or conspire with any other person or persons, to monopolize any of the trade or commerce within this state shall be unlawful." S.D. Codified Laws § 37-1-3.2.

453. At all relevant times, Defendants possessed, and continue to possess, significant market power (i.e., monopoly power)—or possessed and continue to possess a dangerous probability of achieving market power—over the Relevant Output Market or narrower markets therein, in that the UFC is the dominant, if not exclusive, provider of PPV-Level MMA Cards nationwide, including in South Dakota.

454. At all relevant times, Defendants monopolized or attempted to monopolize the Relevant Output Market in the United States, including in South Dakota, for the purpose of excluding competition and controlling, fixing, and maintaining prices for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards, and they continue to do so, in violation of South Dakota antitrust law.

455. At all relevant times, Defendants acted, and continue to act, knowingly, willfully, and unlawfully to establish, maintain, use, and enhance—or attempt to establish, maintain, use, and enhance—their monopoly power in the Relevant Output Market, including through restrictive, exclusionary, and anticompetitive conduct.

456.   As more fully stated above, Defendants' restrictive, exclusionary, and anticompetitive conduct for the purpose of establishing, maintaining, using, and enhancing their monopoly power in the Relevant Output Market includes, but is not limited to, the following:

    a.   Locking MMA fighters into exclusive contracts, ensuring that competitors could not access top-ranked and top-drawing athletes

    b.   Threatening and retaliating against athletes who sought to negotiate their contracts or work with competitors

    c.   Eliminating cross-promotion with competing MMA Promotions

    d.   Counterprogramming competing MMA Promotions' events

    e.   Preventing competing MMA Promotions from securing television deals

    f.   Purchasing and shuttering competing MMA Promotions (or forcing them to be "feeder" leagues)

457.   Defendants' anticompetitive conduct was, and continues to be, willful, flagrant, and malicious and done with the intent to harm competition and consumers throughout the United States, including in South Dakota.

458.   Defendants' anticompetitive conduct substantially affected consumers and economic activity in South Dakota, and continues to do so.

459.   As a direct and proximate result of Defendants' monopolization or attempted monopolization of the Relevant Output Market:

    a.   price competition for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards has been restrained, suppressed, and eliminated throughout the United States, including in South Dakota;

    b.   the price of PPV for PPV-Level MMA Cards and the price of Premium Online Streaming Services carrying PPV-Level MMA Cards has been raised, fixed, maintained, or stabilized at supra-competitive levels throughout the United States, including in South Dakota; and

c.  consumers in South Dakota have been denied the benefits of free and unrestrained competition.

460.    Defendants' ongoing anticompetitive conduct presents a dangerous probability that they will succeed, to the extent they have not already, in their attempt to monopolize the Relevant Output Market.

461.    There are no legitimate business or pro-competitive justifications for Defendants' conduct and any such purported justifications are mere pretexts. Even if such a justification existed, any purported pro-competitive benefits can be achieved through alternative means less restrictive of competition.

462.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and/or other members of the PPV Class and/or the Streaming Class in South Dakota have been, and continue to be, injured in their business and property in that they paid more for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards than they otherwise would have in the absence of such conduct.

463.    Plaintiffs and Class Members seek all available relief under South Dakota law.

### Chapter 16, Part 5 of the Utah Code
### (Utah Code § 76-16-501, *et seq.*)

464.    Plaintiffs repeat, reallege, and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

465.    PPV offerings of PPV-Level MMA Cards and/or Premium Online Streaming Services carrying PPV-Level MMA Cards were available for purchase, and were purchased, by consumers in Utah, including Class Members, throughout the Class Period.

466.    In addition, Defendants have operated, and continue to operate, in Utah as part of their business in the Relevant Output Market, including by directly marketing and selling their products in Utah and by holding live PPV-Level MMA Cards in Utah.

467.    The Utah Code provides "[i]t is unlawful for any person to monopolize, or attempt to monopolize, or combine or conspire with any other person or persons to monopolize, any part of trade or commerce." Utah Code Ann. § 76-16-510(2).

468.    At all relevant times, Defendants possessed, and continue to possess, significant market power (i.e., monopoly power)—or possessed and continue to possess a dangerous probability of achieving market power—over the Relevant Output Market or narrower markets therein, in that the UFC is the dominant, if not exclusive, provider of PPV-Level MMA Cards nationwide, including in Utah.

469.    At all relevant times, Defendants monopolized or attempted to monopolize the Relevant Output Market in the United States, including in Utah, for the purpose of excluding competition and controlling, fixing, and maintaining prices for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards, and they continue to do so, in violation of Utah antitrust law.

470.    At all relevant times, Defendants acted, and continue to act, knowingly, willfully, and unlawfully to establish, maintain, use, and enhance—or attempt to establish, maintain, use, and enhance—their monopoly power in the Relevant Output Market, including through restrictive, exclusionary, and anticompetitive conduct.

471.    As more fully stated above, Defendants' restrictive, exclusionary, and anticompetitive conduct for the purpose of establishing, maintaining, using, and enhancing their monopoly power in the Relevant Output Market includes, but is not limited to, the following:

    a.  Locking MMA fighters into exclusive contracts, ensuring that competitors could not access top-ranked and top-drawing athletes

    b.  Threatening and retaliating against athletes who sought to negotiate their contracts or work with competitors

    c.  Eliminating cross-promotion with competing MMA Promotions

    d.  Counterprogramming competing MMA Promotions' events

    e.  Preventing competing MMA Promotions from securing television deals

f.  Purchasing and shuttering competing MMA Promotions (or forcing them to be "feeder" leagues)

472.  Defendants' anticompetitive conduct was, and continues to be, willful, flagrant, and malicious and done with the intent to harm competition and consumers throughout the United States, including in Utah.

473.  Defendants' anticompetitive conduct substantially affected consumers and economic activity in Utah, and continues to do so.

474.  As a direct and proximate result of Defendants' monopolization or attempted monopolization of the Relevant Output Market:

a.  price competition for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards has been restrained, suppressed, and eliminated throughout the United States, including in Utah;

b.  the price of PPV for PPV-Level MMA Cards and the price of Premium Online Streaming Services carrying PPV-Level MMA Cards has been raised, fixed, maintained, or stabilized at supra-competitive levels throughout the United States, including in Utah; and

c.  consumers in Utah have been denied the benefits of free and unrestrained competition.

475.  Defendants' ongoing anticompetitive conduct presents a dangerous probability that they will succeed, to the extent they have not already, in their attempt to monopolize the Relevant Output Market.

476.  There are no legitimate business or pro-competitive justifications for Defendants' conduct and any such purported justifications are mere pretexts. Even if such a justification existed, any purported pro-competitive benefits can be achieved through alternative means less restrictive of competition.

477.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and/or other members of the PPV Class and/or the Streaming Class in Utah have been, and continue to be,

injured in their business and property in that they paid more for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards than they otherwise would have in the absence of such conduct.

478.    Plaintiffs and Class Members seek all available relief under Utah law.

479.    Plaintiffs will mail a copy of this Complaint to the Attorney General of the State of Utah, in compliance with Utah Code § 76-16-511(9).

**West Virginia Antitrust Act**
**(W.Va. Code §§ 47-18-1, *et seq.*)**

480.    Plaintiffs repeat, reallege, and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

481.    PPV offerings of PPV-Level MMA Cards and/or Premium Online Streaming Services carrying PPV-Level MMA Cards were available for purchase, and were purchased, by consumers in West Virginia, including Class Members, throughout the Class Period.

482.    In addition, Defendants have operated, and continue to operate, in West Virginia as part of their business in the Relevant Output Market, including by directly marketing and selling their products in the state.

483.    The West Virginia Antitrust Act provides "[t]he establishment, maintenance or use of a monopoly or an attempt to establish a monopoly of trade or commerce, any part of which is within this State, by any persons for the purpose of excluding competition or controlling, fixing or maintaining prices is unlawful." W. Va. Code Ann. § 47-18-4.

484.    At all relevant times, Defendants possessed, and continue to possess, significant market power (i.e., monopoly power)—or possessed and continue to possess a dangerous probability of achieving market power—over the Relevant Output Market or narrower markets therein, in that the UFC is the dominant, if not exclusive, provider of PPV-Level MMA Cards nationwide, including in West Virginia.

485.    At all relevant times, Defendants monopolized or attempted to monopolize the Relevant Output Market in the United States, including in West Virginia, for the purpose of excluding

competition and controlling, fixing, and maintaining prices for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards, and they continue to do so, in violation of the West Virginia Antitrust Act.

486.    At all relevant times, Defendants acted, and continue to act, knowingly, willfully, and unlawfully to establish, maintain, use, and enhance—or attempt to establish, maintain, use, and enhance—their monopoly power in the Relevant Output Market, including through restrictive, exclusionary, and anticompetitive conduct.

487.    As more fully stated above, Defendants' restrictive, exclusionary, and anticompetitive conduct for the purpose of establishing, maintaining, using, and enhancing their monopoly power in the Relevant Output Market includes, but is not limited to, the following:

    a.  Locking MMA fighters into exclusive contracts, ensuring that competitors could not access top-ranked and top-drawing athletes

    b.  Threatening and retaliating against athletes who sought to negotiate their contracts or work with competitors

    c.  Eliminating cross-promotion with competing MMA Promotions

    d.  Counterprogramming competing MMA Promotions' events

    e.  Preventing competing MMA Promotions from securing television deals

    f.  Purchasing and shuttering competing MMA Promotions (or forcing them to be "feeder" leagues)

488.    Defendants' anticompetitive conduct was, and continues to be, willful, flagrant, and malicious and done with the intent to harm competition and consumers throughout the United States, including in West Virginia.

489.    Defendants' anticompetitive conduct substantially affected consumers and economic activity in West Virginia, and continues to do so.

490.    As a direct and proximate result of Defendants' monopolization or attempted monopolization of the Relevant Output Market:

a.  price competition for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards has been restrained, suppressed, and eliminated throughout the United States, including in West Virginia;

b.  the price of PPV for PPV-Level MMA Cards and the price of Premium Online Streaming Services carrying PPV-Level MMA Cards has been raised, fixed, maintained, or stabilized at supra-competitive levels throughout the United States, including in West Virginia; and

c.  consumers in West Virginia have been denied the benefits of free and unrestrained competition.

491.   Defendants' ongoing anticompetitive conduct presents a dangerous probability that they will succeed, to the extent they have not already, in their attempt to monopolize the Relevant Output Market.

492.   There are no legitimate business or pro-competitive justifications for Defendants' conduct and any such purported justifications are mere pretexts. Even if such a justification existed, any purported pro-competitive benefits can be achieved through alternative means less restrictive of competition.

493.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and/or other members of the PPV Class and/or the Streaming Class in West Virginia have been, and continue to be, injured in their business and property in that they paid more for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards than they otherwise would have in the absence of such conduct.

494.   Plaintiffs and Class Members seek all available relief under West Virginia law.

### Chapter 133 of the Wisconsin Statutes
### (Wis. Stat. §§ 133.01, *et seq.*)

495.   Plaintiffs repeat, reallege, and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

496.    PPV offerings of PPV-Level MMA Cards and/or Premium Online Streaming Services carrying PPV-Level MMA Cards were available for purchase, and were purchased, by consumers in Wisconsin, including Class Members, throughout the Class Period.

497.    In addition, Defendants have operated, and continue to operate, in Wisconsin as part of their business in the Relevant Output Market, including by directly marketing and selling their products in Wisconsin and by holding live PPV-level MMA Cards in Wisconsin.

498.    Wisconsin antitrust law aims to "safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition by prohibiting unfair and discriminatory business practices which destroy or hamper competition," and the Wisconsin Legislature instructed that the statute "be interpreted in a manner which gives the most liberal construction to achieve the aim of competition." Wis. Stat. Ann. § 133.01.

499.    Wisconsin antitrust law provides that, "[e]very person who monopolizes, or attempts to monopolize, or combines or conspires with any other person or persons to monopolize any part of trade or commerce is guilty of a Class H felony . . . ." *Id.* § 133.03. It further provides that "any person injured, directly or indirectly, by reason of anything prohibited by this chapter may sue therefor and shall recover threefold the damages sustained by the person and the cost of the suit, including reasonable attorney fees." *Id.* § 133.18.

500.    At all relevant times, Defendants possessed, and continue to possess, significant market power (i.e., monopoly power)—or possessed and continue to possess a dangerous probability of achieving market power—over the Relevant Output Market or narrower markets therein, in that the UFC is the dominant, if not exclusive, provider of PPV-Level MMA Cards nationwide, including in Wisconsin.

501.    At all relevant times, Defendants monopolized or attempted to monopolize the Relevant Output Market in the United States, including in Wisconsin, for the purpose of excluding competition and controlling, fixing, and maintaining prices for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards, and they continue to do so, in violation of Wisconsin antitrust law.

502.    At all relevant times, Defendants acted, and continue to act, knowingly, willfully, and unlawfully to establish, maintain, use, and enhance—or attempt to establish, maintain, use, and enhance—their monopoly power in the Relevant Output Market, including through restrictive, exclusionary, and anticompetitive conduct.

503.    As more fully stated above, Defendants' restrictive, exclusionary, and anticompetitive conduct for the purpose of establishing, maintaining, using, and enhancing their monopoly power in the Relevant Output Market includes, but is not limited to, the following:

      a.  Locking MMA fighters into exclusive contracts, ensuring that competitors could not access top-ranked and top-drawing athletes

      b.  Threatening and retaliating against athletes who sought to negotiate their contracts or work with competitors

      c.  Eliminating cross-promotion with competing MMA Promotions

      d.  Counterprogramming competing MMA Promotions' events

      e.  Preventing competing MMA Promotions from securing television deals

      f.  Purchasing and shuttering competing MMA Promotions (or forcing them to be "feeder" leagues)

504.    Defendants' anticompetitive conduct was, and continues to be, willful, flagrant, and malicious and done with the intent to harm competition and consumers throughout the United States, including in Wisconsin.

505.    Defendants' anticompetitive conduct substantially affected consumers and economic activity in Wisconsin, and continues to do so.

506.    As a direct and proximate result of Defendants' monopolization or attempted monopolization of the Relevant Output Market:

      a.  price competition for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards has been restrained, suppressed, and eliminated throughout the United States, including in Wisconsin;

b.  the price of PPV for PPV-Level MMA Cards and the price of Premium Online Streaming Services carrying PPV-Level MMA Cards has been raised, fixed, maintained, or stabilized at supra-competitive levels throughout the United States, including in Wisconsin; and

c.  consumers in Wisconsin have been denied the benefits of free and unrestrained competition.

507.  Defendants' ongoing anticompetitive conduct presents a dangerous probability that they will succeed, to the extent they have not already, in their attempt to monopolize the Relevant Output Market.

508.  There are no legitimate business or pro-competitive justifications for Defendants' conduct and any such purported justifications are mere pretexts. Even if such a justification existed, any purported pro-competitive benefits can be achieved through alternative means less restrictive of competition.

509.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and/or other members of the PPV Class and/or the Streaming Class in Wisconsin have been, and continue to be, injured in their business and property in that they paid more for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards than they otherwise would have in the absence of such conduct.

510.  Plaintiffs and Class Members seek all available relief under Wisconsin law.

## XIII.  COUNT THREE: STATE CONSUMER PROTECTION STATUTES

### (On behalf of Plaintiffs, the PPV Class, and the Paramount+ Class)

### Arkansas Deceptive Trade Practices Act
### (Ark. Code Ann. §§ 4-88-101, *et seq.*)

511.  Plaintiffs repeat, reallege, and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

512.  By reason of the conduct alleged herein, Defendants have violated the Arkansas Deceptive Trade Practices Act Ark. Code Ann. §§ 4-88-101, *et seq.*

513.    PPV offerings of PPV-Level MMA Cards and/or Premium Online Streaming Services carrying PPV-Level MMA Cards were available for purchase, and were purchased, by consumers in Arkansas, including Class Members, throughout the Class Period.

514.    In addition, Defendants have operated, and continue to operate, in Arkansas as part of their business in the Relevant Output Market, including by directly marketing and selling their products in the state.

515.    PPV offerings of PPV-Level MMA Cards and/or Premium Online Streaming Services carrying PPV-Level MMA Cards were available for purchase, and were purchased, by consumers in Arkansas, including Class Members, throughout the Class Period.

516.    The Arkansas Deceptive Trade Practices Act prohibits "[d]eceptive and unconscionable trade practices" including any "unconscionable, false, or deceptive act or practice in business, commerce, or trade" and provides that "[a] person who suffers an actual financial loss as a result of his or her reliance on the use of a practice declared unlawful by this chapter may bring an action to recover his or her actual financial loss proximately caused by the offense or violation." Ark. Code Ann. §§ 4-88-107(a)(10), 4-88-113(f)(1)(A).

517.    At all relevant times, Defendants engaged in unfair methods of competition by monopolizing or attempting to monopolize the Relevant Output Market in the United States, including in Arkansas, for the purpose of excluding competition and controlling, fixing, and maintaining prices for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards, and they continue to do so, in violation of Ark. Code Ann. § 4-88-107(a)(10).

518.    At all relevant times, Defendants knowingly, willfully, and unlawfully engaged in unfair methods of competition—including restrictive, exclusionary, and anticompetitive conduct—to acquire, maintain, and enhance—or attempt to acquire, maintain, and enhance—their monopoly power in the Relevant Output Market in the United States, including in Arkansas.

519.    As more fully stated above, Defendants' unfair methods of competition for the purpose of acquiring, maintaining, and enhancing their monopoly power in the Relevant Output Market include, but are not limited to, the following:

    a.    Locking MMA fighters into exclusive contracts, ensuring that competitors could not access top-ranked and top-drawing athletes

    b.    Threatening and retaliating against athletes who sought to negotiate their contracts or work with competitors

    c.    Eliminating cross-promotion with competing MMA Promotions

    d.    Counterprogramming competing MMA Promotions' events

    e.    Preventing competing MMA Promotions from securing television deals

    f.    Purchasing and shuttering competing MMA Promotions (or forcing them to be "feeder" leagues)

520.    Defendants' conduct was, and continues to be, willful, flagrant, and malicious and done with the intent to harm competition and consumers throughout the United States, including in Arkansas. Defendants' conduct thus affronts the sense of justice, decency, and reasonableness.

521.    Throughout the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers, and continues to do so.

522.    As a direct and proximate result of Defendants' monopolization or attempted monopolization of the Relevant Output Market:

    a.    price competition for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards has been restrained, suppressed, and eliminated throughout the United States, including in Arkansas;

    b.    the price of PPV for PPV-Level MMA Cards and the price of Premium Online Streaming Services carrying PPV-Level MMA Cards has been raised, fixed, maintained, or stabilized at supra-competitive levels throughout the United States, including in Arkansas; and

c.  consumers in Arkansas have been denied the benefits of free and unrestrained competition.

523.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and/or other members of the PPV Class and/or the Streaming Class in Arkansas have been, and continue to be, injured in their business and property in that they paid more for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards than they otherwise would have in the absence of such conduct.

524.    Plaintiffs and Class Members seek all available relief under Arkansas law.

**California Unfair Competition Law**
**(Cal. Bus. & Prof. Code §§ 17200, *et seq.*)**

525.    Plaintiffs repeat, reallege, and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

526.    By reason of the conduct alleged herein, Defendants have violated the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*

527.    PPV offerings of PPV-Level MMA Cards and/or Premium Online Streaming Services carrying PPV-Level MMA Cards were available for purchase, and were purchased, by consumers in California, including Class Members, throughout the Class Period.

528.    In addition, Defendants have operated, and continue to operate, in California as part of their business in the Relevant Output Market, including by directly marketing and selling their products in the state; through multiple UFC Gym locations across California; and by holding numerous live PPV-Level MMA Cards in the state (at least four since 2022).

529.    The California Unfair Competition Law prohibits unfair competition, which expressly includes "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.

530.    At all relevant times, Defendants have engaged in, and continue to engage in, acts of unfair competition by monopolizing or attempting to monopolize the Relevant Output Market in the United States, including in California, for the purpose of excluding competition and controlling, fixing, and maintaining prices for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming

Services carrying PPV-Level MMA Cards, and they continue to do so, in violation of the unlawful and unfair prongs of the UCL. Defendants have also violated the unlawful prong of the UCL by virtue of Defendants' violation of the Sherman Act and various state laws, as alleged in this Complaint.

531.    At all relevant times, Defendants knowingly, willfully, and unlawfully engaged in unfair and unlawful business practices—including restrictive, exclusionary, and anticompetitive conduct—to acquire, maintain, and enhance—or attempt to acquire, maintain, and enhance—their monopoly power in the Relevant Output Market in the United States, including in California.

532.    As more fully stated above, Defendants' unfair and unlawful business practices include, but are not limited to, the following:

a.    Locking MMA fighters into exclusive contracts, ensuring that competitors could not access top-ranked and top-drawing athletes

b.    Threatening and retaliating against athletes who sought to negotiate their contracts or work with competitors

c.    Eliminating cross-promotion with competing MMA Promotions

d.    Counterprogramming competing MMA Promotions' events

e.    Preventing competing MMA Promotions from securing television deals

f.    Purchasing and shuttering competing MMA Promotions (or forcing them to be "feeder" leagues)

533.    Defendants' conduct was, and continues to be, willful, flagrant, and malicious and done with the intent to harm competition and consumers throughout the United States, including in California.

534.    Defendants' unfair and unlawful business practices substantially affected commerce and consumers in California, and continue to do so.

535.    As alleged herein, Defendants' business practices were and continue to be unfair because they offend public policy, including the federal antitrust statutory scheme and the tenets of free competition; because they are immoral, oppressive, and unscrupulous in that they are a function of Defendants' abuse of their market power; and because the supercompetitive pricing for PPV

offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level is substantially injurious to consumers.

536. As a direct and proximate result of Defendants' unfair and unlawful business practices:

a. price competition for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards has been restrained, suppressed, and eliminated throughout the United States, including in California;

b. the price of PPV for PPV-Level MMA Cards and the price of Premium Online Streaming Services carrying PPV-Level MMA Cards has been raised, fixed, maintained, or stabilized at supra-competitive levels throughout the United States, including in California; and

c. consumers in California have been denied the benefits of free and unrestrained competition.

537. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and/or other members of the PPV Class and/or the Streaming Class in have been injured and have suffered ascertainable losses of money or property in that they paid more for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards than they otherwise would have in the absence of such conduct.

538. Plaintiffs and Class Members seek all available relief under California law.

**The Connecticut Unfair Trade Practices Act**
**(Conn. Gen. Stat. Ann. §§ 42–110a, *et seq.*)**

539. Plaintiffs repeat, reallege, and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

540. By reason of the conduct alleged herein, Defendants have violated the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. Ann. §§ 42–110a, *et seq.*

541. PPV offerings of PPV-Level MMA Cards and/or Premium Online Streaming Services carrying PPV-Level MMA Cards were available for purchase, and were purchased, by consumers in Connecticut, including Class Members, throughout the Class Period.

542.    In addition, Defendants have operated, and continue to operate, in Connecticut as part of their business in the Relevant Output Market, including by directly marketing and selling their products in the state.

543.    The Connecticut Unfair Trade Practices Act provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. Ann. § 42-110b(a).

544.    At all relevant times, Defendants engaged in unfair methods of competitions and unfair trade practices by monopolizing or attempting to monopolize the Relevant Output Market in the United States, including in Connecticut, for the purpose of excluding competition and controlling, fixing, and maintaining prices for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards, and they continue to do so, in violation of the Connecticut Unfair Trade Practices Act.

545.    At all relevant times, Defendants knowingly, willfully, and unlawfully engaged in unfair methods of competition and unfair trade practices—including restrictive, exclusionary, and anticompetitive conduct—to acquire, maintain, and enhance—or attempt to acquire, maintain, and enhance—their monopoly power in the Relevant Output Market in the United States, including in Connecticut.

546.    As more fully stated above, Defendants' unfair methods of competition and unfair trade practices include, but are not limited to, the following:

a.  Locking MMA fighters into exclusive contracts, ensuring that competitors could not access top-ranked and top-drawing athletes

b.  Threatening and retaliating against athletes who sought to negotiate their contracts or work with competitors

c.  Eliminating cross-promotion with competing MMA Promotions

d.  Counterprogramming competing MMA Promotions' events

e.  Preventing competing MMA Promotions from securing television deals

f.  Purchasing and shuttering competing MMA Promotions (or forcing them to be "feeder" leagues)

547.  Defendants' conduct was, and continues to be, willful, flagrant, and malicious and done with the intent to harm competition and consumers throughout the United States, including in Connecticut.

548.  Defendants' unfair methods of competition and unfair trade practices substantially affected commerce and consumers in Connecticut, and continue to do so.

549.  As a direct and proximate result of Defendants' unfair methods of competition and unfair trade practices:

a.  price competition for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards has been restrained, suppressed, and eliminated throughout the United States, including in Connecticut;

b.  the price of PPV for PPV-Level MMA Cards and the price of Premium Online Streaming Services carrying PPV-Level MMA Cards has been raised, fixed, maintained, or stabilized at supra-competitive levels throughout the United States, including in Connecticut; and

c.  consumers in Connecticut have been denied the benefits of free and unrestrained competition.

550.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and/or other members of the PPV Class and/or the Streaming Class in Connecticut have been injured and have suffered ascertainable losses of money or property in that they paid more for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards than they otherwise would have in the absence of such conduct.

551.  Plaintiffs and Class Members seek all available relief under Connecticut law.

**Delaware Consumer Fraud Act**
**(Del. Code Ann. tit. 6, § 2511, *et seq.*)**

552.    Plaintiffs repeat, reallege, and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

553.    By reason of the conduct alleged herein, Defendants have violated the Delaware Consumer Fraud Act, Del. Code Ann. tit. 6, § 2511, *et seq.*

554.    PPV offerings of PPV-Level MMA Cards and/or Premium Online Streaming Services carrying PPV-Level MMA Cards were available for purchase, and were purchased, by consumers in Delaware, including Class Members, throughout the Class Period.

555.    The purpose of the Delaware Consumer Fraud Act is "to protect consumers and legitimate business enterprises from unfair or deceptive merchandising practices in the conduct of any trade or commerce in part or wholly within this State." The Act further provides that "[i]t is the intent of the General Assembly that such practices be swiftly stopped and that this subchapter shall be liberally construed and applied to promote its underlying purposes and policies." Del. Code Ann. tit. 6, § 2512.

556.    Under the DCFA, "[t]he act, use, or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale, lease, receipt, or advertisement of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is an unlawful practice." *Id.* § 2513(a).

557.    At all relevant times, Defendants used unfair practices by, and for the purpose of, excluding competition and controlling, fixing, and maintaining prices for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards, and they continue to do so, in violation of the Delaware Consumer Fraud Act.

558.    As more fully stated above, Defendants' unfair practices include, but are not limited to:

  a.    Locking MMA fighters into exclusive contracts, ensuring that competitors could not access top-ranked and top-drawing athletes

b.   Threatening and retaliating against athletes who sought to negotiate their contracts or work with competitors

c.   Eliminating cross-promotion with competing MMA Promotions

d.   Counterprogramming competing MMA Promotions' events

e.   Preventing competing MMA Promotions from securing television deals

f.   Purchasing and shuttering competing MMA Promotions (or forcing them to be "feeder" leagues)

559.   Defendants' conduct was, and continues to be, willful, flagrant, and malicious and done with the intent to harm competition and consumers throughout the United States, including in Delaware.

560.   Defendants' unfair practices substantially affected commerce and consumers in Delaware, and continue to do so.

561.   As a direct and proximate result of Defendants' unfair practices:

a.   price competition for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards has been restrained, suppressed, and eliminated throughout the United States, including in Delaware;

b.   the price of PPV for PPV-Level MMA Cards and the price of Premium Online Streaming Services carrying PPV-Level MMA Cards has been raised, fixed, maintained, or stabilized at supra-competitive levels throughout the United States, including in Delaware; and

c.   consumers in Delaware have been denied the benefits of free and unrestrained competition.

562.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and/or other members of the PPV Class and/or the Streaming Class in Delaware have been injured and have suffered ascertainable losses of money or property in that they paid more for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards than they otherwise would have in the absence of such conduct.

563.    Plaintiffs and Class Members seek all available relief under Delaware law.

**Chapter 39 of the District of Columbia Code**
**(D.C. Code Ann. §§ 28-3901, *et seq.***

564.    Plaintiffs repeat, reallege, and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

565.    By reason of the conduct alleged herein, Defendants have violated Chapter 39 of the District of Columbia Code, D.C. Code Ann. § 28-3901, *et seq.*

566.    PPV offerings of PPV-Level MMA Cards and/or Premium Online Streaming Services carrying PPV-Level MMA Cards were available for purchase, and were purchased, by consumers in the District of Columbia (D.C.), including Class Members, throughout the Class Period.

567.    In addition, Defendants have operated, and continue to operate, in D.C. as part of their business in the Relevant Output Market, including by directly marketing and selling their products in D.C. and by holding live PPV-Level MMA Cards in D.C.

568.    The purposes of Chapter 39 of the D.C. Code are to: "(1) assure that a just mechanism exists to remedy all improper trade practices and deter the continuing use of such practices; (2) promote, through effective enforcement, fair business practices throughout the community; and (3) educate consumers to demand high standards and seek proper redress of grievances." D.C. Code Ann. § 28-3901(b).

569.    Chapter 39 of the D.C. Code further instructs that "[t]his chapter shall be construed and applied liberally to promote its purpose." *Id.* § 28-3901(c).

570.    Under Chapter 39 of the D.C. Code, "[i]t shall be a violation of this chapter for any person to engage in an unfair or deceptive trade practice, whether or not any consumer is in fact misled, deceived, or damaged thereby . . . ." *Id.* § 28-3904.

571.    At all relevant times, Defendants engaged in unfair trade practices by monopolizing or attempting to monopolize the Relevant Output Market in the United States, including in D.C., for the purpose of excluding competition and controlling, fixing, and maintaining prices for PPV offerings of

PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards, and they continue to do so, in violation of D.C. law.

572.     At all relevant times, Defendants knowingly, willfully, and unlawfully engaged in unfair trade practices—including restrictive, exclusionary, and anticompetitive conduct—to acquire, maintain, and enhance—or attempt to acquire, maintain, and enhance—their monopoly power in the Relevant Output Market in the United States, including in D.C.

573.     As more fully stated above, Defendants' unfair trade practices for the purpose of establishing, maintaining, using, and enhancing their monopoly power in the Relevant Output Market include, but are not limited to, the following:

   a.   Locking MMA fighters into exclusive contracts, ensuring that competitors could not access top-ranked and top-drawing athletes

   b.   Threatening and retaliating against athletes who sought to negotiate their contracts or work with competitors

   c.   Eliminating cross-promotion with competing MMA Promotions

   d.   Counterprogramming competing MMA Promotions' events

   e.   Preventing competing MMA Promotions from securing television deals

   f.   Purchasing and shuttering competing MMA Promotions (or forcing them to be "feeder" leagues)

574.     Defendants' conduct was, and continues to be, willful, flagrant, and malicious and done with the intent to harm competition and consumers throughout the United States, including in D.C.

575.     Defendants' unfair trade practices substantially affected commerce and consumers in D.C, and continue to do so.

576.     As a direct and proximate result of Defendants' unfair trade practices:

   a.   price competition for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards has been restrained, suppressed, and eliminated throughout the United States, including in D.C.;

b. the price of PPV for PPV-Level MMA Cards and the price of Premium Online Streaming Services carrying PPV-Level MMA Cards has been raised, fixed, maintained, or stabilized at supra-competitive levels throughout the United States, including in D.C.; and

c. consumers in D.C. have been denied the benefits of free and unrestrained competition.

577.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and/or other members of the PPV Class and/or the Streaming Class in D.C. have been injured and have suffered ascertainable losses of money or property in that they paid more for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards than they otherwise would have in the absence of such conduct.

578.    Plaintiffs and Class Members seek all available relief under D.C. law.

**Florida Deceptive and Unfair Trade Practices Act**
**(Fla. Stat. §§ 501.201, *et seq.*)**

579.    Plaintiffs repeat, reallege, and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

580.    By reason of the conduct alleged herein, Defendants have violated the Florida Deceptive and Unfair Trade Practices Act. Fla. Stat. §§ 501.201, *et seq.*

581.    PPV offerings of PPV-Level MMA Cards and/or Premium Online Streaming Services carrying PPV-Level MMA Cards were available for purchase, and were purchased, by consumers in Florida, including Class Members, throughout the Class Period.

582.    In addition, Defendants have operated, and continue to operate, in Florida as part of their business in the Relevant Output Market, including by directly marketing and selling their products in Florida; through several UFC Gym locations in Florida; and by holding live PPV-Level MMA Cards in Florida.

583.    One of the stated purposes of the Florida Deceptive and Unfair Trade Practices Act is "[t]o protect the consuming public and legitimate business enterprises from those who engage in

unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. Ann. § 501.202(2).

584.    The Florida Deceptive and Unfair Trade Practices Act provides that "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." Fla. Stat. § 501.204(1).

585.    At all relevant times, Defendants possessed, and continue to possess, significant market power (i.e., monopoly power)—or possessed and continue to possess a dangerous probability of achieving market power—over the Relevant Output Market or narrower markets therein, in that the UFC is the dominant, if not exclusive, provider of PPV-Level MMA Cards nationwide, including in Florida.

586.    At all relevant times, Defendants engaged in unfair methods of competition by monopolizing or attempting to monopolize the Relevant Output Market in the United States, including in Florida, for the purpose of excluding competition and controlling, fixing, and maintaining prices for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards, and they continue to do so, in violation of Fla. Stat. Ann. § 501.204(1).

587.    At all relevant times, Defendants knowingly, willfully, and unlawfully engaged in unfair methods of competition—including restrictive, exclusionary, and anticompetitive conduct—to acquire, maintain, and enhance—or attempt to acquire, maintain, and enhance—their monopoly power in the Relevant Output Market in the United States, including in Florida.

588.    As more fully stated above, Defendants' unfair methods of competition for the purpose of acquiring, maintaining, and enhancing their monopoly power in the Relevant Output Market include, but are not limited to, the following:

    a.  Locking MMA fighters into exclusive contracts, ensuring that competitors could not access top-ranked and top-drawing athletes

    b.  Threatening and retaliating against athletes who sought to negotiate their contracts or work with competitors

    c.  Eliminating cross-promotion with competing MMA Promotions

d.  Counterprogramming competing MMA Promotions' events

e.  Preventing competing MMA Promotions from securing television deals

f.  Purchasing and shuttering competing MMA Promotions (or forcing them to be "feeder" leagues)

589.    Defendants' conduct was, and continues to be, willful, flagrant, and malicious and done with the intent to harm competition and consumers throughout the United States, including in Florida.

590.    Defendants' unfair methods of competition substantially affected Florida commerce and consumers, and continue to do so.

591.    As a direct and proximate result of Defendants' unfair methods of competition:

g.  price competition for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards has been restrained, suppressed, and eliminated throughout the United States, including in Florida;

h.  the price of PPV for PPV-Level MMA Cards and the price of Premium Online Streaming Services carrying PPV-Level MMA Cards has been raised, fixed, maintained, or stabilized at supra-competitive levels throughout the United States, including in Florida; and

i.  consumers in Florida have been denied the benefits of free and unrestrained competition.

592.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and/or other members of the PPV Class and/or the Streaming Class in Florida have been injured and have suffered ascertainable losses of money or property in that they paid more for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards than they otherwise would have in the absence of such conduct.

593.    Plaintiffs and Class Members seek all available relief under Florida law.

### Chapter 480 of the Hawaii Revised Statutes
### (Haw. Rev. Stat. §§ 480, *et seq.*)

594.    Plaintiffs repeat, reallege, and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

595.    By reason of the conduct alleged herein, Defendants have violated Chapter 480 of the Hawaii Revised States, Haw. Rev. Stat. §§ 480, *et seq.*

596.    PPV offerings of PPV-Level MMA Cards and/or Premium Online Streaming Services carrying PPV-Level MMA Cards were available for purchase, and were purchased, by consumers in Hawaii, including Class Members, throughout the Class Period.

597.    In addition, Defendants have operated, and continue to operate, in Hawaii as part of their business in the Relevant Output Market, including by directly marketing and selling their products in the state.

598.    Chapter 480 of the Hawaii Revised Statutes provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful." Haw. Rev. Stat. Ann. § 480-2(a). It further provides that "[a]ny person may bring an action based on unfair methods of competition declared unlawful by this section." *Id.* § 480-2(e).

599.    At all relevant times, Defendants engaged in unfair methods of competition and unfair trade practices by monopolizing or attempting to monopolize the Relevant Output Market in the United States, including in Hawaii, for the purpose of excluding competition and controlling, fixing, and maintaining prices for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards, and they continue to do so, in violation of Hawaii law.

600.    At all relevant times, Defendants knowingly, willfully, and unlawfully engaged in unfair methods of competition and unfair trade practices—including restrictive, exclusionary, and anticompetitive conduct—to acquire, maintain, and enhance—or attempt to acquire, maintain, and enhance—their monopoly power in the Relevant Output Market in the United States, including in Hawaii.

601.    As more fully stated above, Defendants' unfair methods of competition and unfair trade practices include, but are not limited to, the following:

a. Locking MMA fighters into exclusive contracts, ensuring that competitors could not access top-ranked and top-drawing athletes

b. Threatening and retaliating against athletes who sought to negotiate their contracts or work with competitors

c. Eliminating cross-promotion with competing MMA Promotions

d. Counterprogramming competing MMA Promotions' events

e. Preventing competing MMA Promotions from securing television deals

f. Purchasing and shuttering competing MMA Promotions (or forcing them to be "feeder" leagues)

602. Defendants' conduct was, and continues to be, willful, flagrant, and malicious and done with the intent to harm competition and consumers throughout the United States, including in Hawaii.

603. Defendants' unfair methods of competition and unfair trade practices substantially affected commerce and consumers in Hawaii, and continue to do so.

604. As a direct and proximate result of Defendants' unfair methods of competition and unfair trade practices:

a. price competition for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards has been restrained, suppressed, and eliminated throughout the United States, including in Hawaii;

b. the price of PPV for PPV-Level MMA Cards and the price of Premium Online Streaming Services carrying PPV-Level MMA Cards has been raised, fixed, maintained, or stabilized at supra-competitive levels throughout the United States, including in Hawaii; and

c. consumers in Hawaii have been denied the benefits of free and unrestrained competition.

605. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and/or other members of the PPV Class and/or the Streaming Class in Hawaii have been injured and have

suffered ascertainable losses of money or property in that they paid more for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards than they otherwise would have in the absence of such conduct.

606.    Plaintiffs and Class Members seek all available relief under Hawaii law.

**Idaho Consumer Protection Act**
**(Idaho Code Ann. §§ 48-601, *et seq.*)**

607.    Plaintiffs repeat, reallege, and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

608.    By reason of the conduct alleged herein, Defendants have violated the Idaho Consumer Protection Act, Idaho Code Ann. §§ 48-601, *et seq.*

609.    PPV offerings of PPV-Level MMA Cards and/or Premium Online Streaming Services carrying PPV-Level MMA Cards were available for purchase, and were purchased, by consumers in Idaho, including Class Members, throughout the Class Period.

610.    In addition, Defendants have operated, and continue to operate, in Idaho as part of their business in the Relevant Output Market, including by directly marketing and selling their products in the state.

611.    The purpose of the Idaho Consumer Protection Act is "to protect both consumers and businesses against unfair methods of competition and unfair or deceptive acts and practices in the conduct of trade or commerce, and to provide efficient and economical procedures to secure such protection." Idaho Code Ann. § 48-601.

612.    The Idaho Consumer Protection Act provides that "[t]he following unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared to be unlawful, where a person knows, or in the exercise of due care should know, that he has in the past, or is: . . . Engaging in any unconscionable method, act or practice in the conduct of trade or commerce . . . ." Idaho Code Ann. § 48-603(18). The Act further instructs that, "[i]n determining whether a method, act or practice is unconscionable," courts shall "take[] into

consideration" certain circumstances, including "[w]hether the sales conduct or pattern of sales conduct would outrage or offend the public conscience." Idaho Code Ann. § 48-603C(2)(d).

613.    At all relevant times, Defendants engaged in unfair and unconscionable practices in trade and commerce by monopolizing or attempting to monopolize the Relevant Output Market in the United States, including in Idaho, for the purpose of excluding competition and controlling, fixing, and maintaining prices for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards, and they continue to do so, in violation of Idaho law.

614.    At all relevant times, Defendants engaged in conduct for the purpose of selling recordings of PPV-Level MMA Cards to ESPN+ and Paramount+ that would outrage or offend the public conscience.

615.    At all relevant times, Defendants knowingly, willfully, and unlawfully engaged in unfair and unconscionable trade practices—including restrictive, exclusionary, and anticompetitive conduct—to acquire, maintain, and enhance—or attempt to acquire, maintain, and enhance—their monopoly power in the Relevant Output Market in the United States, including in Idaho.

616.    As more fully stated above, Defendants' unfair and unconscionable trade practices include, but are not limited to, the following:

    a.  Locking MMA fighters into exclusive contracts, ensuring that competitors could not access top-ranked and top-drawing athletes

    b.  Threatening and retaliating against athletes who sought to negotiate their contracts or work with competitors

    c.  Eliminating cross-promotion with competing MMA Promotions

    d.  Counterprogramming competing MMA Promotions' events

    e.  Preventing competing MMA Promotions from securing television deals

    f.  Purchasing and shuttering competing MMA Promotions (or forcing them to be "feeder" leagues)

617.     Defendants' conduct was, and continues to be, willful, flagrant, and malicious and done with the intent to harm competition and consumers throughout the United States, including in Idaho.

618.     Defendants' unfair methods of competition and unfair trade practices substantially affected commerce and consumers in Idaho, and continue to do so.

619.     As a direct and proximate result of Defendants' unfair methods of competition and unfair trade practices:

a.     price competition for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards has been restrained, suppressed, and eliminated throughout the United States, including in Idaho;

b.     the price of PPV for PPV-Level MMA Cards and the price of Premium Online Streaming Services carrying PPV-Level MMA Cards has been raised, fixed, maintained, or stabilized at supra-competitive levels throughout the United States, including in Idaho; and

c.     consumers in Idaho have been denied the benefits of free and unrestrained competition.

620.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and/or other members of the PPV Class and/or the Streaming Class in Idaho have been injured and have suffered ascertainable losses of money or property in that they paid more for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards than they otherwise would have in the absence of such conduct.

621.     Plaintiffs and Class Members seek all available relief under Idaho law.

### Illinois Consumer Fraud Act
### (815 ILCS 505/1 *et seq.*)

622.     Plaintiffs repeat, reallege, and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

623.    By reason of the conduct alleged herein, Defendants have violated the Illinois Consumer Fraud Act, 815 ILCS 505/1, *et seq.*

624.    PPV offerings of PPV-Level MMA Cards and/or Premium Online Streaming Services carrying PPV-Level MMA Cards were available for purchase, and were purchased, by consumers in Illinois, including Class Members, throughout the Class Period.

625.    In addition, Defendants have operated, and continue to operate, in Illinois as part of their business in the Relevant Output Market, including by directly marketing and selling their products in the state.

626.    The Illinois Consumer Fraud Act provides that "[u]nfair methods of competition and unfair or deceptive acts or practices … are hereby declared unlawful" and provides a private right of action for "[a]ny person who suffers actual damage as a result of a violation of this Act committed by any other person." 815 ILCS 505/2, 505/10a.

627.    At all relevant times, Defendants engaged in unfair methods of competition by monopolizing or attempting to monopolize the Relevant Output Market in the United States, including in Illinois, for the purpose of excluding competition and controlling, fixing, and maintaining prices for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards, and they continue to do so, in violation of 815 ILCS 505/2.

628.    At all relevant times, Defendants knowingly, willfully, and unlawfully engaged in unfair methods of competition—including restrictive, exclusionary, and anticompetitive conduct—to acquire, maintain, and enhance—or attempt to acquire, maintain, and enhance—their monopoly power in the Relevant Output Market in the United States, including in Illinois.

629.    As more fully stated above, Defendants' unfair methods of competition for the purpose of acquiring, maintaining, and enhancing their monopoly power in the Relevant Output Market include, but are not limited to, the following:

    a.    Locking MMA fighters into exclusive contracts, ensuring that competitors could not access top-ranked and top-drawing athletes

b. Threatening and retaliating against athletes who sought to negotiate their contracts or work with competitors

c. Eliminating cross-promotion with competing MMA Promotions

d. Counterprogramming competing MMA Promotions' events

e. Preventing competing MMA Promotions from securing television deals

f. Purchasing and shuttering competing MMA Promotions (or forcing them to be "feeder" leagues)

630.    Defendants' conduct was, and continues to be, willful, flagrant, and malicious and done with the intent to harm competition throughout the United States, including in Illinois.

631.    Throughout the Class Period, Defendants' illegal conduct substantially affected Illinois commerce and substantially injured Illinois consumers, and continues to do so.

632.    As a direct and proximate result of Defendants' monopolization or attempted monopolization of the Relevant Output Market:

a. price competition for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards has been restrained, suppressed, and eliminated throughout the United States, including in Illinois;

b. the price of PPV for PPV-Level MMA Cards and the price of Premium Online Streaming Services carrying PPV-Level MMA Cards has been raised, fixed, maintained, or stabilized at supra-competitive levels throughout the United States, including in Illinois; and

c. consumers in Illinois have been denied the benefits of free and unrestrained competition.

633.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and/or other members of the PPV Class and/or the Streaming Class in Illinois were injured in their business and property in that they paid more for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards than they otherwise would have in the absence of such conduct. Defendants' practices in perpetuating their monopoly and monopsony

offend public policy and are unfair; are unethical and oppressive; and caused substantial injury to Illinois consumers.

634.    Plaintiffs and Class Members seek all available relief under Illinois law.

**Louisiana Unfair Trade Practices and Consumer Protection Law**
**(La. Rev. Stat. Ann. §§ 51:1401, *et seq.*)**

635.    Plaintiffs repeat, reallege, and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

636.    By reason of the conduct alleged herein, Defendants have violated the Louisiana Unfair Trade Practices and Consumer Protection Law, La. Rev. Stat. Ann. §§ 51:1401, *et seq.*

637.    PPV offerings of PPV-Level MMA Cards and/or Premium Online Streaming Services carrying PPV-Level MMA Cards were available for purchase, and were purchased, by consumers in Louisiana, including Class Members, throughout the Class Period.

638.    In addition, Defendants have operated, and continue to operate, in Louisiana as part of their business in the Relevant Output Market, including by directly marketing and selling their products in the state.

639.    The Louisiana Unfair Trade Practices and Consumer Protection Law provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful" and provides a private right of action for "[a]ny person who suffers any ascertainable loss of money or movable property, corporeal or incorporeal, as a result of the use or employment by another person of an unfair or deceptive method, act, or practice declared unlawful by R.S. 51:1405." La. Rev. Stat. Ann. §§ 51:1405.A, 51:1409.A.

640.    At all relevant times, Defendants engaged in unfair methods of competition by monopolizing or attempting to monopolize the Relevant Output Market in the United States, including in Louisiana, for the purpose of excluding competition and controlling, fixing, and maintaining prices for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards, and they continue to do so, in violation of La. Rev. Stat. Ann. § 51:1405.A.

641.    At all relevant times, Defendants knowingly, willfully, and unlawfully engaged in unfair methods of competition—including restrictive, exclusionary, and anticompetitive conduct—to acquire, maintain, and enhance—or attempt to acquire, maintain, and enhance—their monopoly power in the Relevant Output Market in the United States, including in Louisiana.

642.    As more fully stated above, Defendants' unfair methods of competition for the purpose of acquiring, maintaining, and enhancing their monopoly power in the Relevant Output Market include, but are not limited to, the following:

    a.    Locking MMA fighters into exclusive contracts, ensuring that competitors could not access top-ranked and top-drawing athletes

    b.    Threatening and retaliating against athletes who sought to negotiate their contracts or work with competitors

    c.    Eliminating cross-promotion with competing MMA Promotions

    d.    Counterprogramming competing MMA Promotions' events

    e.    Preventing competing MMA Promotions from securing television deals

    f.    Purchasing and shuttering competing MMA Promotions (or forcing them to be "feeder" leagues)

643.    Defendants' conduct was, and continues to be, willful, flagrant, and malicious and done with the intent to harm competition and consumers throughout the United States, including in Louisiana. Defendants' conduct thus offends established public policy and was, and continues to be, immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

644.    Throughout the Class Period, Defendants' illegal conduct substantially affected Louisiana commerce and consumers, and continues to do so.

645.    As a direct and proximate result of Defendants' monopolization or attempted monopolization of the Relevant Output Market:

    a.    price competition for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards has been restrained, suppressed, and eliminated throughout the United States, including in Louisiana;

b.  the price of PPV for PPV-Level MMA Cards and the price of Premium Online Streaming Services carrying PPV-Level MMA Cards has been raised, fixed, maintained, or stabilized at supra-competitive levels throughout the United States, including in Louisiana; and

c.  consumers in Louisiana have been denied the benefits of free and unrestrained competition.

646.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and/or other members of the PPV Class and/or the Streaming Class in Louisiana have been, and continue to be, injured in their business and property in that they paid more for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards than they otherwise would have in the absence of such conduct.

647.    Plaintiffs and Class Members seek all available relief under Louisiana law.

**Missouri Merchandising Practices Act**
**(Mo. Ann. Stat. §§ 407.010, *et seq.*)**

648.    Plaintiffs repeat, reallege, and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

649.    By reason of the conduct alleged herein, Defendants have violated the Missouri Merchandising Practices Act, Mo. Ann. Stat. §§ 407.010, *et seq.*

650.    PPV offerings of PPV-Level MMA Cards and/or Premium Online Streaming Services carrying PPV-Level MMA Cards were available for purchase, and were purchased, by consumers in Missouri, including Class Members, throughout the Class Period.

651.    In addition, Defendants have operated, and continue to operate, in Missouri as part of their business in the Relevant Output Market, including by directly marketing and selling their products in the state.

652.    The Missouri Merchandising Practices Act provides that "[the] use or employment by any person of any … unfair practice … in connection with the sale or advertisement of any merchandise in trade or commerce … is declared to be an unlawful practice," and it provides a private

right of action for actual damages for "[a]ny person who purchases or leases merchandise primarily for personal, family or household purposes and thereby suffers an ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of a method, act or practice declared unlawful by section 407.020" as well as a right for such persons to bring a class action "if the unlawful method, act or practice has caused similar injury to numerous other persons." Mo. Ann. Stat. §§ 407.020; 407.025.1(1); 407.025.5.

653.    At all relevant times, Defendants engaged in unfair methods of competition by monopolizing or attempting to monopolize the Relevant Output Market in the United States, including in Missouri, for the purpose of excluding competition and controlling, fixing, and maintaining prices for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards, in violation and offense of Mo. Ann. Stat. § 407.020.

654.    At all relevant times, Defendants knowingly, willfully, and unlawfully engaged in unfair methods of competition—including restrictive, exclusionary, and anticompetitive conduct—to acquire, maintain, and enhance—or attempt to acquire, maintain, and enhance—their monopoly power in the Relevant Output Market in the United States, including in Missouri.

655.    As more fully stated above, Defendants' unfair methods of competition for the purpose of acquiring, maintaining, and enhancing their monopoly power in the Relevant Output Market include, but are not limited to, the following:

a.    Locking MMA fighters into exclusive contracts, ensuring that competitors could not access top-ranked and top-drawing athletes

b.    Threatening and retaliating against athletes who sought to negotiate their contracts or work with competitors

c.    Eliminating cross-promotion with competing MMA Promotions

d.    Counterprogramming competing MMA Promotions' events

e.    Preventing competing MMA Promotions from securing television deals

f.    Purchasing and shuttering competing MMA Promotions (or forcing them to be "feeder" leagues)

656.   Defendants' conduct was, and continues to be, willful, flagrant, and malicious and done with the intent to harm competition throughout the United States, including in Missouri. Defendants' actions through the Scheme were unethical, oppressive, and unscrupulous.

657.   Throughout the Class Period, Defendants' illegal conduct substantially affected Missouri commerce and substantially injured consumers in Missouri and continues to do so.

658.   As a direct and proximate result of Defendants' monopolization or attempted monopolization of the Relevant Output Market:

   a.   price competition for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards has been restrained, suppressed, and eliminated throughout the United States, including in Missouri;

   b.   the price of PPV for PPV-Level MMA Cards and the price of Premium Online Streaming Services carrying PPV-Level MMA Cards has been raised, fixed, maintained, or stabilized at supra-competitive levels throughout the United States, including in Missouri; and

   c.   consumers in Missouri have been denied the benefits of free and unrestrained competition.

659.   Defendants' actions impacted the public interest. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and/or other members of the PPV Class and/or the Streaming Class in Missouri were injured in their business and property in that they paid more for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards than they otherwise would have in the absence of such conduct. Defendants' practices in perpetuating their monopoly and monopsony offend public policy and are unfair; are unethical and oppressive; and caused substantial injury to Missouri consumers.

660.   Plaintiffs and Class Members seek all available relief under Missouri law.

**Montana Consumer Protection Act**
**(Mont. Code Ann. §§ 30-14-101, _et seq._)**

661.  Plaintiffs repeat, reallege, and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

662.  By reason of the conduct alleged herein, Defendants have violated the Montana Consumer Protection Act, Mont. Code Ann. §§ 30-14-101, *et seq.*

663.  PPV offerings of PPV-Level MMA Cards and/or Premium Online Streaming Services carrying PPV-Level MMA Cards were available for purchase, and were purchased, by consumers in Montana, including Class Members, throughout the Class Period.

664.  In addition, Defendants have operated, and continue to operate, in Montana as part of their business in the Relevant Output Market, including by directly marketing and selling their products in the state.

665.  The Montana Consumer Protection Act provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful" and provides a private right of action for "a consumer who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of a method, act, or practice declared unlawful by 30-14-103 … to recover money damages in the amount of any ascertainable loss of money or property or $500, whichever is greater." Mont. Code Ann. §§ 30-14-103, 30-14-133(1)(a).

666.  At all relevant times, Defendants engaged in unfair methods of competition by monopolizing or attempting to monopolize the Relevant Output Market in the United States, including in Montana, for the purpose of excluding competition and controlling, fixing, and maintaining prices for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards, and they continue to do so, in violation of Mont. Code Ann. § 30-14-103.

667.  At all relevant times, Defendants knowingly, willfully, and unlawfully engaged in unfair methods of competition—including restrictive, exclusionary, and anticompetitive conduct—to acquire, maintain, and enhance—or attempt to acquire, maintain, and enhance—their monopoly power in the Relevant Output Market in the United States, including in Montana.

668.    As more fully stated above, Defendants' unfair methods of competition for the purpose of acquiring, maintaining, and enhancing their monopoly power in the Relevant Output Market include, but are not limited to, the following:

    a.  Locking MMA fighters into exclusive contracts, ensuring that competitors could not access top-ranked and top-drawing athletes

    b.  Threatening and retaliating against athletes who sought to negotiate their contracts or work with competitors

    c.  Eliminating cross-promotion with competing MMA Promotions

    d.  Counterprogramming competing MMA Promotions' events

    e.  Preventing competing MMA Promotions from securing television deals

    f.  Purchasing and shuttering competing MMA Promotions (or forcing them to be "feeder" leagues)

669.    Defendants' conduct was, and continues to be, willful, flagrant, and malicious and done with the intent to harm competition and consumers throughout the United States, including in Montana. Defendants' conduct was, and continues to be, immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

670.    Throughout the Class Period, Defendants' illegal conduct substantially affected Montana commerce and consumers, and continues to do so.

671.    As a direct and proximate result of Defendants' monopolization or attempted monopolization of the Relevant Output Market:

    a.  price competition for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards has been restrained, suppressed, and eliminated throughout the United States, including in Montana;

    b.  the price of PPV for PPV-Level MMA Cards and the price of Premium Online Streaming Services carrying PPV-Level MMA Cards has been raised, fixed, maintained, or stabilized at supra-competitive levels throughout the United States, including in Montana; and

c. consumers in Montana have been denied the benefits of free and unrestrained competition.

672. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and/or other members of the PPV Class and/or the Streaming Class in Montana have been, and continue to be, injured in their business and property in that they paid more for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards than they otherwise would have in the absence of such conduct.

673. Plaintiffs and Class Members seek all available relief under Montana law.

**Nebraska Consumer Protection Act**
**(Neb. Rev. Stat. §§ 59-1601, *et seq.*)**

674. Plaintiffs repeat, reallege, and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

675. By reason of the conduct alleged herein, Defendants have violated the Nebraska Consumer Protection Act, Neb. Rev. Stat. §§ 59-1601, *et seq.*

676. PPV offerings of PPV-Level MMA Cards and/or Premium Online Streaming Services carrying PPV-Level MMA Cards were available for purchase, and were purchased, by consumers in Nebraska, including Class Members, throughout the Class Period.

677. In addition, Defendants have operated, and continue to operate, in Nebraska as part of their business in the Relevant Output Market, including by directly marketing and selling their products in the state.

678. The Nebraska Consumer Protection Act provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce," "[a]ny contract, combination, in the form of trust or otherwise, or conspiracy in restraint of trade or commerce," "to monopolize, or attempt to monopolize or combine or conspire with any other person or persons to monopolize any part of trade or commerce," and to shall all be unlawful, and provides a private right of action for "[a]ny who is injured in his or her business or property by a violation of

sections 59-1602 to 59-1606, whether such injured person dealt directly or indirectly with the defendant." Neb. Rev. Stat. Ann §§ 59-1602; -1603; -1604; -1609.

679.    At all relevant times, Defendants engaged in unfair methods of competition by monopolizing or attempting to monopolize the Relevant Output Market in the United States, including in Nebraska, for the purpose of excluding competition and controlling, fixing, and maintaining prices for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards, and they continue to do so, in violation of Neb. Rev. Stat. Ann §§ 59-1602, -1603; and -1604.

680.    At all relevant times, Defendants knowingly, willfully, and unlawfully engaged in unfair methods of competition—including restrictive, exclusionary, and anticompetitive conduct—to acquire, maintain, and enhance—or attempt to acquire, maintain, and enhance—their monopoly power in the Relevant Output Market in the United States, including in Nebraska.

681.    As more fully stated above, Defendants' unfair methods of competition for the purpose of acquiring, maintaining, and enhancing their monopoly power in the Relevant Output Market include, but are not limited to, the following:

    a.    Locking MMA fighters into exclusive contracts, ensuring that competitors could not access top-ranked and top-drawing athletes

    b.    Threatening and retaliating against athletes who sought to negotiate their contracts or work with competitors

    c.    Eliminating cross-promotion with competing MMA Promotions

    d.    Counterprogramming competing MMA Promotions' events

    e.    Preventing competing MMA Promotions from securing television deals

    f.    Purchasing and shuttering competing MMA Promotions (or forcing them to be "feeder" leagues)

682.    Defendants' conduct was, and continues to be, willful, flagrant, and malicious and done with the intent to harm competition throughout the United States, including in Nebraska.

683.    Throughout the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce and consumers, and continues to do so.

684.    As a direct and proximate result of Defendants' monopolization or attempted monopolization of the Relevant Output Market:

a.    price competition for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards has been restrained, suppressed, and eliminated throughout the United States, including in Nebraska;

b.    the price of PPV for PPV-Level MMA Cards and the price of Premium Online Streaming Services carrying PPV-Level MMA Cards has been raised, fixed, maintained, or stabilized at supra-competitive levels throughout the United States, including in Nebraska; and

c.    consumers in Nebraska have been denied the benefits of free and unrestrained competition.

685.    Defendants' actions impacted the public interest. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and/or other members of the PPV Class and/or the Streaming Class in Nebraska were injured in their business and property in that they paid more for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards than they otherwise would have in the absence of such conduct. Defendants' practices in perpetuating their monopoly and monopsony offend public policy and are unfair; are unethical and oppressive; and caused substantial injury to Nebraska consumers.

686.    Plaintiffs and Class Members seek all available relief under Nebraska law.

**Nevada Deceptive Trade Practices Act**
**(Nev. Rev. Stat. Ann. §§ 598.0903, *et seq.*)**

687.    Plaintiffs repeat, reallege, and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

688.    By reason of the conduct alleged herein, Defendants have violated the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. Ann. §§ 598.0903, *et seq.*

689.    PPV offerings of PPV-Level MMA Cards and/or Premium Online Streaming Services carrying PPV-Level MMA Cards were available for purchase, and were purchased, by consumers in Nevada, including Class Members, throughout the Class Period.

690.    Defendants have operated, and continue to operate, in Nevada as part of their business in the Relevant Output Market, including by directly marketing and selling their products in the state. In addition, Zuffa, TKO OpCo, and the UFC are all headquartered in Nevada; the UFC has UFC Gyms in Las Vegas and Reno; and the UFC has held numerous live PPV-Level MMA Cards in Nevada (at least 38 since 2024).

691.    The Nevada Deceptive Trade Practices Act provides that it is a deceptive trade practice when a person "[v]iolates a state or federal statute or regulation relating to the sale or lease of goods or services," or "[u]ses an unconscionable practice in a transaction." An "unconscionable practice" is an act or practice which "[t]akes advantage of the lack of knowledge, ability, experience or capacity of the consumer to a grossly unfair degree" or "[r]esults in a gross disparity between the value received and the consideration paid, in a transaction involving transfer of consideration." Nevada further provides a right of action to "any person who is a victim of consumer fraud," with "consumer fraud" defined to include "[a] deceptive trade practice as defined in NRS 598.0915 to 598.0925, inclusive." Nev. Rev. Stat. Ann. §§ 41.600.1; 41.600.2(e); 598.0923.1(c), (e); 598.0923.2(b)(1)-(2).

692.    At all relevant times, Defendants engaged in unfair methods of competition by monopolizing or attempting to monopolize the Relevant Output Market in the United States, including in Nevada, for the purpose of excluding competition and controlling, fixing, and maintaining prices for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards, which is a deceptive trade practice under Nev. Rev. Stat. Ann. § 598.0923.

693.    At all relevant times, Defendants knowingly, willfully, and unlawfully engaged in unfair methods of competition—including restrictive, exclusionary, and anticompetitive conduct—to acquire, maintain, and enhance—or attempt to acquire, maintain, and enhance—their monopoly power in the Relevant Output Market in the United States, including in Nevada, in violation of state and antitrust law.

694.    As more fully stated above, Defendants' unfair methods of competition for the purpose of acquiring, maintaining, and enhancing their monopoly power in the Relevant Output Market include, but are not limited to, the following:

  a. Locking MMA fighters into exclusive contracts, ensuring that competitors could not access top-ranked and top-drawing athletes

  b. Threatening and retaliating against athletes who sought to negotiate their contracts or work with competitors

  c. Eliminating cross-promotion with competing MMA Promotions

  d. Counterprogramming competing MMA Promotions' events

  e. Preventing competing MMA Promotions from securing television deals

  f. Purchasing and shuttering competing MMA Promotions (or forcing them to be "feeder" leagues)

695.    Defendants' conduct was, and continues to be, willful, flagrant, and malicious and done with the intent to harm competition throughout the United States, including in Nevada.

696.    Throughout the Class Period, Defendants' illegal conduct substantially affected Nevada commerce and consumers, and continues to do so.

697.    As a direct and proximate result of Defendants' monopolization or attempted monopolization of the Relevant Output Market:

  a. price competition for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards has been restrained, suppressed, and eliminated throughout the United States, including in Nevada;

  b. the price of PPV for PPV-Level MMA Cards and the price of Premium Online Streaming Services carrying PPV-Level MMA Cards has been raised, fixed, maintained, or stabilized at supra-competitive levels throughout the United States, including in Nevada; and

  c. consumers in Nevada have been denied the benefits of free and unrestrained competition.

698.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and/or other members of the PPV Class and/or the Streaming Class in Nevada were injured in their business and property in that they paid more for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards than they otherwise would have in the absence of such conduct, creating a gross disparity between the value of the PPV offerings and the price paid. Defendants' practices in perpetuating their monopoly and monopsony offend public policy and are unfair; are unethical and oppressive; and caused substantial injury to Nevada consumers.

699.    Plaintiffs and Class Members seek all available relief under Nevada law.

### New Hampshire Consumer Protection Act
### (N.H. Rev. Stat. §§ 358-A:1, *et seq.*)

700.    Plaintiffs repeat, reallege, and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

701.    By reason of the conduct alleged herein, Defendants have violated the New Hampshire Consumer Protection Act, N.H. Rev. Stat. §§ 358-A:1, *et seq.*

702.    PPV offerings of PPV-Level MMA Cards and/or Premium Online Streaming Services carrying PPV-Level MMA Cards were available for purchase, and were purchased, by consumers in New Hampshire, including Class Members, throughout the Class Period.

703.    In addition, Defendants have operated, and continue to operate, in New Hampshire as part of their business in the Relevant Output Market, including by directly marketing and selling their products in the state.

704.    The New Hampshire Consumer Protection Act provides that it is "unlawful for any person to use any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state," including through "[p]ricing of goods or services in a manner that tends to create or maintain a monopoly, or otherwise harm competition," and provides a private right of action for "[a]ny person injured by another's use of any method, act or practice declared unlawful under this chapter" as well as a right for such persons to "institute an action as representative or representatives of a class of persons who are residents of this state or whose cause

of action arose within this state against one or more defendants." N.H. Rev. Stat. §§ 358-A:2, XIV; 358-A:10; 358-A:10-a.

705.    At all relevant times, Defendants engaged in unfair methods of competition by monopolizing or attempting to monopolize the Relevant Output Market in the United States, including in New Hampshire, for the purpose of excluding competition and controlling, fixing, and maintaining prices for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards, and they continue to do so, in violation of N.H. Rev. Stat. § 358-A:2.

706.    At all relevant times, Defendants knowingly, willfully, and unlawfully engaged in unfair methods of competition—including restrictive, exclusionary, and anticompetitive conduct—to acquire, maintain, and enhance—or attempt to acquire, maintain, and enhance—their monopoly power in the Relevant Output Market in the United States, including in New Hampshire.

707.    As more fully stated above, Defendants' unfair methods of competition for the purpose of acquiring, maintaining, and enhancing their monopoly power in the Relevant Output Market include, but are not limited to, the following:

    a.  Locking MMA fighters into exclusive contracts, ensuring that competitors could not access top-ranked and top-drawing athletes

    b.  Threatening and retaliating against athletes who sought to negotiate their contracts or work with competitors

    c.  Eliminating cross-promotion with competing MMA Promotions

    d.  Counterprogramming competing MMA Promotions' events

    e.  Preventing competing MMA Promotions from securing television deals

    f.  Purchasing and shuttering competing MMA Promotions (or forcing them to be "feeder" leagues)

708.    Defendants' conduct was, and continues to be, willful, flagrant, and malicious and done with the intent to harm competition throughout the United States, including in New Hampshire.

709. Throughout the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce and consumers, and continues to do so.

710. As a direct and proximate result of Defendants' monopolization or attempted monopolization of the Relevant Output Market:

  a. price competition for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards has been restrained, suppressed, and eliminated throughout the United States, including in New Hampshire;

  b. the price of PPV for PPV-Level MMA Cards and the price of Premium Online Streaming Services carrying PPV-Level MMA Cards has been raised, fixed, maintained, or stabilized at supra-competitive levels throughout the United States, including in New Hampshire; and

  c. consumers in New Hampshire have been denied the benefits of free and unrestrained competition.

711. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and/or other members of the PPV Class and/or the Streaming Class in New Hampshire were injured in their business and property in that they paid more for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards than they otherwise would have in the absence of such conduct. Defendants' practices in perpetuating their monopoly and monopsony offend public policy and are unfair; are unethical and oppressive; and caused substantial injury to New Hampshire consumers.

712. Plaintiffs and Class Members seek all available relief under New Hampshire law.

**New Jersey Consumer Fraud Act**
**(N.J. Stat. Ann. §§ 56:8-1, *et seq.*)**

713. Plaintiffs repeat, reallege, and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

714. By reason of the conduct alleged herein, Defendants have violated the New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8-1, *et seq.*

715.    PPV offerings of PPV-Level MMA Cards and/or Premium Online Streaming Services carrying PPV-Level MMA Cards were available for purchase, and were purchased, by consumers in New Jersey, including Class Members, throughout the Class Period.

716.    In addition, Defendants have operated, and continue to operate, in New Jersey as part of their business in the Relevant Output Market, including by directly marketing and selling their products in the state.

717.    The New Jersey Consumer Fraud Act provides that "[t]he act, use or employment by any person of any commercial practice that is unconscionable or abusive … in connection with the sale or advertisement of any merchandise … is declared to be an unlawful practice" and provides a private right of action for "[a]ny person who suffers any ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act." N.J. Stat. Ann. §§ 56:8-2; 56:8-19.

718.    At all relevant times, Defendants engaged in unfair methods of competition by monopolizing or attempting to monopolize the Relevant Output Market in the United States, including in New Jersey, for the purpose of excluding competition and controlling, fixing, and maintaining prices for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards, and they continue to do so, in violation of N.J. Stat. Ann. § 56:8-2.

719.    At all relevant times, Defendants knowingly, willfully, and unlawfully engaged in unfair methods of competition—including restrictive, exclusionary, and anticompetitive conduct—to acquire, maintain, and enhance—or attempt to acquire, maintain, and enhance—their monopoly power in the Relevant Output Market in the United States, including in New Jersey.

720.    As more fully stated above, Defendants' unfair methods of competition for the purpose of acquiring, maintaining, and enhancing their monopoly power in the Relevant Output Market include, but are not limited to, the following:

a.    Locking MMA fighters into exclusive contracts, ensuring that competitors could not access top-ranked and top-drawing athletes

b. Threatening and retaliating against athletes who sought to negotiate their contracts or work with competitors

c. Eliminating cross-promotion with competing MMA Promotions

d. Counterprogramming competing MMA Promotions' events

e. Preventing competing MMA Promotions from securing television deals

f. Purchasing and shuttering competing MMA Promotions (or forcing them to be "feeder" leagues)

721. Defendants' conduct was, and continues to be, willful, flagrant, and malicious and done with the intent to harm competition throughout the United States, including in New Jersey.

722. Throughout the Class Period, Defendants' illegal conduct substantially affected New Jersey commerce and consumers, and continues to do so.

723. As a direct and proximate result of Defendants' monopolization or attempted monopolization of the Relevant Output Market:

a. price competition for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards has been restrained, suppressed, and eliminated throughout the United States, including in New Jersey;

b. the price of PPV for PPV-Level MMA Cards and the price of Premium Online Streaming Services carrying PPV-Level MMA Cards has been raised, fixed, maintained, or stabilized at supra-competitive levels throughout the United States, including in New Jersey; and

c. consumers in New Jersey have been denied the benefits of free and unrestrained competition.

724. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and/or other members of the PPV Class and/or the Streaming Class in New Jersey were injured in their business and property in that they paid more for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards than they otherwise would have in the absence of such conduct, thus suffering an ascertainable loss due to Defendants' unlawful

conduct. Defendants' practices in perpetuating their monopoly and monopsony offend public policy and are unfair; are unethical and oppressive; and caused substantial injury to New Jersey consumers.

725.    Plaintiffs and Class Members seek all available relief under New Jersey law.

726.    Plaintiffs will deliver a copy of this Complaint to the Attorney General of the State of New Jersey via email within 24 hours of filing this Complaint, in compliance with N.J. Stat. Ann. § 56:8-20.

## North Carolina Unfair and Deceptive Trade Practices Act
## (N.C. Gen. Stat. §§ 75-1.1, *et seq.*)

727.    Plaintiffs repeat, reallege, and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

728.    By reason of the conduct alleged herein, Defendants have violated the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. §§ 75-1.1, *et seq.*

729.    PPV offerings of PPV-Level MMA Cards and/or Premium Online Streaming Services carrying PPV-Level MMA Cards were available for purchase, and were purchased, by consumers in North Carolina, including Class Members, throughout the Class Period.

730.    In addition, Defendants have operated, and continue to operate, in North Carolina as part of their business in the Relevant Output Market, including by directly marketing and selling their products in the state.

731.    The North Carolina Unfair and Deceptive Trade Practices Act provides that "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful" and provides a private right of action for any person injured "by any other person, firm or corporation in violation of the provisions of this Chapter." N.C. Gen. Stat. §§ 75-1.1(a); 75-16.

732.    At all relevant times, Defendants engaged in unfair methods of competition by monopolizing or attempting to monopolize the Relevant Output Market in the United States, including in North Carolina, for the purpose of excluding competition and controlling, fixing, and maintaining prices for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming

Services carrying PPV-Level MMA Cards, and they continue to do so, in violation of N.C. Gen. Stat. § 75-1.1(a).

733.    At all relevant times, Defendants knowingly, willfully, and unlawfully engaged in unfair methods of competition—including restrictive, exclusionary, and anticompetitive conduct—to acquire, maintain, and enhance—or attempt to acquire, maintain, and enhance—their monopoly power in the Relevant Output Market in the United States, including in North Carolina.

734.    As more fully stated above, Defendants' unfair methods of competition for the purpose of acquiring, maintaining, and enhancing their monopoly power in the Relevant Output Market include, but are not limited to, the following:

    a.    Locking MMA fighters into exclusive contracts, ensuring that competitors could not access top-ranked and top-drawing athletes

    b.    Threatening and retaliating against athletes who sought to negotiate their contracts or work with competitors

    c.    Eliminating cross-promotion with competing MMA Promotions

    d.    Counterprogramming competing MMA Promotions' events

    e.    Preventing competing MMA Promotions from securing television deals

    f.    Purchasing and shuttering competing MMA Promotions (or forcing them to be "feeder" leagues)

735.    Defendants' conduct was, and continues to be, willful, flagrant, and malicious and done with the intent to harm competition throughout the United States, including in North Carolina.

736.    Throughout the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce and consumers, and continues to do so.

737.    As a direct and proximate result of Defendants' monopolization or attempted monopolization of the Relevant Output Market:

    a.    price competition for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards has been restrained, suppressed, and eliminated throughout the United States, including in North Carolina;

b.  the price of PPV for PPV-Level MMA Cards and the price of Premium Online Streaming Services carrying PPV-Level MMA Cards has been raised, fixed, maintained, or stabilized at supra-competitive levels throughout the United States, including in North Carolina; and

c.  consumers in North Carolina have been denied the benefits of free and unrestrained competition.

738.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and/or other members of the PPV Class and/or the Streaming Class in North Carolina were injured in their business and property in that they paid more for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards than they otherwise would have in the absence of such conduct. Defendants' practices in perpetuating their monopoly and monopsony offend public policy and are unfair; are unethical and oppressive; and caused substantial injury to North Carolina consumers.

739.    Plaintiffs and Class Members seek all available relief under North Carolina law.

**Rhode Island Deceptive Trade Practices Act**
**(R.I. Gen. Laws §§ 6-13.1-1, *et seq.*)**

740.    Plaintiffs repeat, reallege, and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

741.    By reason of the conduct alleged herein, Defendants have violated the Rhode Island Deceptive Trade Practices Act, R.I. Gen. Laws §§ 6-13.1-1, *et seq.*

742.    PPV offerings of PPV-Level MMA Cards and/or Premium Online Streaming Services carrying PPV-Level MMA Cards were available for purchase, and were purchased, by consumers in Rhode Island, including Class Members, throughout the Class Period.

743.    In addition, Defendants have operated, and continue to operate, in Rhode Island as part of their business in the Relevant Output Market, including by directly marketing and selling their products in the state.

744. The Rhode Island Deceptive Trade Practices Act provides that "[u]nfair methods of competition and unfair or deceptive acts or practices," meaning "any act or practice that is unfair or deceptive to the consumer," "are declared unlawful" and provides a private right of action for "[a]ny person who purchases or leases goods or services primarily for personal, family, or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by another person" who employs such an unlawful act. R.I. Gen. Laws §§ 6-13.1-1(6)(xiii); 6-13.1-2, 6-13.1-5.2(a).

745. At all relevant times, Defendants engaged in unfair methods of competition by monopolizing or attempting to monopolize the Relevant Output Market in the United States, including in Rhode Island, for the purpose of excluding competition and controlling, fixing, and maintaining prices for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards, and they continue to do so, in violation of R.I. Gen. Laws § 6-13.1-2.

746. At all relevant times, Defendants knowingly, willfully, and unlawfully engaged in unfair methods of competition—including restrictive, exclusionary, and anticompetitive conduct—to acquire, maintain, and enhance—or attempt to acquire, maintain, and enhance—their monopoly power in the Relevant Output Market in the United States, including in Rhode Island.

747. As more fully stated above, Defendants' unfair methods of competition for the purpose of acquiring, maintaining, and enhancing their monopoly power in the Relevant Output Market include, but are not limited to, the following:

a. Locking MMA fighters into exclusive contracts, ensuring that competitors could not access top-ranked and top-drawing athletes

b. Threatening and retaliating against athletes who sought to negotiate their contracts or work with competitors

c. Eliminating cross-promotion with competing MMA Promotions

d. Counterprogramming competing MMA Promotions' events

e. Preventing competing MMA Promotions from securing television deals

f.  Purchasing and shuttering competing MMA Promotions (or forcing them to be "feeder" leagues)

748.  Defendants' conduct was, and continues to be, willful, flagrant, and malicious and done with the intent to harm competition throughout the United States, including in Rhode Island.

749.  Throughout the Class Period, Defendants' illegal conduct substantially affected Rhode Island commerce and consumers, and continues to do so.

750.  As a direct and proximate result of Defendants' monopolization or attempted monopolization of the Relevant Output Market:

a.  price competition for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards has been restrained, suppressed, and eliminated throughout the United States, including in Rhode Island;

b.  the price of PPV for PPV-Level MMA Cards and the price of Premium Online Streaming Services carrying PPV-Level MMA Cards has been raised, fixed, maintained, or stabilized at supra-competitive levels throughout the United States, including in Rhode Island; and

c.  consumers in Rhode Island have been denied the benefits of free and unrestrained competition.

751.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and/or other members of the PPV Class and/or the Streaming Class in Rhode Island were injured in their business and property in that they paid more for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards than they otherwise would have in the absence of such conduct. Defendants' practices in perpetuating their monopoly and monopsony offend public policy and are unfair; are unethical and oppressive; and caused substantial injury to Rhode Island consumers.

752.  Plaintiffs and Class Members seek all available relief under Rhode Island law.

### South Carolina Unfair Trade Practices Act
### (S.C. Code Ann. §§ 39-5-10, *et seq.*)

753.    Plaintiffs repeat, reallege, and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

754.    By reason of the conduct alleged herein, Defendants have violated the South Carolina Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-10, *et seq.*

755.    PPV offerings of PPV-Level MMA Cards and/or Premium Online Streaming Services carrying PPV-Level MMA Cards were available for purchase, and were purchased, by consumers in South Carolina, including Class Members, throughout the Class Period.

756.    In addition, Defendants have operated, and continue to operate, in South Carolina as part of their business in the Relevant Output Market, including by directly marketing and selling their products in the state.

757.    PPV offerings of PPV-Level MMA Cards and/or Premium Online Streaming Services carrying PPV-Level MMA Cards were available for purchase, and were purchased, by consumers in South Carolina, including Class Members, throughout the Class Period.

758.    The South Carolina Unfair Trade Practices Act provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful" and provides a private right of action for "any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of an unfair or deceptive method, act or practice declared unlawful by Section 39-5-20 may bring an action … to recover actual damages." S.C. Code Ann. §§ 39-5-20(a), 39-5-140(a).

759.    At all relevant times, Defendants engaged in unfair methods of competition by monopolizing or attempting to monopolize the Relevant Output Market in the United States, including in South Carolina, for the purpose of excluding competition and controlling, fixing, and maintaining prices for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards, and they continue to do so, in violation of S.C. Code Ann. § 39-5-20(a).

760.    At all relevant times, Defendants knowingly, willfully, and unlawfully engaged in unfair methods of competition—including restrictive, exclusionary, and anticompetitive conduct—to

acquire, maintain, and enhance—or attempt to acquire, maintain, and enhance—their monopoly power in the Relevant Output Market in the United States, including in South Carolina.

761.    As more fully stated above, Defendants' unfair methods of competition for the purpose of acquiring, maintaining, and enhancing their monopoly power in the Relevant Output Market include, but are not limited to, the following:

     a.    Locking MMA fighters into exclusive contracts, ensuring that competitors could not access top-ranked and top-drawing athletes

     b.    Threatening and retaliating against athletes who sought to negotiate their contracts or work with competitors

     c.    Eliminating cross-promotion with competing MMA Promotions

     d.    Counterprogramming competing MMA Promotions' events

     e.    Preventing competing MMA Promotions from securing television deals

     f.    Purchasing and shuttering competing MMA Promotions (or forcing them to be "feeder" leagues)

762.    Defendants' conduct was, and continues to be, willful, flagrant, and malicious and done with the intent to harm competition and consumers throughout the United States, including in South Carolina. Defendants' conduct was, and continues to be, offensive to public policy, immoral, unethical, and oppressive.

763.    Throughout the Class Period, Defendants' illegal conduct substantially affected South Carolina commerce and consumers, and continues to do so.

764.    As a direct and proximate result of Defendants' monopolization or attempted monopolization of the Relevant Output Market:

     a.    price competition for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards has been restrained, suppressed, and eliminated throughout the United States, including in South Carolina;

     b.    the price of PPV for PPV-Level MMA Cards and the price of Premium Online Streaming Services carrying PPV-Level MMA Cards has been raised, fixed,

maintained, or stabilized at supra-competitive levels throughout the United States, including in South Carolina; and

c. consumers in South Carolina have been denied the benefits of free and unrestrained competition.

765. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and/or other members of the PPV Class and/or the Streaming Class in South Carolina have been, and continue to be, injured in their business and property in that they paid more for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards than they otherwise would have in the absence of such conduct.

766. Plaintiffs and Class Members seek all available relief under South Carolina law.

**Title 9, Chapter 63 of the Vermont Statutes**
**(Vt. Stat. Ann. tit. 9 §§ 2451, *et seq.*)**

767. Plaintiffs repeat, reallege, and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

768. By reason of the conduct alleged herein, Defendants have violated the Vermont Antitrust and Consumer Fraud Act, Vt. Stat. Ann. tit. 9, §§ 2451, *et seq.*

769. PPV offerings of PPV-Level MMA Cards and/or Premium Online Streaming Services carrying PPV-Level MMA Cards were available for purchase, and were purchased, by consumers in Vermont, including Class Members, throughout the Class Period.

770. In addition, Defendants have operated, and continue to operate, in Vermont as part of their business in the Relevant Output Market, including by directly marketing and selling their products in the state.

771. The Vermont Antitrust and Consumer Fraud Act provides that "[u]nfair methods of competition in commerce and unfair or deceptive acts or practices in commerce are hereby declared unlawful" and provides a private right of action for "[a]ny person who sustains damages or injury as a result of any violation of State antitrust laws, including section 2453 of this title" even when that person "has not dealt directly with a defendant." Vt. Stat. Ann. tit. 9, § 2453(a); 2465(a) & (b).

772.    At all relevant times, Defendants engaged in unfair methods of competition by monopolizing or attempting to monopolize the Relevant Output Market in the United States, including in Vermont, for the purpose of excluding competition and controlling, fixing, and maintaining prices for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards, and they continue to do so, in violation of Vermont law.

773.    At all relevant times, Defendants knowingly, willfully, and unlawfully engaged in unfair methods of competition—including restrictive, exclusionary, and anticompetitive conduct—to acquire, maintain, and enhance—or attempt to acquire, maintain, and enhance—their monopoly power in the Relevant Output Market in the United States, including in Vermont.

774.    As more fully stated above, Defendants' unfair methods of competition for the purpose of acquiring, maintaining, and enhancing their monopoly power in the Relevant Output Market include, but are not limited to, the following:

      a.    Locking MMA fighters into exclusive contracts, ensuring that competitors could not access top-ranked and top-drawing athletes

      b.    Threatening and retaliating against athletes who sought to negotiate their contracts or work with competitors

      c.    Eliminating cross-promotion with competing MMA Promotions

      d.    Counterprogramming competing MMA Promotions' events

      e.    Preventing competing MMA Promotions from securing television deals

      f.    Purchasing and shuttering competing MMA Promotions (or forcing them to be "feeder" leagues)

775.    Defendants' conduct was, and continues to be, willful, flagrant, and malicious and done with the intent to harm competition throughout the United States, including in Vermont.

776.    Throughout the Class Period, Defendants' illegal conduct substantially affected Vermont commerce and consumers, and continues to do so.

777.    As a direct and proximate result of Defendants' monopolization or attempted monopolization of the Relevant Output Market:

a.  price competition for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards has been restrained, suppressed, and eliminated throughout the United States, including in Vermont;

b.  the price of PPV for PPV-Level MMA Cards and the price of Premium Online Streaming Services carrying PPV-Level MMA Cards has been raised, fixed, maintained, or stabilized at supra-competitive levels throughout the United States, including in Vermont; and

c.  consumers in Vermont have been denied the benefits of free and unrestrained competition.

778.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and/or other members of the PPV Class and/or the Streaming Class in Vermont were injured in their business and property in that they paid more for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards than they otherwise would have in the absence of such conduct.

779.   Plaintiffs and Class Members seek all available relief under Vermont law.

780.   Plaintiffs and Class Members have been, and continue to be, injured in their business and property by reason of Defendants' anticompetitive, unfair, unconscionable, and/or deceptive conduct. Their injury consists of paying higher prices for PPV-Level MMA Cards and for Premium Online Streaming Services used to view PPV-Level MMA Cards than they would have paid in the absence of these violations. This injury is of the type the state consumer protection statutes were designed to prevent and directly results from Defendants' unlawful conduct. On behalf of themselves and the Class Members, Plaintiffs seek all appropriate relief provided for under the foregoing statutes, including compensatory and punitive damages and equitable relief.

## XIV.    COUNT FOUR: UNJUST ENRICHMENT CLAIMS

**(On behalf of Plaintiffs, the PPV Class, and the Streaming Class)**
**Unjust Enrichment Under State Law**

781. Plaintiffs repeat, reallege, and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

782. To the extent required, Plaintiffs' and Class Members' claims for unjust enrichment are pleaded in the alternative, where Plaintiffs otherwise lack an adequate remedy at law.

783. PPV offerings of PPV-Level MMA Cards and/or Premium Online Streaming Services carrying PPV-Level MMA Cards were available for purchase, and were purchased, by consumers nationwide throughout the Class Period, including in the states identified below (Arizona, Arkansas, California, Colorado, Connecticut, Delaware, District of Columbia, Hawaii, Idaho, Indiana, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, Wisconsin).

784. In addition, Defendants have operated, and continue to operate, their business in the Relevant Output Market, including by directly marketing and selling their products in the states identified below (Arizona, Arkansas, California, Colorado, Connecticut, Delaware, District of Columbia, Hawaii, Idaho, Indiana, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, Wisconsin).

785. Defendants have benefitted from monopoly profits in the market for PPV-Level MMA Cards resulting from the unlawful and inequitable acts alleged in this Complaint.

786. Defendants abused their market power to enrich themselves at the expense of Plaintiffs and Class Members.

787. Defendants' financial benefit resulting from their unlawful and inequitable acts is traceable to overpayments for indirect purchases of PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards by Plaintiffs.

788.    Plaintiffs and Class Members have conferred upon Defendants an economic benefit, profits from unlawful overcharges and monopoly profits, to the economic detriment of Plaintiffs.

789.    It would be futile for Plaintiffs and Class Members to seek a remedy from any party with whom they have privity of contract for their indirect purchases of PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards.

790.    It would be futile for Plaintiffs and Class Members to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards, as they are not liable and would not compensate Plaintiffs for unlawful conduct caused by Defendants.

791.    The economic benefits of overcharges and monopoly profits derived by Defendants through charging supra-competitive and artificially inflated prices for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards is a direct and proximate result of Defendants' unlawful conduct.

792.    The economic benefits derived by Defendants rightfully belong to Plaintiffs and Class Members, as they paid anticompetitive and monopolistic prices for at least six years, and continuing through the present, and it will continue to do so until the effects of Defendants' illegal and anticompetitive conduct cease.

793.    It would be inequitable under unjust enrichment principles for Defendants to be permitted to retain any of the overcharges for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards derived from Defendants' unlawful, unfair, and unconscionable methods, acts, and trade practices alleged in this Complaint.

794.    Defendants are aware of and appreciate the benefits bestowed upon them by Plaintiffs and Class Members.

795.    Plaintiffs and Class Members are entitled to restitution, and Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds they received.

796.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants traceable to Plaintiffs and Class Members.

797.    By engaging in the foregoing unlawful or inequitable conduct, which deprived Plaintiffs and Class Members of the opportunity to purchase PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in a free and competitive market and forced them to pay overcharges for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards, Defendants have been unjustly enriched in violation of the common law of the following states, as outlined below:

**Arizona**

798.    Defendants unlawfully overcharged Plaintiffs and Class Members, who purchased PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in Arizona at prices that were more than they would have been but for Defendants' conduct.

799.    Defendants have been enriched by revenue resulting from unlawful overcharges for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards.

800.    Plaintiffs and Class Members have been impoverished by the overcharges PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards resulting from Defendants' unlawful conduct.

801.    Defendants' enrichment and Plaintiffs' impoverishment are connected. Defendants have paid no consideration to any other person for any benefits they received from Plaintiffs.

802.    Plaintiffs and Class Members have conferred a direct economic benefit upon Defendants, in that revenues received by Defendants from media deals related to PPV offerings of PPV-Level MMA Cards and to Premium Online Streaming Services carrying PPV-Level MMA Cards at wrongfully inflated prices are directly related to, and caused the overcharges paid by Plaintiffs and

Class Members for the purchase of PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in Arizona.

803.    There is no justification for Defendants' receipt of the benefits causing their enrichment and Plaintiffs' and Class Members' impoverishment, because Plaintiffs paid supra-competitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from such unlawful overcharges.

804.    To the extent required, Plaintiffs' and Class Members' unjust enrichment claim is alleged in the alternative and where they have no remedy at law.

805.    Plaintiffs and Class Members seek all available relief under Arizona law.

**Arkansas**

806.    Defendants unlawfully overcharged Plaintiffs and Class Members, who purchased PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in Arkansas at prices that were more than they would have been but for Defendants' conduct.

807.    Plaintiffs and Class Members have conferred a direct economic benefit upon Defendants, in that revenues received by Defendants from media deals related to PPV offerings of PPV-Level MMA Cards and to Premium Online Streaming Services carrying PPV-Level MMA Cards at wrongfully inflated prices are directly related to, and caused the overcharges paid by Plaintiffs and Class Members for the purchase of PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in Arkansas.

808.    Defendants have been enriched by revenue resulting from unlawful overcharges for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in Arkansas, which revenue resulted from supra-competitive prices paid by Plaintiffs and Class Members, and which inured to Defendants' benefit.

809.    Defendants' enrichment has occurred at the expense of Plaintiffs and Class Members.

810.    Under the circumstances alleged, it is contrary to fundamental principles of equity, justice, and good conscience for Defendants to retain the revenue resulting from unlawful overcharges for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in Arkansas.

811.    To the extent required, Plaintiffs' and Class Members' unjust enrichment claim is alleged in the alternative and where they have no remedy at law.

812.    Plaintiffs and Class Members seek all available relief under Arkansas law.

**California**

813.    Defendants unlawfully overcharged Plaintiffs and Class Members, who purchased PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in California at prices that were more than they would have been but for Defendants' conduct.

814.    Defendants have been unjustly enriched by receiving an economic benefit at the expense of Plaintiffs and Class Members, in that revenues received by Defendants from media deals related to PPV offerings of PPV-Level MMA Cards and to Premium Online Streaming Services carrying PPV-Level MMA Cards at wrongfully inflated prices are directly related to, and caused the overcharges paid by Plaintiffs and Class Members for the purchase of PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in California.

815.    Under the circumstances, it would be inequitable and unjust for Defendants to retain such benefits without compensating Plaintiffs and Class Members.

816.    To the extent required, Plaintiffs' and Class Members' unjust enrichment claim is alleged in the alternative and where they have no remedy at law.

817.    Plaintiffs and Class Members seek all available relief under California law.

**Colorado**

818.   Defendants unlawfully overcharged Plaintiffs and Class Members, who purchased PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in Colorado at prices that were more than they would have been but for Defendants' conduct.

819.   Defendants have been enriched by receiving an economic benefit at the expense of Plaintiffs and Class Members, in that revenues received by Defendants from media deals related to PPV offerings of PPV-Level MMA Cards and to Premium Online Streaming Services carrying PPV-Level MMA Cards at wrongfully inflated prices are directly related to, and caused the overcharges paid by Plaintiffs and Class Members for the purchase of PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in Colorado.

820.   Under the circumstances, it would be inequitable and unjust for Defendants to retain such benefits without compensating Plaintiffs and Class Members, yet Defendants have retained that benefit without compensating Plaintiffs and the Class for its value.

821.   To the extent required, Plaintiffs' and Class Members' unjust enrichment claim is alleged in the alternative and where they have no remedy at law.

822.   Plaintiffs and Class Members seek all available relief under Colorado law.

**Connecticut**

823.   Defendants unlawfully overcharged Plaintiffs and Class Members, who purchased PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in Connecticut at prices that were more than they would have been but for Defendants' conduct.

824.   Defendants have received an economic benefit from Plaintiffs and Class Members, in that revenues received by Defendants from media deals related to PPV offerings of PPV-Level MMA Cards and to Premium Online Streaming Services carrying PPV-Level MMA Cards at wrongfully inflated prices are directly related to, and caused the overcharges paid by Plaintiffs and Class Members

for the purchase of PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in Connecticut.

825.    Defendants have retained that benefit without payment of its value, unjustly benefitting from media deals related to PPV offerings of PPV-Level MMA Cards and to Premium Online Streaming Services carrying PPV-Level MMA Cards at wrongfully inflated prices.

826.    This failure of payment for the value of this benefit was to the detriment of Plaintiffs and Class Members, who have paid overcharges for the purchase of PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards due to Defendants' media deals related to PPV offerings of PPV-Level MMA Cards and to Premium Online Streaming Services carrying PPV-Level MMA Cards.

827.    To the extent required, Plaintiffs' and Class Members' unjust enrichment claim is alleged in the alternative and where they have no remedy at law.

828.    Plaintiffs and Class Members seek all available relief under Connecticut law.

**Delaware**

829.    Defendants unlawfully overcharged Plaintiffs and Class Members, who purchased PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in Delaware at prices that were more than they would have been but for Defendants' conduct.

830.    Plaintiffs and Class Members have conferred a direct economic benefit upon Defendants, in that revenues received by Defendants from media deals related to PPV offerings of PPV-Level MMA Cards and to Premium Online Streaming Services carrying PPV-Level MMA Cards at wrongfully inflated prices are directly related to, and caused the overcharges paid by Plaintiffs and Class Members for the purchase of PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in Delaware.

831.    Defendants have been enriched by revenue resulting from media deals related to PPV offerings of PPV-Level MMA Cards and to Premium Online Streaming Services carrying PPV-Level MMA Cards at wrongfully inflated prices.

832.    Plaintiffs and Class Members have been impoverished by Defendants' media deals related to PPV offerings of PPV-Level MMA Cards and to Premium Online Streaming Services carrying PPV-Level MMA Cards at wrongfully inflated prices in that Plaintiffs paid overcharges for the purchase of PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in Delaware.

833.    Defendants' enrichment and Plaintiffs' and Class Members' impoverishment are connected. Defendants knew Plaintiffs and Class Members would end up paying more for the purchase of PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards due to Defendants' media deals related to PPV offerings of PPV-Level MMA Cards and to Premium Online Streaming Services carrying PPV-Level MMA Cards at wrongfully inflated prices. Yet Defendants paid no consideration for the benefits they received indirectly from Plaintiffs and Class Members.

834.    There is no justification for Defendants to receive the benefits causing their enrichment. Plaintiffs and Class Members paid overinflated prices for the purchase of PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards and it would be inequitable for Defendants to retain any revenue gained due to its wrongfully inflated media deals.

835.    To the extent required, Plaintiffs' and Class Members' unjust enrichment claim is alleged in the alternative and where they have no remedy at law.

836.    Plaintiffs and Class Members seek all available relief under Delaware law.

**District of Columbia**

837.    Defendants unlawfully overcharged Plaintiffs and Class Members, who purchased PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-

Level MMA Cards in D.C. at prices that were more than they would have been but for Defendants' conduct.

838.    Plaintiffs and Class Members have conferred a direct, measurable economic benefit upon Defendants, in that revenues received by Defendants from media deals related to PPV offerings of PPV-Level MMA Cards and to Premium Online Streaming Services carrying PPV-Level MMA Cards at wrongfully inflated prices are directly related to, and caused the overcharges paid by Plaintiffs and Class Members for the purchase of PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in D.C.

839.    Defendants retained the benefits bestowed upon them by Plaintiffs and Class Members.

840.    Under the circumstances, it would be inequitable and unjust for Defendants to retain such benefits without compensating Plaintiffs and Class Members, yet Defendants have retained that benefit without payment of its value.

841.    To the extent required, Plaintiffs' and Class Members' unjust enrichment claim is alleged in the alternative and where they have no remedy at law.

842.    Plaintiffs and Class Members seek all available relief under D.C. law.

**Hawaii**

843.    Defendants unlawfully overcharged Plaintiffs and Class Members, who purchased PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in Hawaii at prices that were more than they would have been but for Defendants' conduct.

844.    Plaintiffs and Class Members have conferred a direct economic benefit upon Defendants, in that revenues received by Defendants from media deals related to PPV offerings of PPV-Level MMA Cards and to Premium Online Streaming Services carrying PPV-Level MMA Cards at wrongfully inflated prices are directly related to, and caused the overcharges paid by Plaintiffs and

Class Members for the purchase of PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in Hawaii.

845.    Because Plaintiffs and Class Members paid more for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in Hawaii than they would have in the absence of Defendants' conduct, Plaintiffs suffered losses and were injured.

846.    It is unjust for Defendants to retain the benefits received without compensating Plaintiffs and Class Members.

847.    To the extent required, Plaintiffs' and Class Members' unjust enrichment claim is alleged in the alternative and where they have no remedy at law.

848.    Plaintiffs and Class Members seek all available relief under Hawaii law.

**Idaho**

849.    Defendants unlawfully overcharged Plaintiffs and Class Members, who purchased PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in Idaho at prices that were more than they would have been but for Defendants' conduct.

850.     Plaintiffs and Class Members have conferred a direct, measurable economic benefit upon Defendants, in that revenues received by Defendants from media deals related to PPV offerings of PPV-Level MMA Cards and to Premium Online Streaming Services carrying PPV-Level MMA Cards at wrongfully inflated prices are directly related to, and caused the overcharges paid by Plaintiffs and Class Members for the purchase of PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in Idaho.

851.    Defendants appreciated the benefits bestowed upon them by Plaintiffs and Class Members, as Defendants knew Plaintiffs and Class Members would end up paying more for the purchase of PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards.

852.    Under the circumstances, it would be inequitable and unjust for Defendants to retain such benefits without compensating Plaintiffs and Class Members, yet Defendants have retained that benefit without payment of its value.

853.    To the extent required, Plaintiffs' and Class Members' unjust enrichment claim is alleged in the alternative and where they have no remedy at law.

854.    Plaintiffs and Class Members seek all available relief under Idaho law.

**Indiana**

855.    Defendants unlawfully overcharged Plaintiffs and Class Members, who purchased PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in Indiana at prices that were more than they would have been but for Defendants' conduct.

856.    Plaintiffs and Class Members have conferred a direct and measurable economic benefit upon Defendants, in that revenues received by Defendants from media deals related to PPV offerings of PPV-Level MMA Cards and to Premium Online Streaming Services carrying PPV-Level MMA Cards at wrongfully inflated prices are directly related to, and caused the overcharges paid by Plaintiffs and Class Members for the purchase of PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in Indiana.

857.    Defendants have been enriched by revenue resulting from unlawful overcharges for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in Indiana, which revenue resulted from supra-competitive prices paid by Plaintiffs and Class Members, and which inured to Defendants' benefit.

858.    Defendants' enrichment has occurred at the expense of Plaintiffs and Class Members.

859.    Under the circumstances alleged, it is contrary to fundamental principles of equity, justice, and good conscience for Defendants to retain the revenue resulting from unlawful overcharges for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in Indiana.

860.    Given that Defendants abused their market power to enrich themselves at the expense of Plaintiffs and Class Members, natural and immutable justice dictates that restitution is appropriate.

861.    To the extent required, Plaintiffs' and Class Members' unjust enrichment claim is alleged in the alternative and where they have no remedy at law.

862.    Plaintiffs and Class Members seek all available relief under Indiana law.

**Iowa**

863.    Defendants unlawfully overcharged Plaintiffs and Class Members, who purchased PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in Iowa at prices that were more than they would have been but for Defendants' conduct.

864.    Plaintiffs and Class Members have conferred a direct economic benefit upon Defendants, in that revenues received by Defendants from media deals related to PPV offerings of PPV-Level MMA Cards and to Premium Online Streaming Services carrying PPV-Level MMA Cards at wrongfully inflated prices are directly related to, and caused the overcharges paid by Plaintiffs and Class Members for the purchase of PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in Iowa.

865.    Defendants have been enriched by revenue resulting from unlawful overcharges for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in Iowa, which revenue resulted from supra-competitive prices paid by Plaintiffs and Class Members, which inured to Defendants' benefit.

866.    Defendants' enrichment has occurred at the expense of Plaintiffs and Class Members.

867.    Defendants have received a benefit that in equity and good conscience belongs to Plaintiffs and Class Members. It is unjust for Defendants to be permitted to retain the revenue resulting from unlawful overcharges for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards.

868.    To the extent required, Plaintiffs' and Class Members' unjust enrichment claim is alleged in the alternative and where they have no remedy at law.

869.    Plaintiffs and Class Members seek all available relief under Iowa law.

**Kansas**

870.    Defendants unlawfully overcharged Plaintiffs and Class Members, who purchased PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in Kansas at prices that were more than they would have been but for Defendants' conduct.

871.    Plaintiffs and Class Members have conferred a direct, measurable economic benefit upon Defendants, in that revenues received by Defendants from media deals related to PPV offerings of PPV-Level MMA Cards and to Premium Online Streaming Services carrying PPV-Level MMA Cards at wrongfully inflated prices are directly related to, and caused the overcharges paid by Plaintiffs and Class Members for the purchase of PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in Kansas.

872.    Defendants appreciated the benefits bestowed upon them by Plaintiffs and Class Members, as Defendants knew Plaintiffs and Class Members would end up paying more for the purchase of PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards.

873.    Under the circumstances, it would be inequitable and unjust for Defendants to retain such benefits without compensating Plaintiffs and Class Members, yet Defendants have retained that benefit without payment of its value.

874.    To the extent required, Plaintiffs' and Class Members' unjust enrichment claim is alleged in the alternative and where they have no remedy at law.

875.    Plaintiffs and Class Members seek all available relief under Kansas law.

**Maine**

876.    Defendants unlawfully overcharged Plaintiffs and Class Members, who purchased PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in Maine at prices that were more than they would have been but for Defendants' conduct.

877.    Plaintiffs and Class Members have conferred a direct economic benefit upon Defendants, in that revenues received by Defendants from media deals related to PPV offerings of PPV-Level MMA Cards and to Premium Online Streaming Services carrying PPV-Level MMA Cards at wrongfully inflated prices are directly related to, and caused the overcharges paid by Plaintiffs and Class Members for the purchase of PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in Maine.

878.    Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to Plaintiff and the Class.

879.    Defendants were aware of and appreciated the benefit bestowed upon them by Plaintiffs and Class Members.

880.    Defendants were unjustly enriched at the expense of Plaintiffs and Class Members.

881.    Under the circumstances alleged, it is unjust and inequitable for Defendants to retain the benefit received without compensating Plaintiffs and Class Members.

882.    To the extent required, Plaintiffs' and Class Members' unjust enrichment claim is alleged in the alternative and where they have no remedy at law.

883.    Plaintiffs and Class Members seek all available relief under Maine law.

**Maryland**

884.    Defendants unlawfully overcharged Plaintiffs and Class Members, who purchased PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in Maryland at prices that were more than they would have been but for Defendants' conduct.

885.    Plaintiffs and Class Members have conferred a direct, measurable economic benefit upon Defendants, in that revenues received by Defendants from media deals related to PPV offerings of PPV-Level MMA Cards and to Premium Online Streaming Services carrying PPV-Level MMA Cards at wrongfully inflated prices are directly related to, and caused the overcharges paid by Plaintiffs and Class Members for the purchase of PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in Maryland.

886.    Defendants appreciated the benefits bestowed upon them by Plaintiffs and Class Members, as Defendants knew Plaintiffs and Class Members would end up paying more for the purchase of PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards.

887.    Under the circumstances, it would be inequitable and unjust for Defendants to retain such benefits without compensating Plaintiffs and Class Members, yet Defendants have retained that benefit without payment of its value.

888.    To the extent required, Plaintiffs' and Class Members' unjust enrichment claim is alleged in the alternative and where they have no remedy at law.

889.    Plaintiffs and Class Members seek all available relief under Maryland law.

**Massachusetts**

890.    Defendants unlawfully overcharged Plaintiffs and Class Members, who purchased PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in Massachusetts at prices that were more than they would have been but for Defendants' conduct.

891.    Plaintiffs and Class Members have conferred a direct economic benefit upon Defendants, in that revenues received by Defendants from media deals related to PPV offerings of PPV-Level MMA Cards and to Premium Online Streaming Services carrying PPV-Level MMA Cards at wrongfully inflated prices are directly related to, and caused the overcharges paid by Plaintiffs and

Class Members for the purchase of PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in Massachusetts.

892.    Defendants have been enriched by revenue resulting from unlawful overcharges for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in Massachusetts, which revenue resulted from supra-competitive prices paid by Plaintiffs and Class Members, and which inured to Defendants' benefit.

893.    Defendants knowingly accepted, retained, and appreciated the benefits bestowed upon them by Plaintiffs and Class Members.

894.    Defendants were unjustly enriched to the detriment of Plaintiffs and Class Members.

895.    Under the circumstances alleged, it is contrary to fundamental principles of equity, justice, and good conscience for Defendants to retain the benefits received without compensating Plaintiffs and Class Members.

896.    To the extent required, Plaintiffs' and Class Members' unjust enrichment claim is alleged in the alternative and where they have no remedy at law.

897.    Plaintiffs and Class Members seek all available relief under Massachusetts law.

**Michigan**

898.    Defendants unlawfully overcharged Plaintiffs and Class Members, who purchased PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in Michigan at prices that were more than they would have been but for Defendants' conduct.

899.    Plaintiffs and Class Members have conferred a direct economic benefit upon Defendants, in that revenues received by Defendants from media deals related to PPV offerings of PPV-Level MMA Cards and to Premium Online Streaming Services carrying PPV-Level MMA Cards at wrongfully inflated prices are directly related to, and caused the overcharges paid by Plaintiffs and Class Members for the purchase of PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in Michigan.

900.     Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to Plaintiff and the Class, resulting in an inequity to Plaintiffs and Class Members.

901.     Defendants were unjustly enriched at the expense of Plaintiffs and Class Members.

902.     Under the circumstances alleged, it is unjust and inequitable for Defendants to retain the benefit received without compensating Plaintiffs and Class Members.

903.     To the extent required, Plaintiffs' and Class Members' unjust enrichment claim is alleged in the alternative and where they have no remedy at law.

904.     Plaintiffs and Class Members seek all available relief under Michigan law.

**Minnesota**

905.     Defendants unlawfully overcharged Plaintiffs and Class Members, who purchased PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in Minnesota at prices that were more than they would have been but for Defendants' conduct.

906.     Plaintiffs and Class Members have conferred a direct economic benefit upon Defendants, in that revenues received by Defendants from media deals related to PPV offerings of PPV-Level MMA Cards and to Premium Online Streaming Services carrying PPV-Level MMA Cards at wrongfully inflated prices are directly related to, and caused the overcharges paid by Plaintiffs and Class Members for the purchase of PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in Minnesota.

907.     Defendants appreciated and knowingly accepted the benefits bestowed upon them by Plaintiffs and Class Members, for which Defendants have paid no consideration to any other person.

908.     Under the circumstances alleged, Defendants are not entitled to the benefits they have received, and it is inequitable for Defendants to accept and retain the benefits received without compensating Plaintiffs and Class Members.

909.     To the extent required, Plaintiffs' and Class Members' unjust enrichment claim is alleged in the alternative and where they have no remedy at law.

910.     Plaintiffs and Class Members seek all available relief under Minnesota law.

**Mississippi**

911.     Defendants unlawfully overcharged Plaintiffs and Class Members, who purchased PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in Mississippi at prices that were more than they would have been but for Defendants' conduct.

912.     Plaintiffs and Class Members have conferred a direct economic benefit upon Defendants, in that revenues received by Defendants from media deals related to PPV offerings of PPV-Level MMA Cards and to Premium Online Streaming Services carrying PPV-Level MMA Cards at wrongfully inflated prices are directly related to, and caused the overcharges paid by Plaintiffs and Class Members for the purchase of PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in Mississippi.

913.     Defendants retained the benefit of overcharges received in relation to PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in Mississippi, which in equity and good conscience belong to Plaintiffs and Class Members on account of Defendants' anticompetitive conduct.

914.     Under the circumstances alleged, it is inequitable for Defendants to retain the benefits received without compensating Plaintiffs and Class Members.

915.     To the extent required, Plaintiffs' and Class Members' unjust enrichment claim is alleged in the alternative and where they have no remedy at law.

916.     Plaintiffs and Class Members seek all available relief under Mississippi law.

**Missouri**

917.    Defendants unlawfully overcharged Plaintiffs and Class Members, who purchased PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in Missouri at prices that were more than they would have been but for Defendants' conduct.

918.    Defendants have been enriched by receiving an economic benefit at the expense of Plaintiffs and Class Members, in that revenues received by Defendants from media deals related to PPV offerings of PPV-Level MMA Cards and to Premium Online Streaming Services carrying PPV-Level MMA Cards at wrongfully inflated prices are directly related to, and caused the overcharges paid by Plaintiffs and Class Members for the purchase of PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in Missouri.

919.    Under the circumstances, it would be inequitable and unjust for Defendants to retain such benefits without compensating Plaintiffs and Class Members, yet Defendants have retained that benefit without payment of its value.

920.    To the extent required, Plaintiffs' and Class Members' unjust enrichment claim is alleged in the alternative and where they have no remedy at law.

921.    Plaintiffs and Class Members seek all available relief under Missouri law.

**Montana**

922.    Defendants unlawfully overcharged Plaintiffs and Class Members, who purchased PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in Montana at prices that were more than they would have been but for Defendants' conduct.

923.    Defendants have been enriched by receiving an economic benefit at the expense of Plaintiffs and Class Members, in that revenues received by Defendants from media deals related to PPV offerings of PPV-Level MMA Cards and to Premium Online Streaming Services carrying PPV-Level MMA Cards at wrongfully inflated prices are directly related to, and caused the overcharges paid

by Plaintiffs and Class Members for the purchase of PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in Montana.

924.  Defendants appreciated the benefits bestowed upon them by Plaintiffs, as Defendants knew Plaintiffs would end up paying more for the purchase of PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards.

925.  Under the circumstances, it would be inequitable and unjust for Defendants to profit from their wrongful acts and to retain such benefits without compensating Plaintiffs and Class Members, yet Defendants have retained that benefit without payment of its value.

926.  To the extent required, Plaintiffs' and Class Members' unjust enrichment claim is alleged in the alternative and where they have no remedy at law.

927.  Plaintiffs and Class Members seek all available relief under Montana law.

**Nebraska**

928.  Defendants unlawfully overcharged Plaintiffs and Class Members, who purchased PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in Nebraska at prices that were more than they would have been but for Defendants' conduct.

929.  Plaintiffs and Class Members have conferred a direct economic benefit upon Defendants, in that revenues received by Defendants from media deals related to PPV offerings of PPV-Level MMA Cards and to Premium Online Streaming Services carrying PPV-Level MMA Cards at wrongfully inflated prices are directly related to, and caused the overcharges paid by Plaintiffs and Class Members for the purchase of PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in Nebraska.

930.  Defendants have been enriched by revenue resulting from unlawful overcharges for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in Nebraska, which revenue resulted from supra-competitive prices paid by Plaintiffs and Class Members, and which inured to Defendants' benefit.

931.    Defendants knowingly retained this revenue and have paid no consideration to any other person for any of the benefits they have received from Plaintiffs and Class Members.

932.    Under the circumstances alleged, it is inequitable for Defendants to retain the benefits received without compensating Plaintiffs and Class Members.

933.    In justice and fairness, Defendants should disgorge such money and remit the overcharged payments back to Plaintiffs and Class Members.

934.    To the extent required, Plaintiffs' and Class Members' unjust enrichment claim is alleged in the alternative and where they have no remedy at law.

935.    Plaintiffs and Class Members seek all available relief under Nebraska law.

**Nevada**

936.    Defendants unlawfully overcharged Plaintiffs and Class Members, who purchased PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in Nevada at prices that were more than they would have been but for Defendants' conduct.

937.    Plaintiffs and Class Members have conferred a direct economic benefit upon Defendants, in that revenues received by Defendants from media deals related to PPV offerings of PPV-Level MMA Cards and to Premium Online Streaming Services carrying PPV-Level MMA Cards at wrongfully inflated prices are directly related to, and caused the overcharges paid by Plaintiffs and Class Members for the purchase of PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in Nevada.

938.    Defendants have been enriched by revenue resulting from unlawful overcharges for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in Nevada, which revenue resulted from supra-competitive prices paid by Plaintiffs and Class Members, and which inured to Defendants' benefit.

939. Defendants knowingly accepted, retained, and appreciated the benefits bestowed upon them by Plaintiffs and Class Members, for which Defendants have paid no consideration to any other person.

940. Under the circumstances alleged, it is contrary to fundamental principles of equity, justice, and good conscience for Defendants to retain the benefits received without compensating Plaintiffs and Class Members.

941. To the extent required, Plaintiffs' and Class Members' unjust enrichment claim is alleged in the alternative and where they have no remedy at law.

942. Plaintiffs and Class Members seek all available relief under Nevada law.

**New Hampshire**

943. Defendants unlawfully overcharged Plaintiffs and Class Members, who purchased PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in New Hampshire at prices that were more than they would have been but for Defendants' conduct.

944. Defendants have received an economic benefit from Plaintiffs and Class Members, in that revenues received by Defendants from media deals related to PPV offerings of PPV-Level MMA Cards and to Premium Online Streaming Services carrying PPV-Level MMA Cards at wrongfully inflated prices are directly related to, and caused the overcharges paid by Plaintiffs and Class Members for the purchase of PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in New Hampshire.

945. Defendants thus received this benefit from Plaintiffs through Defendants' wrongful acts in furtherance of the Scheme and through passive acceptance of the inflated income paid to Defendants through the Scheme.

946. Under the circumstances, it would be unconscionable for Defendants to retain such benefits without compensating Plaintiffs and Class Members, yet Defendants have retained that benefit without payment of its value.

947.    To the extent required, Plaintiffs' and Class Members' unjust enrichment claim is alleged in the alternative and where they have no remedy at law.

948.    Plaintiffs and Class Members seek all available relief under New Hampshire law.

**New Jersey**

949.    Defendants unlawfully overcharged Plaintiffs, who purchased PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in New Jersey at prices that were more than they would have been but for Defendants' conduct.

950.    Defendants have received an economic benefit from Plaintiffs, in that revenues received by Defendants from media deals related to PPV offerings of PPV-Level MMA Cards and to Premium Online Streaming Services carrying PPV-Level MMA Cards at wrongfully inflated prices are directly related to, and caused the overcharges paid by Plaintiffs for the purchase of PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in New Jersey.

951.    Under the circumstances, it would be inequitable and unjust for Defendants to retain such benefits without compensating Plaintiffs, yet Defendants have retained that benefit without payment of its value.

952.    To the extent required, Plaintiffs' and Class Members' unjust enrichment claim is alleged in the alternative and where they have no remedy at law.

953.    Plaintiffs and Class Members seek all available relief under New Jersey law.

**New Mexico**

954.    Defendants unlawfully overcharged Plaintiffs and Class Members, who purchased PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in New Mexico at prices that were more than they would have been but for Defendants' conduct.

955.    Plaintiffs and Class Members have conferred a direct economic benefit upon Defendants, in that revenues received by Defendants from media deals related to PPV offerings of PPV-Level MMA Cards and to Premium Online Streaming Services carrying PPV-Level MMA Cards at wrongfully inflated prices are directly related to, and caused the overcharges paid by Plaintiffs and Class Members for the purchase of PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in New Mexico.

956.    Defendants have been enriched by revenue resulting from unlawful overcharges for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in New Mexico, which revenue resulted from supra-competitive prices paid by Plaintiffs and Class Members, and which inured to Defendants' benefit.

957.    Defendants knowingly accepted, retained, and appreciated the benefits bestowed upon them by Plaintiffs and Class Members, for which Defendants have paid no consideration to any other person.

958.    Under the circumstances alleged, it is unjust and inequitable for Defendants to retain the benefits received without compensating Plaintiffs and Class Members.

959.    To the extent required, Plaintiffs' and Class Members' unjust enrichment claim is alleged in the alternative and where they have no remedy at law.

960.    Plaintiffs and Class Members seek all available relief under New Mexico law.

**New York**

961.    Defendants unlawfully overcharged Plaintiffs and Class Members, who purchased PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in New York at prices that were more than they would have been but for Defendants' conduct.

962.    Plaintiffs and Class Members have conferred a direct economic benefit upon Defendants, in that revenues received by Defendants from media deals related to PPV offerings of PPV-Level MMA Cards and to Premium Online Streaming Services carrying PPV-Level MMA Cards

at wrongfully inflated prices are directly related to, and caused the overcharges paid by Plaintiffs and Class Members for the purchase of PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in New York.

963.    Defendants have been enriched by revenue resulting from unlawful overcharges for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in New York, which revenue resulted from supra-competitive prices paid by Plaintiffs and Class Members, and which inured to Defendants' benefit.

964.    Defendants' enrichment has occurred at the expense of Plaintiffs and Class Members.

965.    Under the circumstances alleged, it is contrary to fundamental principles of equity, justice, and good conscience for Defendants to retain the revenue resulting from unlawful overcharges for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in New York.

966.    To the extent required, Plaintiffs' and Class Members' unjust enrichment claim is alleged in the alternative and where they have no remedy at law.

967.    Plaintiffs and Class Members seek all available relief under New York law.

**North Carolina**

968.    Defendants unlawfully overcharged Plaintiffs, who purchased PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in North Carolina at prices that were more than they would have been but for Defendants' conduct.

969.    Plaintiffs have conferred a direct, measurable economic benefit upon Defendants, in that revenues received by Defendants from media deals related to PPV offerings of PPV-Level MMA Cards and to Premium Online Streaming Services carrying PPV-Level MMA Cards at wrongfully inflated prices are directly related to, and caused the overcharges paid by Plaintiffs for the purchase of PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in North Carolina.

970.    Defendants consciously accepted the benefits bestowed upon them by Plaintiffs, as Defendants knew Plaintiffs would end up paying more for the purchase of PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards.

971.    Plaintiffs did not confer this benefit gratuitously, as they did not pay overinflated prices for the purchase of PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in North Carolina to benefit Defendants intentionally.

972.    To the extent required, Plaintiffs' and Class Members' unjust enrichment claim is alleged in the alternative and where they have no remedy at law.

973.    Plaintiffs and Class Members seek all available relief under North Carolina law.

**North Dakota**

974.    Defendants unlawfully overcharged Plaintiffs, who purchased PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in North Dakota at prices that were more than they would have been but for Defendants' conduct.

975.    Plaintiffs and Class Members have conferred a direct economic benefit upon Defendants, in that revenues received by Defendants from media deals related to PPV offerings of PPV-Level MMA Cards and to Premium Online Streaming Services carrying PPV-Level MMA Cards at wrongfully inflated prices are directly related to, and caused the overcharges paid by Plaintiffs for the purchase of PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in North Dakota.

976.    Defendants have been enriched by revenue resulting from media deals related to PPV offerings of PPV-Level MMA Cards and to Premium Online Streaming Services carrying PPV-Level MMA Cards at wrongfully inflated prices.

977.    Plaintiffs have been impoverished by Defendants' media deals related to PPV offerings of PPV-Level MMA Cards and to Premium Online Streaming Services carrying PPV-Level MMA Cards at wrongfully inflated prices in that Plaintiffs paid overcharges for the purchase of PPV offerings

of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in North Dakota.

978.    Defendants' enrichment and Plaintiffs' impoverishment are connected. Defendants knew Plaintiffs would end up paying more for the purchase of PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards due to Defendants' media deals related to PPV offerings of PPV-Level MMA Cards and to Premium Online Streaming Services carrying PPV-Level MMA Cards at wrongfully inflated prices. Yet Defendants paid no consideration for the benefits they received indirectly from Plaintiffs.

979.    There is no justification for Defendants to receive the benefits causing their enrichment. Plaintiffs paid overinflated prices for the purchase of PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards and it would be inequitable for Defendants to retain any revenue gained due to their wrongfully inflated media deals.

980.    To the extent required, Plaintiffs' and Class Members' unjust enrichment claim is alleged in the alternative and where they have no remedy at law.

981.    Plaintiffs and Class Members seek all available relief under North Dakota law.

**Rhode Island**

982.    Defendants unlawfully overcharged Plaintiffs and Class Members, who purchased PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in Rhode Island at prices that were more than they would have been but for Defendants' conduct.

983.    Plaintiffs and Class Members have conferred a direct economic benefit upon Defendants, in that revenues received by Defendants from media deals related to PPV offerings of PPV-Level MMA Cards and to Premium Online Streaming Services carrying PPV-Level MMA Cards at wrongfully inflated prices are directly related to, and caused the overcharges paid by Plaintiffs for the purchase of PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in Rhode Island.

984.    Defendants appreciated the benefits bestowed upon them by Plaintiffs, as Defendants knew Plaintiffs would end up paying more for the purchase of PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards.

985.    Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and Class Members, yet Defendants have retained that benefit without payment of its value.

986.    To the extent required, Plaintiffs' and Class Members' unjust enrichment claim is alleged in the alternative and where they have no remedy at law.

987.    Plaintiffs and Class Members seek all available relief under Rhode Island law.

**South Carolina**

988.    Defendants unlawfully overcharged Plaintiffs and Class Members, who purchased PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in South Carolina at prices that were more than they would have been but for Defendants' conduct.

989.    Plaintiffs and Class Members have conferred a direct, non-gratuitous economic benefit upon Defendants, in that revenues received by Defendants from media deals related to PPV offerings of PPV-Level MMA Cards and to Premium Online Streaming Services carrying PPV-Level MMA Cards at wrongfully inflated prices are directly related to, and caused the overcharges paid by Plaintiffs and Class Members for the purchase of PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in South Carolina.

990.    Defendants have been enriched by revenue resulting from unlawful overcharges for PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in South Carolina, which revenue resulted from supra-competitive prices paid by Plaintiffs and Class Members, which inured to Defendants' benefit.

991.    Defendants' enrichment has occurred at the expense of Plaintiffs and Class Members.

992.    Under these circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and Class Members for their value.

993.    To the extent required, Plaintiffs' and Class Members' unjust enrichment claim is alleged in the alternative and where they have no remedy at law.

994.    Plaintiffs and Class Members seek all available relief under South Carolina law.

**South Dakota**

995.    Defendants unlawfully overcharged Plaintiffs and Class Members, who purchased PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in South Dakota at prices that were more than they would have been but for Defendants' conduct.

996.    Plaintiffs and Class Members have conferred a direct economic benefit upon Defendants, in that revenues received by Defendants from media deals related to PPV offerings of PPV-Level MMA Cards and to Premium Online Streaming Services carrying PPV-Level MMA Cards at wrongfully inflated prices are directly related to, and caused the overcharges paid by Plaintiffs for the purchase of PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in South Dakota.

997.    Defendants knew of the benefits bestowed upon them by Plaintiffs, as Defendants knew Plaintiffs would end up paying more for the purchase of PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards.

998.    Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs, yet Defendants have retained that benefit without payment of its value.

999.    To the extent required, Plaintiffs' and Class Members' unjust enrichment claim is alleged in the alternative and where they have no remedy at law.

1000.    Plaintiffs and Class Members seek all available relief under South Dakota law.

**Tennessee**

1001.   Defendants unlawfully overcharged Plaintiffs and Class Members, who purchased PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in Tennessee at prices that were more than they would have been but for Defendants' conduct.

1002.   Plaintiffs and Class Members have conferred a direct, measurable economic benefit upon Defendants, in that revenues received by Defendants from media deals related to PPV offerings of PPV-Level MMA Cards and to Premium Online Streaming Services carrying PPV-Level MMA Cards at wrongfully inflated prices are directly related to, and caused the overcharges paid by Plaintiffs and Class Members for the purchase of PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in Tennessee.

1003.   Defendants appreciated the benefits bestowed upon them by Plaintiffs and Class Members, as Defendants knew Plaintiffs and Class Members would end up paying more for the purchase of PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards.

1004.   Plaintiffs and Class Members have exhausted all remedies against the entities from whom they directly purchased PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards, in that Plaintiffs and Class Members cannot bring claims against entities that—to the best of Plaintiffs' knowledge at this time—are not responsible for, and did not engage in, the Defendants' monopolistic Scheme.

1005.   Under the circumstances, it would be inequitable and unjust for Defendants to retain such benefits without compensating Plaintiffs and Class Members, yet Defendants have retained that benefit without payment of its value.

1006.   To the extent required, Plaintiffs' and Class Members' unjust enrichment claim is alleged in the alternative and where they have no remedy at law.

1007.   Plaintiffs and Class Members seek all available relief under Tennessee law.

**Utah**

1008.   Defendants unlawfully overcharged Plaintiffs and Class Members, who purchased PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in Utah at prices that were more than they would have been but for Defendants' conduct.

1009.   Plaintiffs and Class Members have conferred a direct economic benefit upon Defendants, in that revenues received by Defendants from media deals related to PPV offerings of PPV-Level MMA Cards and to Premium Online Streaming Services carrying PPV-Level MMA Cards at wrongfully inflated prices are directly related to, and caused the overcharges paid by Plaintiffs for the purchase of PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in Utah.

1010.   Defendants knew of or appreciated the benefits bestowed upon them by Plaintiffs, as Defendants knew Plaintiffs would end up paying more for the purchase of PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards.

1011.   Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs, yet Defendants have retained that benefit without payment of its value.

1012.   To the extent required, Plaintiffs' and Class Members' unjust enrichment claim is alleged in the alternative and where they have no remedy at law.

1013.   Plaintiffs and Class Members seek all available relief under Utah law.

**Vermont**

1014.   Defendants unlawfully overcharged Plaintiffs and Class Members, who purchased PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in Vermont at prices that were more than they would have been but for Defendants' conduct.

1015. Plaintiffs and Class Members have conferred a direct economic benefit upon Defendants, in that revenues received by Defendants from media deals related to PPV offerings of PPV-Level MMA Cards and to Premium Online Streaming Services carrying PPV-Level MMA Cards at wrongfully inflated prices are directly related to, and caused the overcharges paid by Plaintiffs for the purchase of PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in Vermont.

1016. Defendants accepted the benefits bestowed upon them by Plaintiffs, as Defendants knew Plaintiffs would end up paying more for the purchase of PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards.

1017. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs, yet Defendants have retained that benefit without payment of its value.

1018. To the extent required, Plaintiffs' and Class Members' unjust enrichment claim is alleged in the alternative and where they have no remedy at law.

1019. Plaintiffs and Class Members seek all available relief under Vermont law.

**West Virginia**

1020. Defendants unlawfully overcharged Plaintiffs and Class Members, who purchased PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in West Virginia at prices that were more than they would have been but for Defendants' conduct.

1021. Plaintiffs and Class Members have conferred a direct economic benefit upon Defendants, in that revenues received by Defendants from media deals related to PPV offerings of PPV-Level MMA Cards and to Premium Online Streaming Services carrying PPV-Level MMA Cards at wrongfully inflated prices are directly related to, and caused the overcharges paid by Plaintiffs for the purchase of PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in West Virginia.

1022.   Defendants appreciated the benefits bestowed upon them by Plaintiffs, as Defendants knew Plaintiffs would end up paying more for the purchase of PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards.

1023.   Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs, yet Defendants have retained that benefit without payment of its value.

1024.   To the extent required, Plaintiffs' and Class Members' unjust enrichment claim is alleged in the alternative and where they have no remedy at law.

1025.   Plaintiffs and Class Members seek all available relief under West Virginia law.

**Wisconsin**

1026.   Defendants unlawfully overcharged Plaintiffs and Class Members, who purchased PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in Wisconsin at prices that were more than they would have been but for Defendants' conduct.

1027.   Plaintiffs and Class Members have conferred a direct economic benefit upon Defendants, in that revenues received by Defendants from media deals related to PPV offerings of PPV-Level MMA Cards and to Premium Online Streaming Services carrying PPV-Level MMA Cards at wrongfully inflated prices are directly related to, and caused the overcharges paid by Plaintiffs and Class Members for the purchase of PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards in Wisconsin.

1028.   Defendants appreciated the benefits bestowed upon them by Plaintiffs and Class Members, as Defendants knew Plaintiffs would end up paying more for the purchase of PPV offerings of PPV-Level MMA Cards and Premium Online Streaming Services carrying PPV-Level MMA Cards.

1029.   Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and Class Members.

1030. To the extent required, Plaintiffs' and Class Members' unjust enrichment claim is alleged in the alternative and where they have no remedy at law.

1031. Plaintiffs and Class Members seek all available relief under Wisconsin law.

## XV.    DEMAND FOR JUDGMENT

WHEREFORE, Plaintiffs on behalf of themselves and the Putative Classes, ask this Court for a judgment that will:

a. Certify the Putative Classes pursuant to Fed. R. Civ. P. 23, and appoint Plaintiffs and their attorneys as class representatives and class counsel, respectively;

b. Hold Defendants jointly and severally liable under the relevant state antitrust, consumer protection, and unjust enrichment laws for damages suffered by the Putative Classes due to Defendants' Scheme;

c. Award damages and/or restitution and/or disgorgement to the Putative Classes under the relevant state antitrust, unfair trade practices, consumer protection, and unjust enrichment laws,

d. Award actual, double, treble, and exemplary damages as permitted,

e. Award pre- and post-judgment interest as permitted,

f. Award Plaintiffs and the Putative Classes the costs and fees, including attorneys' fees, incurred in bringing this action,

g. Enjoin Defendants from continuing the unlawful conduct,

h. Issue a declaratory judgment that Defendants' conduct is unlawful,

i. Order equitable relief; and

j. Order such other relief as the Court holds is necessary and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury as to all issues so triable.

Dated:  February 26, 2026

Respectfully submitted,

MORRIS, SULLIVAN & LEMKUL, LLP

*/s/ Christopher Turtzo*

WILL LEMKUL (NV Bar No. 6715)
lemkul@morrissullivanlaw.com
CHRISTOPHER TURTZO (NV Bar No. 10253)
turtzo@morrissullivanlaw.com
**MORRIS, SULLIVAN & LEMKUL, LLP**
3960 Howard Hughes Parkway, Suite 400
Las Vegas, NV 89169
Telephone: (702) 405-8100
Facsimile: (702) 405-8101

GARRETT R. BROSHUIS (will comply with LR
IA 11-2 within 10 days)
gbroshuis@koreintillery.com
CAROL O'KEEFE (will comply with LR IA 11-2
within 10 days)
cokeefe@koreintillery.com
DEVIN DIPPOLD (will comply with LR IA 11-2
within 10 days)
ddippold@koreintillery.com
**KOREIN TILLERY, LLC**
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Telephone:  (314) 241-4844
Facsimile: (314) 241-3525

PAMELA YAACOUB (will comply with LR IA
11-2 within 10 days)
pyaacoub@koreintillery.com
**KOREIN TILLERY, LLC**
205 North Michigan Avenue, Suite 1950
Chicago, IL 60601
Telephone: (312) 641-9750
Facsimile: (314) 241-3525

*Attorneys for Plaintiffs Alana Costantino*
*and Kyle Nicholson, on behalf of themselves*
*and all those similarly situated*

COMPLAINT